UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DOUGLAS TOPLIFF, Individually and
as Parent of Tanisha Topliff,
                Plaintiff,

       v.                                    6:04-CV-0297
                                                (GHL)
WAL-MART STORES EAST LP,
                     Defendant.
_____

APPEARANCES:                             OF COUNSEL:

ABDELLA LAW OFFICES               GEORGE ABDELLA, ESQ.
  Counsel for Plaintiff
8 West Fulton Street
P.O. Box 673
Gloversville, NY 12078-0006

OFFICE OF JOHN W. BAILEY & ASSOCIATES, P.C.   JOHN W. BAILEY, ESQ.
  Counsel for Defendant                  NANNETTE R. KELLEHER, ESQ.
Pine West Plaza 2
Washington Avenue Extension
Albany, NY 12205

GEORGE H. LOWE, United States Magistrate Judge

## DECISION and ORDER

     This action is before me on consent of the parties, pursuant to 28 U.S.C. § 636(c) and

Local Rule N.D.N.Y. 72.2(b).  (Dkt. No. 23.)  Currently pending are Defendant's motion to

exclude the testimony of Plaintiff's expert Meyer R. Rosen, its motion for summary judgment,

and its motion to bifurcate the trial in this action into two parts (on the issues of liability and

damages).  (Dkt. Nos. 44-46.)  For the reasons stated below, I grant in part and deny in part

Defendant's motion to preclude, I grant Defendant's motion for summary judgment, and I deny

as moot Defendant's motion to bifurcate.

**Table of Contents**

I.    BACKGROUND.................................................................................4

II.   MOTION TO EXCLUDE EXPERT TESTIMONY.................................................5

      A.   Mr. Rosen's Qualifications.......................................................7

           1.   Qualifications Regarding Flammability of Consumer Apparel........................9
           2.   Qualifications Regarding Use of Flame Retardants on
                Consumer Apparel..........................................................16
           3.   Qualifications Regarding Warnings on Consumer Apparel............................23
           4.   Qualifications Regarding Fire Investigation...................................30

      B.   Reliability of Mr. Rosen's Proffered Testimony.........................................34

           1.   Reliability of Testimony Regarding Flammability of
                Consumer Apparel..........................................................35
                a.   Testing Performed by Mr. Rosen....................................35
                b.   Arguments and Analysis.............................................38
           2.   Reliability of Testimony Regarding Use of Flame Retardants on
                Consumer Apparel..........................................................42
           3.   Reliability of Testimony Regarding Warnings on Consumer Apparel...........45
           4.   Reliability of Testimony Regarding Fire Investigation.............................47

III.  MOTION FOR SUMMARY JUDGMENT.............................................................52

      A.   Plaintiff's Claim of Strict Liability.................................................52
           1.   Manufacturing Defect......................................................52
           2.   Design Defect.............................................................57
                a.   Product's Utility to Public as Whole, and Product's Utility to
                     Individual User........................................................58
                b.   Likelihood that Product Will Cause Injury..........................59
                c.   Availability of Safer Design........................................60
                d.   Possibility of Designing and Manufacturing Product
                     So that It Is Safer but Remains Functional and
                     Reasonably Priced, and Manufacturer's Ability to
                     Spread Cost of any Safety-Related Design Changes..........................65
                e.   Degree of Awareness of Product's Potential Danger that Can
                     Reasonably Be Attributed to Injured User..........................67
           3.   Inadequate Warnings.......................................................67

B.      Plaintiff's Claim of Negligent Failure to Warn.......................................68

      1.      Relevant Legal Standard.................................................68
      2.      Danger from "Melt Drip" Effect of 100% Polyester.....................75
           a.      No Record Evidence of Such Danger...............................75
                i.      Types of Evidence that Typically Might Suffice to
                      Create Issue of Fact Under Similar Circumstances.................77
                ii.     Plaintiff's Arguments.........................................80
           b.      In any Event, No Record Evidence of Knowledge or
                "Reason to Know" of Such Danger....................................87
                i.      Types of Evidence that Typically Might Suffice to
                      Create Issue of Fact Under Similar Circumstances.................88
                ii.     Plaintiff's Arguments.........................................88
      3.      Danger from Loose-Fit and/or Fuzziness of Jogging Suit.............94
           a.      Preclusion of Assertion of Such Claim.............................94
           b.      In any Event, No Record Evidence of Such Danger.................95
           c.      In any Event, No Record Evidence of Knowledge or
                "Reason to Know" of Such Danger..................................100
      4.      Grounds on Which Defendant's Motion Is *Not* Decided............102

C.      Plaintiff's Claim of Negligent Failure to Inspect and/or Test...................107

D.      Plaintiff's Claim of Breach of Implied Warranty of Merchantability......................111

E.      Plaintiff's Derivative Claim for Medical Expenses, Loss of Services
      and Loss of Companionship..........................................................115

IV.     MOTION TO BIFURCATE TRIAL..............................................................117

## I.      BACKGROUND

This action, sounding in strict liability, negligence and breach of warranty, arises out of

an accident occurring on October 16, 2002, in which then-five-year-old Tanisha Topliff

("Tanisha") was severely burned and permanently scarred in an accident that occurred at the

home of her parents, Douglas and Margaret Topliff.  (Dkt. No. 1, ¶¶ 3, 17 [Plf.'s Compl.]; Dkt.

No. 44, Part 8, ¶ 17.a. [Plf.'s Responses to Def.'s Interrogatories].)[1]  The plaintiff in this action is

Tanisha's father, Douglas, who is suing on behalf of Tanisha as her parent, and on behalf of

himself under a derivative theory of liability.  (Dkt. No. 1, ¶¶ 1, 36-37 [Plf.'s Compl.].)

Generally, Plaintiff alleges that the accident occurred when the 100% polyester jogging

suit that Tanisha was wearing at the time ignited and melted upon contact with hot air and debris

from a wood-burning stove, caused by a "back draft" from the stove.  (*Id.* at ¶ 17.)  Plaintiff

further alleges that Defendant, Wal-Mart Stores East LP ("Wal-Mart" or "Defendant"), was the

retailer of the 100% polyester jogging suit in question.  (*Id.* at ¶¶ 4-6, 17.)  Plaintiff alleges that

the jogging suit was purchased by Beatrice Topliff, Tanisha's grandmother, at one of Defendant's

stores, in December of 2001, as a gift for Tanisha.[2]

More specifically, Plaintiff's Complaint asserts five causes of action against Defendant:

(1) a cause of action for strict products liability alleging that the jogging suit in question

contained a manufacturing defect, a design defect, and/or an inadequate warning; (2) a cause of

action for negligent failure to warn Plaintiff of the alleged defect; (3) a cause of action for

---

[1]      (*See also* Dkt. No. 46, Part 3, at 1 [Def.'s Mem. of Law in Supp. of Mtn. to Bifurcate, conceding burns and scarring].)

[2]      (Dkt. No. 8, ¶¶ 7.f., 8 [Plf.'s Response to Defendant's Interrogatories].)

negligent failure to inspect and/or test the jogging suit in question for the alleged defect before sale; (4) a cause of action for breach of implied warranty of merchantability under N.Y. U.C.C. § 2-314; and (5) a derivative cause of action for medical expenses, loss of services and loss of companionship.  (*See generally id.* at ¶¶ 6-37.)[3]

## II.   MOTION TO EXCLUDE EXPERT TESTIMONY

In support of his claims, Plaintiff relies on the expert testimony of Meyer R. Rosen, M.S., of InterCity Testing & Consulting.  Among other things, Mr. Rosen's Expert Report asserts that the 100% polyester jogging suit in question was defective in that it did not contain a fire retardant, the presence of which would have caused the fire to be extinguished before the "melt-drip" feature of the jogging suit's fabric burned Tanisha.  (Dkt. No. 44, Part 42, at 2-7, 9-11 [Expert Report of Meyer Rosen].)[4]  Mr. Rosen also asserts that Defendant failed to provide

---

[3]     Plaintiff's Complaint asserts no claims against (1) the manufacturer of the jogging suit in question, Killara Enterprises Ltd., of Taipei, Taiwan, (2) the importer or distributor of the jogging suit in question, Apparel Associates, LLC, of New York City, (3) the apparent manufacturer of the "Avenger"-brand wood-burning stove alleged to have "back drafted," National Stove Works, of Cobleskill, New York, or (4) the individual who allegedly gave Plaintiff that wood-burning stove, Walter Buyce.  (Dkt. No. 51, Part 9 ["Vendor Agreement" and "Sales Confirmation"]; Dkt. No. 44, Part 33, at 4 [Exhibits to Expert Report of Genevieve J. Bures]; Dkt. No. 44, Part 13, ¶ 22.c [Plf.'s Supplemental Response to Defendant's Interrogatores]).

[4]     This interpretation of Mr. Rosen's expert opinion is consistent with my interpretation of the legal arguments made by Plaintiff's counsel, who argues that the jogging suit in question could have been designed more safely in that, had a fire-retardant been used in the manufacturing of the jogging suit, the fire in question would have been extinguished before the "melt-drip" feature of the jogging suit's fabric burned Tanisha.  (*See*, *e.g.*, Dkt. No. 58, at 2 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude, citing case in which the plaintiff's expert established that "the synthetics used in the exhibit tend to melt rather than burn to ash and produce high temperatures" and that "when ignited and not immediately extinguished, severe and deep burns are inflicted upon the body of the wearer"]; Dkt. No. 58, at 2, 4 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude, arguing, "It is the contention of the plaintiff's expert that the industry standards of flammability are

proper warnings on the jogging suit as to the inherent danger posed by the "melt-drip" property of its 100% polyester fabric.  (*Id.*)

Generally, Defendant argues that the Court should not allow Mr. Rosen to testify at trial as an expert for three reasons.  First, argues Defendant, under Rule 702 of the Federal Rules of Evidence, Mr. Rosen is not "qualified" to testify as an expert in the subjects he proposes (i.e., the subjects of fire investigation, the flammability of apparel, the use of flame retardants in or on apparel, and the use, placement or composition of warnings for apparel), because he does not possess the necessary "knowledge, skill, experience, training, or education" in those subjects.  Second, argues Defendant, under Rules 702 and 703 of the Federal Rules of Evidence, Mr. Rosen's methods are not "reliable" because he altered standard testing protocols to achieve the results he desired, and he relied on insufficient facts to reconstruct the alleged incident that injured Tanisha.  Third, argues Defendant, under Rules 703 and 403 of the Federal Rules of Evidence, Mr. Rosen's proposed testimony should be excluded since the probative value of that testimony is substantially outweighed by its prejudicial effect upon Defendant.

"[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a) [of the Federal Rules of Evidence].  Under that Rule, the proponent [of the expert testimony] has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."  Fed. R. Evid. 702, Advisory Committee Notes: 2000

---

devised by the industry itself and that, while there is no requirement that 100% polyester garments be tested for flammability, the fact that the garment in question ignited as it did indicates to him that no fire retardants were added during the manufacturing of the garment. . . . [T]he plaintiff can prove that the subject garment was not reasonably safe and that a flame retardant should have been added to the manufacturing process."]; *see also* Dkt. No. 54, ¶ 18 [Affid. of Robert Abdella, arguing that "there is no other explanation [as to defect] but that there was insufficient fire retardant on the garment when it left the manufacturer"].)

6

Amendments.[5]  It is true that, generally, such a proponent is aided by the "presumption of

admissibility of evidence."[6]  However, even this presumption will not rescue a proponent who

has failed to adduce sufficient evidence in support of his position.[7]  Keeping these general points

in mind, I proceed to an analysis of the particular issues raised by Defendant's motion.

### A.      Mr. Rosen's Qualifications

_____Under Rule 702 of the Federal Rules of Evidence, before a witness may be certified as an

expert, he must be found to be "qualified" as an expert "by knowledge, skill, experience,

training, or education."  Fed. R. Evid. 702.  Specifically, Rule 702 of the Federal Rules of

Evidence provides:

---

[5]      *See also Bourjaily v. U.S.*, 483 U.S. 171, 175-176 (1987), *accord*, *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, n.10 (1993), *Graham v. Playtex Products, Inc.*, 993 F. Supp. 127, 129-130 (N.D.N.Y. 1998) (McAvoy, C.J.).

[6]      *See Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995), *accord*, *TC Systems Inc., v. Town of Colonie*, 213 F. Supp.2d 171, 173-74 (N.D.N.Y. 2002) (Treece, M.J.).

[7]      *See, e.g.*, *McCulloch v. H.B. Fuller Co.*, 981 F.2d 656, 657-658 (2d Cir. 1992) (affirming district court ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warning labels for hot melt glue); *Patterson v. Cent. Mills*, 64 F. App'x 457, 462 (6th Cir. 2003) (affirming district court ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of written flammability warnings for clothing); *Wilson v. Bradlees of New Eng.*, 250 F.3d 10, 18 (1st Cir. 2001) (upholding district court's ruling precluding plaintiff's expert to testify on "usages and practices in the silk-screening industry, or [on] the commercial feasibility of printing shirt logos with flame-retardant ink"); *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998) (affirming district court ruling that plaintiff's proffered experts did not possess the required qualifications to testify as experts on the subject of warnings for ceramic products); *Gurwitz v. Wal-Mart*, 97-CV-5678, Order at 4, 12 (E.D.N.Y. filed Oct. 25, 1999) (precluding expert testimony of Meyer Rosen in flammable fabrics case).

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness **qualified** as an expert by **knowledge, skill, experience, training, or education**, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 [emphasis added].  Under this rule, the trial judge stands as a "gatekeeper," charged with determining whether the proffered testimony satisfies a number of standards, including whether the proposed expert is "qualified" to give the proffered opinion.  *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589-590, 597 & nn.7, 10 (1993).

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) [citation omitted].  In assessing whether a proposed expert is "qualified," the trial judge should remember the "liberal[] purpose" of Rule 702, and remain "flexibl[e]" in evaluating the proposed expert's qualifications.[8]  Having said that, of course, "a district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient."[9]

---

[8]     *See U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (Rule 702 "must be read in light of the liberalizing purpose of the rule"); *Lappe v. Am. Honda Motor Co.*, 857 F.Supp. 222, 227 (N.D.N.Y. 1994) (Hurd, M.J.) ("[L]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."), *aff'd without opinion*, 101 F.3d 68 (2d Cir. 1996).

[9]     *Stagl v. Delta*, 117 F.3d 76, 81 (2d Cir. 1997), *accord*, *Dreyer v. Ryder Automotive Carrier Group, Inc.,* 367 F. Supp.2d 413, 425-426 (W.D.N.Y. 2005); *Byrne v. Liquid Asphalt Systems, Inc.*, 238 F. Supp.2d 491, 494 (E.D.N.Y. 2002); *Trumps v. Toastmaster*, 969 F. Supp. 247, 252 (S.D.N.Y. 1997); *see, e.g.*, *McCulloch v. H.B. Fuller Co.*, 981 F.2d 656, 657-658 (2d Cir. 1992) (affirming district court ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warning labels for hot melt glue);

### 1.    Qualifications Regarding Flammability of Consumer Apparel

Generally, Mr. Rosen opines that garments containing synthetic fibers such as polyester, when untreated with flame retardant, are more dangerous than garments containing natural fibers such as cotton, due to the capability of 100% polyester fabrics to melt, and adhere to one's skin, when subjected to "high heat"–a fact that is not known to "the vast majority of people wearing such garments."[10]  Defendant argues that Mr. Rosen is not qualified to give an expert opinion regarding the flammability of consumer apparel.[11]  Specifically, Defendant argues that Mr. Rosen's attendance at a few seminars and his claims to have authored an unpublished article on the subject are insufficient to make him an expert on the subject.[12]

While Plaintiff, in his memorandum of law, opposes this argument in a general fashion (arguing that "there is no question that the plaintiff's expert has the qualifications to testify as to the issues of flammability," that "the qualifications necessary to testify as an expert are minimal," and that "Plaintiff's expert has vast experience in evaluating the flammability of clothing"), he points to no specific education or experience of Mr. Rosen that qualifies him to give an expert opinion on the subject of the flammability of consumer apparel.[13]  Similarly devoid of any

---

*see also* cases cited *supra* in note 7 of this Decision and Order.

[10]     (*See*, *e.g.*, Dkt. No. 44, Part 42, at 3-4, 10-11 [Expert Report of Meyer Rosen]; Dkt. No. 44, Part 17 at 2 [Plf.'s Supp. Expert Witness Disclosure]; Dkt. No. 57, ¶ 8 [Affid. of Meyer Rosen].)

[11]     (Dkt. No. 44, Part 76, at 9-13 [Def.'s Mem. of Law on Mtn. to Excl. Expert Testimony].)

[12]     (*Id.*)

[13]     (Dkt. No. 58, at 6-7 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude].)

specific argument in refutation of Defendant's argument on this issue is the "affidavit" of

Plaintiff's counsel.[14]  It is only by examining the affidavit of Mr. Rosen that the Court can find

any real opposition to Defendant's argument.[15]  As an initial matter, this response is inadequate

in that it was not referenced in Plaintiff's memorandum of law, as is required under the Local

Rules of Practice for this Court.[16]  In any event, Mr. Rosen's testimony does little to refute

Defendant's argument.

Specifically, Mr. Rosen's testimony as to why he is qualified to testify on the subject of

the flammability of consumer apparel occurs in only two paragraphs of his affidavit.[17]  In those

two paragraphs, he asserts that he is so qualified because (1) his "expert testimony and opinions

relative to flammable fabrics has [sic] been accepted in a court of law on two previous

occasions," namely in 2000 in the case of *DeFrancisco v. Cotton Deluxe* (N.J. Super. Ct.), and in

2004 in the case of *U.S. v. Robinson Lazala* (S.D.N.Y.), (2) he has rendered "expert consultant

services in this area including extensive research in the field of flammable fabrics conducted in

numerous fabric fire tests, depositions and[] preparation of reports[] in many other flammable

fabrics cases which have not gone to Court," and (3) in 2000 he finished researching and co-

---

[14]     (*See generally* Dkt. No. 54, ¶¶ 26-33 [Affid. of Robert Abdella].)  I place the word
"affidavit" in quotation marks because the document in question is more properly characterized
as a memorandum of law.  This is because, under the Local Rules of Practice for this Court, an
"affidavit" may not contain legal argument.  N.D.N.Y. L.R. 7.1(a)(2).

[15]     (Dkt. No. 57, ¶¶ 5-6 [Affid. of Meyer Rosen].)

[16]     *See* N.D.N.Y. L.R. 7.1(a)(1),(2) (requiring that oppositions to, *inter alia*, motions
to exclude contain a memorandum of law, and prohibiting affidavits from containing legal
argument).

[17]     (Dkt. No. 57, ¶¶ 5-6 [Affid. of Meyer Rosen].)

authoring a 500-page book entitled, "Handbook of Rheology Modifiers–Practice Use and Applications," which involved "the subject matter of this case–the thermo plastic behavior and viscosity of molten polyester."[18]

With regard to Mr. Rosen's testimony that a New Jersey state court found in 2000 that he was qualified to testify as an expert regarding flammable fabrics in the case of *DeFrancisco v. Cotton Deluxe* (N.J. Super. Ct.), despite my request that Plaintiff provide the docket number of that case, the year the case was filed and closed, and any orders or transcripts finding that Mr. Rosen was an expert in the area of flammable fabrics (Dkt. No. 64), Plaintiff did not provide those details (Dkt. No. 65).  Using Lexis, Westlaw and the New Jersey court system's website, and both variations on the name of the plaintiff given by Mr. Rosen, I have been unable to find any decisions or orders in that case which would give me an indication of the facts and issues in the case.[19]  As stated above, it is Plaintiff's burden to establish that Mr. Rosen is qualified in the area of flammable fabrics by a preponderance of the evidence.[20]

Moreover, I am somewhat dubious of the accuracy of Mr. Rosen's assertion about *DeFrancisco v. Cotton Deluxe* (N.J. Super. Ct.), given the dubiousness of his assertion about the other case in which he was allegedly found to be an expert--*United States v. Robinson Lazala* (S.D.N.Y.).  Despite my request that Plaintiff provide the docket number of "United States v. Robinson Lazala," the year the case was filed and closed, and any orders or transcripts finding

---

[18]        (*Id*.)

[19]        (*Compare* Dkt. No. 57, ¶ 5 [Affid. of Meyer Rosen, testifying that the name of the case was "DeFrancisco v. Cotton Deluxe"] *with* Dkt. No. 65 at 3 [Letter from Robert Abdella, attaching Mr. Rosen's list of cases, which refers to the case as "DiFrancesco v. Cotton Deluxe"].)

[20]        *See supra* Part II of this Decision and Order.

that Mr. Rosen was an expert in the area of flammable fabrics (Dkt. No. 64), Plaintiff did not

provide those details (Dkt. No. 65).  In any event, the details that Mr. Rosen did provide appear

inaccurate, including the name of the counsel who apparently hired him ("William Joseph

Stampur," not "William Stampu") and the name of the party for whom he was apparently

working ("Joseph Solem," not "Robinson Lazala" or "Robinson Latula," which does not appear

to have been the name of any of the many co-defendants in the case, although there appears to

have been a co-defendant named, "Raulston DeCosta Robinson").[21]  Moreover, I do not

understand how Mr. Rosen could have testified as an expert in district court in that case on

March 2, 2004, when a final judgment was entered in that case on September 24, 2002, and no

activity appears on the docket in 2004.[22]  Finally, it is difficult to conceive how the criminal

charges in that action–which appear to have stemmed from an alleged conspiracy to distribute

narcotics–could have involved the flammability of fabrics.

    Nor am I persuaded by Mr. Rosen's rather conclusory assertion that he has rendered

"expert consultant services in this area including extensive research in the field of flammable

fabrics conducted in numerous fabric fire tests, depositions and[] preparation of reports[] in many

other flammable fabrics cases which have not gone to Court."[23]  For whom did he render such

---

    [21]    (*Compare* Dkt. No. 57, ¶ 5 [Affid. of Meyer Rosen] *and* Dkt. No. 65 at 3 [Letter from Robert Abdella, attaching Mr. Rosen's list of cases] *with U.S. v. Solem*, 00-CR-0678-AKH-16, *Docket Sheet* [S.D.N.Y.].)  *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related findings.") [internal quotation market and citation omitted].

    [22]    (*Id*.)

    [23]    (Dkt. No. 57, ¶ 5 [Affid. of Meyer Rosen].)

services, what were those services specifically, and when were they rendered?  A review of Mr.

Rosen's curriculum vitae yields no clear answers to these questions.[24]  Nor does a review of Mr.

Rosen's deposition testimony.[25]  As for the deposition testimony and expert reports Mr. Rosen

allegedly provided in this area in cases that have not gone to court, one can only guess which (if

any) of the dozen cases listed by him in his curriculum vitae are such cases.[26]  I note that, in one

of those dozen cases, Mr. Rosen was clearly found *not* to be qualified as an expert, although I

cannot determine on what subject he was attempting to testify (presumably, it was on the subject

of groundwater contamination as viewed from the field of rheology).[27]

   Under the circumstances, I agree with Defendant that Mr. Rosen lacks the particular

expertise to qualify him as an expert on the *general subject* of the flammability of consumer

apparel.  In addition to the reasons stated above, Mr. Rosen's lack of fitness to testify on the

general subject of the flammability of fabrics is supported by an October 15, 1999, ruling by the

Eastern District of New York in *Gurwitz v. Wal-Mart*, 97-CV-5678, which precluded similar

---

[24]      (Dkt. No. 44, Part 41 [Curriculum Vitae of Meyer Rosen].)

[25]      (*See, e.g.*, Dkt. No. 52, Part 2, at 6-9 [Trans. of Depo. of Meyer Rosen, testifying
that he has never "done any consulting work for an entity of any kind that manufactures wearing
apparel"], at 8-12, 20-21 [testifying that he has never done any consulting work *for* any chemical
companies that provide flame retardants for *consumer apparel*] [emphasis added].)

[26]      (Dkt. No. 65 at 3 [Letter from Robert Abdella, attaching Mr. Rosen's list of
cases].)

[27]      *See In re Burbank Environmental Litigation*, 96-CV-5584, *Minute Order and
Civil Minutes* (C.D. Cal., filed Apr. 2, 2001, and May 22, 2001) (granting defendant's motion to
exclude the testimony of Meyer Rosen).

testimony by Mr. Rosen.[28]  I find no sufficient education and/or experience, acquired by Mr.

Rosen since October 1999, that warrants a finding that he is now so qualified on the general

subject of the flammability of consumer apparel.  (*See* Dkt. No. 44, Part 44 [Curriculum Vitae of

Meyer Rosen, as of 7/25/05].)  Granted, in 2001, Mr. Rosen attended a one-day seminar on

"Regulatory Compliance for Flammability of Children's Sleepwear," and he published an article

entitled, "Technologies Grow Flame Retardants Market."  (*Id.* at 2, 6.)  However, simply stated, I

find that these accomplishments (which are only tangentially related to the subject at hand) are

not enough to tip the scales in favor of finding Mr. Rosen qualified as an expert on the general

subject of the flammability of consumer apparel.

---

[28]        (Dkt. No. 44, Parts 44-45 [attaching Order and Record from *Gurwitz v. Wal-Mart*,
97-CV-5678, S.D.N.Y., dated 10/15/99].)  *See Global Network Commc'ns, Inc.*, 458 F.3d at 157
("A court may take judicial notice of a document filed in another court . . . to establish the fact of
such litigation and related findings.") [internal quotation market and citation omitted].  I am not
persuaded by Plaintiff's attempt to distinguish *Gurwitz* by arguing that, in that case, Mr. Rosen
was never asked to provide an affidavit or testify at a *Daubert* hearing.  Furthermore, while I
would not call the apparent facts of *Gurwitz* "identical" to those present here (as Defendant
does), I would say that they appear similar.  In *Gurwitz*, a six-year-old boy was burned after his
clothing caught fire from a lighted Menorah.  At the time, the boy was wearing three articles of
clothing: (1) a cotton undershirt, (2) a religious garment called a Tztzis, and (3) a Wal-Mart shirt
on top.  Among other things, the plaintiff argued that the Wal-Mart shirt should have been treated
with a flame retardant.  Among Wal-Mart's defense theories was its argument that "a flame
retardant[,] treated shirt on top would not have made any difference" under the circumstances.
*See Gurwitz v. Wal-Mart*, 97-CV-5678, Order at 4 (E.D.N.Y. filed Oct. 25, 1999).  On the
defendant's motion to preclude, the judge held that Mr. Rosen is not an expert with respect to
flammable fabrics.  *Id.* at 12.  The judge further stated that "his own boss just last year said that
he's not an expert with respect to flammable fabrics and every factor which I could apply as
indicated in *Daubert* and *Kumho*, would weigh very, very heavily against Mr. Rosen."  *Id.*
Indeed, the judge further stated that "just applying Rule 702 of the Federal Rules of Evidence
even without invoking the factors of *Daubert* and *Kumho* would compel me to conclude that this
evidence would not be reliable and would not be helpful to the jury and I'm not going to permit
him to testify in the ex[er]cise of my gate keeping role, which has been assigned to trial judges by
*Daubert* . . . ."  *Id.*  (*See also* Dkt. No. 44, Part 46 [attaching 1998 deposition testimony of Mr.
Rosen's former supervisor, Carl J. Abraham, in another case, in which Mr. Abraham testified,
"[Mr. Rosen] doesn't have expertise in [the area of flammable fabrics]."].)

However, I find that Mr. Rosen's background as a chemist and chemical engineer qualify him to testify on the *limited subject* of the chemical properties of polyester in general and how such properties are subject to change due to the application of heat or flame.[29]  As a practical matter, while the line might seem fine between testifying on this subject and not testifying on the general subject of the flammability of consumer apparel, that line has been walked before.  *See Wilson v. Bradlees of New England*, 250 F.3d 10, 18 (1st Cir. 2001) (upholding district court's ruling permitting plaintiff's expert to testify on limited subject of "matters involving chemistry and the flammable properties of polyvinyl chloride and plastisols," but not on "usages and practices in the silk-screening industry, or [on] the commercial feasibility of printing shirt logos with flame-retardant ink").  It is noteworthy that, in the *Wilson* case, the expert whose testimony was excluded on textile issues other than those related to chemistry appears to have had *more* education and experience with regard to textiles than does Mr. Rosen.[30]  In addition, the expert in question was Gordon Damant, who appears to currently be one of Mr. Rosen's colleagues at

---

[29]    (Dkt. No. 44, Part 41, at 3-4 [Curriculum Vitae of Meyer Rosen].)  A "lack of extensive personal experience directly on point does not necessarily preclude [an] expert from testifying."  *TC Systems*, 213 F. Supp.2d at 174 (quoting *Valentin v. New York City,* 94-CV-3911, 1997 WL 33323099, at *15 [E.D.N.Y. Sept. 9, 1997] [internal quotation marks omitted]; *see also Gardner v. General Motors Corp*., 507 F.2d 525, 52 (10th Cir. 1974) (stating that engineering professors could testify regarding the design defects of a truck exhaust system even though they possessed no actual experience with the product); *Baumolser v. Amax Coal* Co., 630 F.2d 550 (7th Cir. 1980) (holding that expert geologist in shock waves was allowed to testify, in a case where mine blasting allegedly damaged plaintiff's home, even though he lacked any experience with regard to blasts from coal mining).

[30]    *See Wilson v. Bradlees of New Eng.*, 93-CV-0047, 1999 WL 816817, at *4, n.4 (D. N.H. Feb. 3, 1999) (indicating that plaintiff's proffered expert on textiles had "additional course study in . . textile processes and marketing," that he was "the president of a consulting company for 'textiles and related industries,'" and that he had previous experience "primarily in [the] marketing and testing of textile products and components").

Inter-City Testing & Consulting Corp.[31]

Accordingly, Mr. Rosen is qualified to testify on the limited subject of the properties of polyester and how such properties are subject to change due to the application of heat or flame, but he would not be permitted to testify on the more general subject of the flammability of consumer apparel.[32]

### 2. Qualifications Regarding Use of Flame Retardants on Consumer Apparel

Mr. Rosen's report asserts that polyester fiber is very easy to flame-retard.[33]  Specifically, his report asserts that the fabric used to make Tanisha's jogging suit could have been made safe through the application of a commercial flame retardant such as Antiblaze NF10.[34]  Mr. Rosen's report also asserts that the cost to flame-retard each piece of garment would be ten to thirty cents per garment, which is "a small fraction of the price typically charged for finished garments such as the subject-jogging suit . . . ."[35]

Defendant argues that such testimony should be precluded because Mr. Rosen is not

---

[31]      (Dkt. No. 51, Part 4, at 2 [Expert Report of Meyer Rosen, listing "Gordon H. Damant as "Director" of InterCity Testing & Consulting Corporation's "California Office"].) *See also* Inter-City Testing & Consulting Corp., "Expert CV Gordon H. Damant" http://www.intercitytesting.com/areas/fireinvest/003.html (last visited March 6, 2007).

[32]      (Dkt. No. 44, Part 42, at 3-4 [Expert Report of Meyer Rosen].)

[33]      (*Id.* at 9.)

[34]      (*Id.*)

[35]      (*Id.* at 10.)

16

qualified to give an expert opinion regarding flame resistant treatments for consumer apparel.[36]

Specifically, Defendant argues that, "[w]hile [Mr. Rosen's] professional experience has involved

some use of flame resistant materials, the application of flame retardant chemicals to consumer

. . . apparel is a very specialized science, in which he has no experience."[37]  Furthermore,

Defendant argues, while Mr. Rosen authored an article referencing flame-resistant treatments for

consumer apparel, the discussion of such treatments in that article occurred in only one

sentence.[38]

        While Plaintiff's memorandum of law contains some general argument about Mr.

Rosen's qualifications to testify as an expert on "the issues of flammability [of clothing]," that

memorandum of law contains no argument on the distinct issue of Mr. Rosen's qualifications to

testify as an expert on *the use of flame retardants on consumer apparel*.[39]  Similarly devoid of

any specific refutation of Defendant's argument as to Mr. Rosen's qualifications in this specific

subject area is the "affidavit" of Plaintiff's counsel, which contains only a conclusory and off-

topic argument that "[t]he opinion of Meyer Rosen . . . that the garment lacked sufficient flame

retardant is scientifically valid.  His opinion squares with the facts in evidence.  It is not based on

bogus science.  If the garment was adequately manufactured to minimize the danger upon contact

---

[36]        (Dkt. No. 44, Part 76, at 9-11, 13-14 [Def.'s Mem. of Law on Mtn. to Excl. Expert Testimony].)

[37]        (*Id*.)

[38]        (*Id*. at 14; *see also* Dkt. No. 44, Part 55 [attaching copy of Mr. Rosen's article entitled, "Weaving Out Opportunities in Textile Chemicals"].)

[39]        (Dkt. No. 58, at 6-7 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude].)

with heat or flame, how did the event happen?"[40]  Not even the affidavit of Mr. Rosen contains

any assertions specifically refuting Defendant's argument that Mr. Rosen is not qualified to

testify as an expert regarding the subject of the use of flame retardants on consumer apparel.[41]

"Where a properly filed motion is unopposed and the Court determines that the moving

party has met its burden to demonstrate entitlement to the relief requested therein, the non-

moving party's failure to file or serve any papers as required by this Rule shall be deemed as

consent to the granting or denial of the motion, as the case may be, unless good cause be shown."

N.D.N.Y. L.R. 7.1(b)(3).  Failure to oppose one of the legal arguments advanced by a movant on

a motion to exclude expert testimony shall be deemed "consent" to exclusion based on that legal

argument.[42]

Because Plaintiff has "consented" to Defendant's argument, the only remaining issue is

whether Defendant has met its burden "to demonstrate entitlement to the relief requested"

through that argument.  A review of whether a movant has met its burden "to demonstrate

---

[40]    (Dkt. No. 54, ¶ 30 [Affid. of Robert Abdella].)  As stated above, the place for this argument is not an attorney's "affidavit," but Plaintiff's memorandum of law.  *See* N.D.N.Y. L.R. 7.1(a)(2) (providing that an "affidavit" may not contain legal argument).

[41]    (Dkt. No. 57, ¶¶ 5-12 [Affid. of Meyer Rosen].)

[42]    *See, e.g., Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony"); *Green v. Doukas*, 97-CV-8288, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests . . . it has merit[]"); *Amaker v. Coombe*, 96-CV-1622, 2003 WL 21222534, at *6 (S.D.N.Y. May 27, 2003) (granting motion to preclude use of depositions at trial "by default" because plaintiff failed to respond to the motion); *see also* N.D.N.Y. L.R. 7.1(b)(3) ("The Court shall not consider any papers required under this Rule that are not . . . in compliance with this Rule unless good cause is shown.").

entitlement" to the relief requested under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion requesting such relief.[43]

Here, after careful consideration, I find that Defendant's argument is, at the very least, facially meritorious. The application of flame retardant chemicals to consumer apparel appears indeed to be a specialized science, one that is somewhat distinct from the more general subject of the flammability of clothing (a subject on which Mr. Rosen is also not qualified to testify as an expert).[44] Furthermore, based on the current record, it appears that Mr. Rosen lacks sufficient "knowledge, skill, experience, training, or education" in that specialized science, most

---

[43]     *See*, *e.g.*, *Hernandez v. Nash*, 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*") (emphasis added) (citations omitted); *Race Safe Sys., Inc. v. Indy Racing League*, 251 F. Supp.2d 1106, 1109-1110 (N.D.N.Y. 2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3]); *see also Wilmer v. Torian*, 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers)*, adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello*, 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F. Supp. 595 (N.D.N.Y. 1996) (Pooler, J.).

[44]     *See*, *e.g.*, *Wilson*, 250 F.3d at 18 (permitting expert to testify on "matters involving chemistry and the flammable properties of polyvinyl chloride and plastisols" but not on the "usages and practices in the silk-screening industry, or to the commercial feasibility of printing shirt logos with flame-retardant ink"); *cf. SSM Indus. v. Fairchild Apparel Group, Inc.*, 03-CV-0223, 2004 WL 1109547, at *2 (E.D. Tenn. Jan. 16, 2004) (referring to the manufacturing process of flame-resistant fabric as "highly specialized," noting that the process involved successfully treating the fabric with chemicals, and testing the fabric for, among other things, "weight, shrinkage, feel, and knit characteristics," and noting that "[i]t takes a minimum of ten days to do a test because the cloth must pass a burn test after being washed and dried fifty times"). (*See also* Dkt. No. 52, Part 2, at 8-11 [Trans. of Depo. of Meyer Rosen, indicating that the manufacturing of apparel fabrics is distinct from the application of flame-retardant chemicals to those apparel fabrics].)

significantly in the *application* of flame retardant chemicals to *consumer* apparel.  His curriculum vitae is devoid of any clear indication of such specific education or experience.[45]  In addition, his affidavit is devoid of any such clear indication.[46]  Finally, his deposition is devoid of any such clear indication.[47]  For example, in his deposition, Mr. Rosen testified that he has never "done any consulting work for an entity of any kind that manufactures wearing apparel," nor has he done any consulting work for any chemical companies that provide flame retardants for consumer apparel.[48]

Even if I were to treat Defendant's motion as "contested" on this issue, I would reach the same conclusion.  Granted, Mr. Rosen testified, in his deposition, that he "wrote an article for [a] specialty chemical magazine[] in the United Kingdom on flame retardant chemicals and interviewed experts from the Consumer Product Safety Commission, manufacturers of flame retardant chemicals."[49]  For the sake of brevity, I will set aside the issue of whether or not the Consumer Product Safety Commission (a federal agency) manufactures flame-retardant chemicals, and the issue of whether or not "interviewing" experts qualifies one to testify as an expert in federal court.  The problem with Mr. Rosen's testimony is that he did not testify that he interviewed experts at companies that *applied* fire-retardant chemicals to *consumer apparel*, or,

---

[45]     (*See generally* Dkt. No. 44, Part 41 [Curriculum Vitae of Meyer Rosen].)

[46]     (*See generally* Dkt. No. 57, ¶¶ 5-12 [Affid. of Meyer Rosen].)

[47]     (*See generally* Dkt. No. 52, Part 2, at 8-21 [Trans. of Depo. of Meyer Rosen]; Dkt. No. 62, Part 3 [Trans. of Depo. of Meyer Rosen, supplying missing page of transcript].)

[48]     (Dkt. No. 52, Part 2, at 6-12, 20-21 [Trans. of Depo. of Meyer Rosen].)

[49]     (*Id*. at 8.)

more importantly, that his interviews concerned the subject of applying fire-retardant chemicals

to consumer apparel.  Indeed, the title of the article that Mr. Rosen published after the interviews

(which I can find nowhere in the record) suggests that the article had to do with the flame-

retardant market in general, and not with regard to the specific subject of applying fire-retardant

chemicals to consumer apparel.  (Dkt. No. 44, Part 41, at 6 [Curriculum Vitae of Meyer Rosen,

listing article entitled, "Technologies Grow Flame Retardant Market," published in *Specialty*

*Chemicals Magazine* in England in November of 2001].)

      In addition, Mr. Rosen testified that he has "written an article and interviewed many

people for Chemical Market Reporte[r], which is a trade publication on types of treatments that

are used for fabrics in several different market areas."[50]  However, that article, published in April

of 1998 in the *Chemical Market Reporter*, mainly regards the *market* for producing and applying

*dyes* to *textiles*.[51]  It does not regard the *application* of *fire-retardant* chemicals to *consumer*

*apparel*, much less to 100% polyester consumer apparel.  Indeed, the article mentions flame

retardants only four times.[52]

      Mr. Rosen also testified that he has consulted "with" (as opposed to consulting "for") "a

---

[50]      (*Id.*)

[51]      (*See* Dkt. No. 44, Part 55 [attaching copy of Mr. Rosen's article entitled, "Weaving Out Opportunities in Textile Chemicals," published in the *Chemical Market Reporter* on April, 27 1998].)

[52]      (*Id.* at 1-2 [stating that "[t]he leading sectors [of the processing chemicals market] are . . . flame retardants ($140 million) . . . .", repeating that statistic in a chart, stating that "[i]n flame retardants for textile applications, players include Cytec, Albright and Wilson, Clariant, DuPont and BF Goodrich," and then stating that "[i]n flame retardants, Mike Fischer, vice-president of international sales and business development with Freedom Textile Chemicals, points to a durable flame retardant product for cotton and polyester/cotton blends and a new flame retardant for cotton, which is marketed by Itex"].)

half-dozen or more" companies that manufactured flame-retardant chemicals.[53]  Mr. Rosen

explained that, by the term "consulted with," he meant "talk[ing] to laboratory managers[] [and]

technical personnel, inquiring more deeply than what might be in literature about how things

work, [and] looking at patents that they have and the like."[54]  However, Mr. Rosen acknowledged

that, with regard to the issues in the current litigation (including the issue of the use of flame

retardants on consumer apparel), he has not "consulted with" any such company.[55]  Moreover, I

can find no portion of the current record in which he has identified those companies, described

when he consulted "with" them, or even clearly indicated that such consultation regarded the

subject at hand–the application of flame-retardant chemicals to consumer apparel.[56]

Finally, Mr. Rosen has testified that he worked for 26 years at Union Carbide, helping it,

among other things, manufacture chemicals used to flame retard "carpet backing" and "seat

cushions" of automobiles, and "backs of drapery."[57]  However, again, such things are not the

application of flame retardants to *consumer apparel*, which I have found to be a subject of some

specialization and distinctiveness, as discussed above.

I note that, in the *Wilson* case discussed above in Part II.A.1. of this Decision and Order,

the First Circuit excluded similar testimony by a chemist under analogous circumstances, that is,

---

[53]     (Dkt. No. 52, Part 2, at 9-10, 20-21 [Trans. of Depo. of Meyer Rosen].)

[54]     (Dkt. No. 62, Part 3 [Trans. of Depo. of Meyer Rosen].)

[55]     (*Id*.)

[56]     (*See generally* Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Meyer Rosen]; Dkt. No. 62, Part 3 [Trans. of Depo. of Meyer Rosen]; Dkt. No. 57 [Affid. of Meyer Rosen]; Dkt. No. 44, Part 41 [Curriculum Vitae of Meyer Rosen].)

[57]     (*Id*. at 11-12.)

where a proffered expert's knowledge with regard to the application of flame retardants to consumer apparel was sorely lacking.[58]  I note also that, in October of 1999, in the case of *Gurwitz v. Wal-Mart*, the district judge ruled that "before starting [what] seems to be a second career as an expert witness, [Mr. Rosen] had nothing whatever to do with . . . flame retardant garments . . . ."  *See Gurwitz v. Wal-Mart*, 97-CV-5678, Order at 10 (E.D.N.Y. filed Oct. 25, 1999).  I find no sufficient "knowledge, skill, experience, training, or education," acquired by Mr. Rosen since October 1999, that warrants a finding that he is now so qualified on the subject of the application of fire retardants to consumer apparel.  To the extent that Plaintiff relies on the aforementioned April 1998 article published by Mr. Rosen in the *Chemical Market Reporter*, I note that the article was published *before* the district judge in the *Gurwitz* decision reached his conclusion about Mr. Rosen's lack of qualifications regarding flame retardant garments.

For all these reasons, I find that Mr. Rosen lacks sufficient education and experience to qualify him to testify as an expert on the subject of the application of fire retardants to consumer apparel.

### 3.   Qualifications Regarding Warnings on Consumer Apparel

Mr. Rosen's report concludes that Defendant "had a duty to warn on the label of the subject garment that if exposed to high heat or flame . . . it would certainly melt and cause severe burns to the skin . . . ."[59]  Defendant argues that Mr. Rosen lacks the necessary qualifications to

---

[58]     *See Wilson*, 250 F.3d at 18 (upholding district court's ruling precluding plaintiff's proffered expert from testifying on "the commercial feasibility of printing shirt logos with flame-retardant ink" in part because "[h]is only knowledge of the use of flame-retardant ink by clothing manufacturers was gleaned from a telephone conversation with an ink vendor who told him that it was used for children's sleepwear").

[59]     (Dkt. No. 44, Part 42, at 10 [Expert Report of Meyer Rosen].)

form a reliable opinion regarding the use, placement, and composition of warnings on consumer

apparel.[60]  More specifically, Defendant argues that Mr. Rosen's curriculum vitae is completely

silent with respect to any such qualifications, and that his only such "qualifications" consist of

Mr. Rosen's sporadic collaboration and discussion with a colleague regarding warnings, and his

having read some publications that he could not identify.[61]

Plaintiff's memorandum of law begins its refutation of Defendant's argument by

conceding that Mr. Rosen has "less" experience with warnings than he does with flammable

textiles.[62]  This is telling, in light of my earlier finding that Mr. Rosen lacks expertise on the

general subject of flammable fabrics.  (*See*, *supra*, Part II.A.1. of this Decision and Order.)

Plaintiff's memorandum of law goes on to argue that Mr. Rosen's "expertise on warnings is

based upon the accumulation of his testing experience, his knowledge of clothing and

flammability, and his reading of various articles such as [a two-page "Safety Alert" published by

the Consumer Product Safety Commission]."[63]  However, the memorandum fails to specify any

other such articles read, it fails to specify what "testing experience" Mr. Rosen has ever done (if

any) *with regard to warnings*, and it fails to explain how Mr. Rosen's "knowledge of clothing

and flammability" involves the use, placement, and composition of warnings in particular.

---

[60]     (Dkt. No. 44, Part 76, at 9-11, 14-15 [Def.'s Mem. of Law on Mtn. to Excl. Expert
Testimony].)

[61]     (*Id*.)

[62]     (*See* Dkt. No. 58, at 7 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ.
Judg. and Mtn. to Exclude].)

[63]     (*Id*; *see also* Dkt. No. 51, Part 12 [attaching two-page Consumer Product Safety
Commission "Safety Alert" entitled, "New Labels on Children's Sleepwear Alert Parents to Fire
Dangers [and] Prevent Burn Injuries by Wearing Snug-fitting or Flame-resistant Garments"].)

Rather than fleshing out this rather conclusory argument is his memorandum of law,

Plaintiff relies on an "affidavit" of Plaintiff's counsel to develop this legal argument.[64]  In that

affidavit, Plaintiff's counsel begins his refutation of Defendant's warnings argument by

"refer[ring] the Court to the Affidavit of Meyer Rosen in support of his position herewith."[65]

Counsel then presents a series of conclusory assertions in support of Plaintiff's argument, failing

to identify any specific qualifications, possessed by Mr. Rosen, to testify as an expert on the issue

of the use, placement, and composition of warnings on consumer apparel:

> The plaintiff's expert Meyer Rosen based his opinions upon facts
> actually in evidence as well as his professional and thorough testing of
> the exemplar garment and his personal conversations with Douglas and
> Margaret Topliff. . . .  [Meyer Rosen has] appropriate credentials to
> opine on the issue[] [of the use, placement and composition of
> warnings on consumer apparel].  A few more articles written or
> seminars attended may be ample fodder for cross-examination, but in
> the end the plaintiff's expert offers a valid scientific explanation on
> these issues, as will be demonstrated in the plaintiff's memorandum of
> law . . . .  The plaintiff's expert Meyer Rosen is qualified to testify on
> the issues of appropriate warnings and was examined on this issue by
> defense counsel on June 12, 2006.  (See Plaintiff's Exhibit "I",
> Rosen's testimony.) . . . .  Mr. Rosen is perfectly capable of reading
> those warnings, and no special degree, seminar or article of opinion
> would be required to justify his testimony to the effect that proper
> warnings are not only preferred but required.[66]

---

[64]     (*See generally* Dkt. No. 54, ¶¶ 26-33 [Affid. of Robert Abdella].)  As stated
before, the place for Plaintiff's legal argument is not an attorney's "affidavit," but Plaintiff's
memorandum of law.

[65]     (*Id*. at ¶ 27.)  A party may not articulate a legal argument simply by "incorporating
by reference" the argument presented in another document.  Such a practice violates the Local
Rule on page limitations.  *See* N.D.N.Y. L.R. 7.1(a)(1) (providing that opposition memoranda of
law shall not exceed 25 pages in length without prior leave of the Court).  Here, taken together,
Plaintiff's memorandum of law, counsel's "affidavit," and Mr. Rosen's affidavit total 36 pages in
length.  (*See* Dkt. Nos. 54, 57, 58.)

[66]     (Dkt. No. 54, ¶¶ 28, 29, 31, 32 [Affid. of Robert Abdella].)

This last argument–that "no special degree, seminar or article of opinion" is required for Mr. Rosen to be qualified to testify as an expert on the subject at issue–illustrates what I believe is the crux of Plaintiff's argument, namely, that Mr. Rosen does not *need* any qualifications to testify as an expert on the subject at issue.  I reject this argument.  Whether or not Plaintiff needs an expert to testify at trial in order to prevail on his failure-to-warn claim is a different issue than whether such an individual, in order to testify as an "expert," must possess the relevant qualifications.  Clearly, he must.  *See* Fed. R. Evid. 702 (permitting testimony from "a witness *qualified* as an expert *by knowledge, skill, experience, training, or education*") [emphasis added]. Indeed, courts have routinely rejected expert testimony on warnings where the proffered "expert" lacked the necessary qualifications.  *See*, *e.g.*, *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657-658 (2d Cir. 1992) (affirming district court ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warning labels for hot melt glue); *Patterson v. Cent. Mills*, 64 F. App'x 457, 462 (6th Cir. 2003) (affirming district court ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of written flammability warnings for clothing); *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998) (affirming district court ruling that plaintiff's proffered experts did not possess the required qualifications to testify as experts on the subject of warnings for ceramic products).[67]

---

[67]     *See Ortiz-Semprit v. Coleman Co., Inc.*, 301 F. Supp.2d 116, 120 (D. Puerto Rico 2004) (holding that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of consumer warnings for generators); *Schaaf v. Caterpiller, Inc.*, 286 F. Supp.2d 1070, 1073-1074 (D. N.D. 2003) (holding that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warnings for tractors).

Although I have no duty to *sua sponte* scour the record in this case for further argument in support of Mr. Rosen's qualifications with regard to warnings, I have carefully reviewed his affidavit, especially those paragraphs in which he presents assertions in refutation of Defendant's argument that he is not qualified to testify as an expert with regard to the use, placement, and composition of warnings on consumer apparel.[68]  Briefly summarized, he asserts that his qualifications on the subject consist of the following: (1) the fact that, "[o]ver the past 14 years," he has received "extensive training" with regard to warnings by Dr. Harold Tanyzer through working with him on "numerous litigation matters" involving warnings, "many of [which] . . . involved flammability warnings on textiles"; and (2) the fact that, during this time period, Mr. Rosen has "review[ed] . . . literature on warnings."[69]

What particular "litigation matters" has Mr. Rosen worked on with Dr. Tanyzer?  Which of those matters involved flammability warnings on textiles?  How often, and when, did that work occur?  And what *exactly* did Mr. Rosen do?  Mr. Rosen does not provide this information–not in his affidavit, his curriculum vitae, or his deposition testimony.[70]  To the extent that Mr. Rosen's "experience" regards warnings other than those placed on consumer apparel, I question whether such "experience" would qualify him to testify as an expert on the subject of the use, placement, and composition of warnings on consumer apparel.  I note that, in

---

[68]         (*See generally* Dkt. No. 57, ¶¶ 7-12 [Affid. of Meyer Rosen].)

[69]         (*Id*. at ¶¶ 7, 10-12.)

[70]         (*See generally id.* at ¶¶ 7-12; Dkt. No. 44, Part 42 [Curriculum Vitae of Meyer Rosen]; Dkt. No. 52, Part 3, at 65-80 [Trans. of Depo. of Meyer Rosen].)  I note that, in his deposition, he testified that, as of the date of the deposition (June 13, 2006), he had had "over ten years" experience with Dr. Tanyzer.  (Dkt. No. 52, Part 3, at 66 [Trans. of Depo. of Meyer Rosen].)

*Patterson v. Central Mills*, the Sixth Circuit affirmed the district court's exclusion of the proffered expert testimony of one of Mr. Rosen's current colleagues at Inter-City Testing & Consulting Corp., Gordon Damant, on the issue of garments warnings, where Mr. Damant's only experience with flammability warnings dealt with warnings placed on mattresses and furniture. *See Patterson*, 64 F. App'x at 462.[71]

And what "literature" has Mr. Rosen read on the subject of warnings that supposedly qualifies him as an expert?  In his affidavit, he testified that this literature included the following: (1) a warning used on an L.L. Bean article of clothing; (2) a five-page "article" entitled, "If You Make, Import, Distribute or Sell Clothing: An Important Safety Message About the Flammability Hazard of Your Products," prepared in December of 2004 by the National Association of Fire Marshals, (3) a three-page article entitled, "Synthetic Clothes Off Limits to Marines Outside Bases in Iraq," reputedly published on the United States Department of Defense website, and (4) a five-page "article" entitled, "Frequently Asked Questions," prepared by SALTA International, Inc., a textile fabrics and apparel manufacturing *company*, although Mr. Rosen characterized this entity as an "association."[72]  In his deposition, he was unable to identify any specific such literature, other than (1) a "brown colored" book, (2) a seven-page article entitled, "Facts About Fabric Flammability" published by the U.S. Department of Agriculture and Iowa State University in July of 2003, (3) an eight-page article entitled, "Nightwear and Fire: A Guide to Nightwear (Safety) Regulations" published on an undetermined date by the United Kingdom Department of

---

[71]     *See*, *supra*, note 31 of this Decision and Order.

[72]     (Dkt. No. 57, ¶¶ 10-12 [Affid. of Meyer Rosen]; *see also* Dkt. No. 52, Parts 7-10 [attaching copies of articles].)

Trade and Industry, and (4) some "warning standards published by . . . [the] Natural Paint and Coatings Association."[73]  Those are all the pieces of "literature" that Mr. Rosen has been able to point to as the foundation of his proffered expertise, despite having been given numerous opportunities to do so.[74]

Based on the current record, I find no evidence that Mr. Rosen has (1) had any formal education on warnings,[75] (2) had the necessary informal education on warnings, (3) published any books or articles on warnings, or (4) personally authored any specific flammability warnings for clothing, which were of any academic, legal or commercial use or value.  This Court has excluded expert testimony under analogous circumstances.  *See Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *9-10 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.)

---

[73]     (Dkt. No. 52, Part 3, at 66-72 [Trans. of Depo. of Meyer Rosen]; *see also* Dkt. No. 44, Parts 56-58 [attaching referenced materials].)

[74]     Although I do not rely on this fact in reaching my conclusion, I note that among the types of authorities conspicuously missing from this list are books on warnings such as (1) the 864-page textbook entitled, *Handbook of Warnings* by Michael S. Wogalter, published by Lawrence Erlbaum Associates in 2006, (2) the 365-page sourcebook entitled, *Warning & Risk Communication* by Michael S. Wogalter, David M. DeJoy, and Kenneth R. Laughery, published by CRC (Taylor & Francis) in 1999, and (3) the 219-page book *Warning Design: A Research Prospective* by Jude Edworthy and Aaron J. Adams, published by CRC (Taylor & Francis) in 1996.  Also missing are peer-reviewed articles on product warnings published in trade journals such as (1) the 20-page article entitled, "The Use of Vivid Stimuli to Enhance Comprehension of the Content of Product Warning Messages" by Craig A. Kelley, William C. Gaidis, and Peter H. Reingen, published by the *Journal of Consumer Affairs* in July of 2005, and (2) the 15-page article entitled, "Effectiveness of Product Warning Labels: Effects of Consumers' Information Processing Objectives" by Mark A. deTurck and Gerald M. Goldhaber, published by the *Journal of Consumer Affairs* in June of 1989.

[75]     By the term "formal education on warnings," I mean attendance at any professional seminars, or completion of any undergraduate or graduate courses covering warnings (whether the subject is covered during the study of consumer protection, communications, business, law, etc.).

(excluding expert testimony in a products liability case involving an antidepressant prescription

drug where plaintiff's proffered expert had received no "formal education" on subject, had

"never been drafter or been asked to draft a warning for any antidepressant . . . [and] has not done

any research or written any publications on prescription drug warnings").[76]

Finally, it is noteworthy that, in October of 1999, the plaintiff's counsel in *Gurwitz v.*

*Wal-Mart* expressly conceded that Mr. Rosen was not an expert with respect to warnings.  *See*

*Gurwitz v. Wal-Mart*, 97-CV-5678, Order at 11 (E.D.N.Y. filed Oct. 25, 1999).  Again, I find no

evidence of sufficient "knowledge, skill, experience, training, or education" acquired by Mr.

Rosen since October 1999, that would warrant a finding that he is now so qualified on the subject

of warnings.  (*See* Dkt. No. 44, Part 44 [Curriculum Vitae of Meyer Rosen, as of 7/25/05].)

For all of these reasons, I find that Mr. Rosen is not qualified to testify on the subject of

the use, placement, and composition of warnings on consumer apparel.

### 4.      Qualifications Regarding Fire Investigation

Defendant argues that Mr. Rosen lacks the necessary qualifications to form a reliable

opinion as to how the garment ignited.[77]  In particular, Defendant argues that Mr. Rosen's only

education regarding fire investigation has been his attendance at three seminars: (1) the National

Fire, Arson, and Explosion Investigation Training Program, (2) the National Seminar on Fire

---

[76]      *See also Robertson*, 148 F.3d at 907 (holding that ceramics expert was not
qualified to provide warnings testimony in a product liability action because "[h]e had never
designed a warning for a ceramic product . . .  [and] [h]is knowledge of ceramics would not
provide the expertise on questions of display, syntax, and emphasis that the jury would expect
from a bona fide warnings expert") [internal quotations omitted].

[77]      (Dkt. No. 44, Part 76, at 9-12 [Def.'s Mem. of Law to Excl. Rosen's Expert
Testimony].)

Analysis Litigation; and (3) the National Advanced Fire, Arson, and Explosion Investigating Science and Technology Program.[78]  Moreover, Defendant argues, Mr. Rosen did not lecture at those seminars, nor conduct any of the technical presentations; he was merely a member of the audience.[79]  Finally, Defendant argues that, although Mr. Rosen obtained a certification as a Certified Fire and Explosion Investigator from the National Association of Fire Investigation ("NAFI"), NAFI explicitly states that the certification "does not, in and of itself, qualify an [individual] as an expert witness for purposes of civil and criminal litigation."[80]

Plaintiff fails, in his memorandum of law, to respond to Defendant's argument.[81]  Plaintiff has filed, in response to Defendant's motion to exclude, an affidavit by Mr. Rosen that appears to attempt to respond to Defendant's argument.  As discussed above in Part II.A.1. of this Decision and Order, this response is inadequate in that it was not referenced in Plaintiff's memorandum of law, as is required under the Local Rules of Practice for this Court.  In any event, the response is incomplete and off-topic.  Specifically, Mr. Rosen asserts that, not only is he a Certified Fire and Explosion Investigator, but he has been "an adjunct professor of fire science and fire chemistry for over 15 years."[82]  Among the problems with this piece of testimony is that it fails to identify in what way (if any) the course(s) that Mr. rosen taught related to the subject at hand in this

---

[78]       (*Id*. at 12.)

[79]       (*Id*.)

[80]       (*Id*.; *see also* Dkt. No. 44, Part 53, at 3 [Nat'l Assoc. of Fire Invest. Certification Program Guidelines].)

[81]       (*See generally* Dkt. No. 58, at 6-7 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude].)

[82]       (Dkt. No. 57, ¶ 1 [Affid. of Meyer Rosen].)

action, namely, fire investigation.  Indeed, my examination of Mr. Rosen's curriculum vitae

reveals that the course in question (taught at Westchester Community College in Valhalla, New

York) was entitled, "Chemical Hazard and Toxicology" and involved instructing "senior

professional Firefighters of New York City and surrounding cities in physics and chemistry of

modern fire extinguishing methods including: AF-3 aqueous film forming foam, low and high

expansion foam; Halon and dry powder agents."[83]  As a result, it appears that the course had little

or nothing to do with the subject at hand, namely, *fire investigation*.[84]

        As discussed above in Part II.A.2. of this Decision and Order, where a properly filed

motion is unopposed and the Court determines that the moving party has met its burden to

demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or

serve any required papers shall be deemed as consent to the granting or denial of the motion, as

the case may be, unless good cause be shown.  Because Plaintiff has "consented" to Defendant's

argument, the only remaining issue is whether Defendant has met its burden "to demonstrate

entitlement to the relief requested" through that argument.

        Here, after careful consideration, I find that Defendant's argument is *not* facially

meritorious on this particular issue.  As stated above, Defendant argues that NAFI explicitly

states that the certification "does not, in and of itself, qualify an [individual] as an expert witness

for purposes of civil and criminal litigation."[85]  However, Defendant fails to note that the stated

---

[83]        (Dkt. No. 44, Part 41, at 3 [Curriculum Vitae of Meyer Rosen, as of 7/25/05].)

[84]        I reach the same conclusion with respect to the other course listed on Mr. Rosen's
curriculum vitae–the course entitled, "Scientific Fire Fighting," which he taught in 1984.  (*Id.*)

[85]        (Dkt. No. 44, Part 76, at 12 [Def.'s Mem. of Law to Excl. Rosen's Expert
Testimony]; Dkt. No. 44, Part 53, at 3 [Nat'l Assoc. of Fire Invest. Certification Program

purpose of the certification is to identify "those individuals who have the minimum professional training, education and experience to investigate fire and explosion incidents and/or participate in the civil and criminal investigation which ensues from such investigations or analysis."[86]  In addition, Defendant cites no cases in which individuals receiving such certification were found not to be qualified in fire investigation.  Indeed, a brief review of the law reveals only cases in which individuals receiving such certification *were* found to be qualified in fire and explosion investigation (although, granted, those experts appear to have had somewhat more education and/or experience on the subject than does Mr. Rosen).[87]  Finally, I note that the three seminars attended by Mr. Rosen appear to have totaled approximately nine full days in length.[88]

Under the circumstances, I find that Mr. Rosen is qualified to testify as an expert with regard to fire investigation.  However, even though I find that Mr. Rosen is so qualified, I conclude that his proposed testimony about fire investigation be excluded on the ground that it is

---

Guidelines].)

[86]     (*Id.*)

[87]     *See Cincinnati Ins. Co. v. Cochran*, 99-CV-0552, 2005 WL 2179799, at *4-5 (S.D. Ala. Sept. 2, 2005) (finding that defendants' proffered expert, Eleanor Posey, was qualified to offer testimony on fire cause and origin, in part due to fact that she was "certified by the National Association of Fire Investigators as a fire and explosion investigator"); *103 Investors I, L.P. v. Square Deal Co.*, 01-CV-2504, 2005 WL 1124315, at *1, 5 (D. Kan. May 10, 2005) (finding that plaintiff's proffered expert, Carl Martin, was qualified to offer testimony on fire cause and origin, in part due to fact that he was "recognized by the National Association of Fire Investigators as a Certified Fire Investigator"); *cf. Travelers Property & Cas. Corp. v. General Elec. Co.*, 150 F. Supp.2d 360, 365 (D. Conn. 2001) finding that plaintiff's proffered expert, John P. Machnicki, was qualified to offer testimony on fire origin and cause, in part due to fact that he was "a Certified Fire and Explosion Investigator" and "a member of both the National Association of Fire Investigators and the National Fire Protection Association").

[88]     (*See* Dkt. No. 44, Parts 49-51.)

33

unreliable and/or unfairly prejudicial.  *See*, *infra*, Part II.B.4. of this Decision and Order.

## B.   Reliability of Mr. Rosen's Proffered Testimony

As stated above, Rule 702 of the Federal Rules of Evidence provides, in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify . . . in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of ***reliable*** principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 [emphasis added].  In *Daubert v. Merrell Dow Pharm., Inc.*, the Supreme Court set forth a non-exclusive list of factors for a trial court to use when assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be, or has been, tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.[89]

In addition, "[c]ourts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact."[90]  These factors include the following: (1) whether the expert is "proposing to testify about

---

[89]     *Daubert*, 509 U.S. at 593-594 [citations omitted]; *see also* Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.

[90]     Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.

matters growing naturally and directly out of research they have conducted independent of the

litigation, or whether they have developed their opinions expressly for the purposes of

testifying";[91] (2) whether the expert has unjustly extrapolated from an accepted premise to an

unfounded conclusion;[92] and (3) whether the expect has adequately accounted for obvious

alternative explanations for the plaintiff's condition.[93]

      **1.     Reliability of Testimony Regarding Flammability of Consumer Apparel**

      **a.     Testing Performed by Mr. Rosen**

Generally, Mr. Rosen asserts that the jogging suit in question was defective and/or

dangerous because of the tendency of its 100% polyester fabric to melt and drip excessively, with

"flaming drops," when subjected to excessive heat.[94]  This opinion is based on ***six*** tests

performed by Mr. Rosen on an exemplar of the garment in order to assess its relative

flammability.[95]

First, Mr. Rosen subjected the exemplar garment to something called the "CS 191-53

test" or the "45-degree angle flammability test," which he asserted (in his Expert Report) is "a

---

[91]     *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

[92]     *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

[93]     *See Claar Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994) (testimony excluded where expert failed to consider other obvious causes for plaintiff's condition).

[94]     (*See*, *e.g.*, Dkt. No. 44, Part 42, at 3-11 [Expert Report of Meyer Rosen]; Dkt. No. 44, Part 17 at 2 [Plf.'s Supp. Expert Witness Disclosure]; Dkt. No. 57, ¶ 8 [Affid. of Meyer Rosen].)

[95]     (Dkt. No. 51, Part 4 at 4-7 [Expert Report of Meyer Rosen].)

mandatory flammability standard for all apparel fabrics used in the United States."[96]  Mr. Rosen subjected the exemplar garment to the test, even though he noted that the garment is exempt from the CS 191-53 test because of its relatively heavy weight and its polyester composition.[97]  In any event, from the test, Mr. Rosen concluded that the exemplar garment was of "*normal flammability*," and that it was not composed of a "*torch type*" fabric.[98]

Second, Mr. Rosen subjected the exemplar garment to something called the "[m]odified CS 191-53 [test]" or the "Forced Ignition Test."[99]  Mr. Rosen stated that he used this modification of the CS 191-53 test because the subject garment failed to ignite under the original test.[100]  From this modified test, Mr. Rosen concluded that the subject garment was of "*low flammability*."[101]  In addition, although the test does not involve noting whether there are "molten flaming drops" coming from the burning fabric, Mr. Rosen reported the presence of "molten flaming drops."[102]

Third, Mr. Rosen subjected the exemplar garment to something called the "Federal Test Method Standard 191A Method 5903," which is a type of "vertical flammability test."[103]  Mr.

---

[96]     (*Id*. at 4-5.)

[97]     (*Id*. at 4.)

[98]     (*Id*. [emphasis in original].)

[99]     (*Id*. at 5-6.)

[100]    (*Id*.)

[101]    (*Id*. [emphasis in original].)

[102]    (*Id*.)

[103]    (*Id*. at 6.)

Rosen stated that a vertical flammability test is appropriate because the CS 191-53 test is a "totally unrealistic test" in that fabric garments will "for the most part" be in a vertical position (and not a 45-degree angle) when being worn.[104]  From this vertical flammability test, Mr. Rosen concluded that the exemplar garment "passed the test" and "very slow burning was evident."[105]

Fourth, Mr. Rosen subjected the exemplar garment to something called "the Children's sleepwear standards [test]," which is another type of "vertical flammability test."[106]  Again, from this test, Mr. Rosen concluded that the exemplar garment "passed the test" and that "very slow burning was evident."[107]

Fifth, Mr. Rosen subjected the exemplar garment to something called the "NFPA 701 Test," which is yet another type of "vertical flammability test."[108]  From this test, Mr. Rosen concluded that the garment was "hard to ignite (it took 16.1 seconds) and once ignited, burned somewhat and self extinguished."[109]  Again, despite the fact that the test involves noting only "the ease of ignition" and the "time it takes for the sample to be consumed," Mr. Rosen noted also the generation of "long molten viscoelastic material" and the presence of "flaming drops" during the test.[110]

---

[104]     (*Id.*)

[105]     (*Id.*)

[106]     (*Id.*)

[107]     (*Id.*)

[108]     (*Id.* at 6-7.)

[109]     (*Id.*)

[110]     (*Id.*)

Sixth, Mr. Rosen subjected the exemplar garment to something he called an "incident reconstruction."[111]  Briefly stated, this test involved placing a two-by-two-inch "wad" of "flaming" newspaper against the surface of the exemplar garment as it sat at a 45-degree angle (even though he previously characterized such an angle as "totally unrealistic").[112]  From this test, Mr. Rosen found that the wad "indeed ignited the exemplar garment and burned a hole in it," although he does not state how long it took the wad to do so, or how large the hole was.[113]  Moreover, he found that the garment "extinguished itself."[114]  Mr. Rosen then repeated the test with a three-by-three-inch "wad" of "flaming" newspaper.[115]  From this second test, Mr. Rosen found that the wad "again ignite[d] the fabric" and that "a larger hole was created," although, again, he does not state how long it took the wad to do so, or how large the hole was.[116]

### b.    Arguments and Analysis

Defendant argues that Mr. Rosen used unreliable data and testing methods in reaching his conclusions about the exemplar garment.[117]  Specifically, Defendant argues that Mr. Rosen's testimony is unreliable because he (1) conducted flammability tests on a garment that is exempt from such tests under federal regulations, (2) altered the testing protocols in order to generate

---

[111]    (*Id.*)

[112]    (*Id.* at 6-7.)

[113]    (*Id.* at 7.)

[114]    (*Id.*)

[115]    (*Id.*)

[116]    (*Id.*)

[117]    (Dkt. No. 44, Part 76, at 15 [Def.'s Mem. of Law on Mtn. to Excl. Rosen's Expert Testimony].)

particular results, and (3) performed tests that were never intended for consumer clothing.[118]

While Plaintiff's memorandum of law contains a general argument that "[t]he science behind [Rosen's] testimony is solid [and] his testing is scientifically valid . . .," that memorandum of law does not specifically respond to Defendant's argument.[119]  Nor does Plaintiff's counsel's affidavit.[120]  Nor does Mr. Rosen's affidavit, except in one paragraph in which he implies that, although the exemplar garment passed the current NFPA 701 test, it would not have passed a version of the NFPA 701 test in effect in 1989 (approximately 13 years before the occurrence of the accident in question).[121]  Rather, the thrust of Plaintiff's argument appears to be that it is not appropriate to apply the *Daubert* factors to Mr. Rosen's testimony because his testimony is based "solely on experience and training as opposed to methodology or technique."[122]

As an initial matter, I agree with Defendant that Mr. Rosen's testimony regarding the flammability of consumer apparel, *and any testimony based on his "testing" of the exemplar garment*, is unreliable under a *Daubert* analysis.  For example, Mr. Rosen conducted the "CS

---

[118]      (*Id*. at 15-18.)

[119]      (Dkt. No. 58, at 6 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude].)

[120]      (*See, e.g.*, Dkt. No. 54, ¶¶ 28, 30 [Affid. of Robert Abdella].)

[121]      (Dkt. No. 57, ¶¶ 3, 13 [Affid. of Meyer Rosen].)  I note that it is not even clear, from Mr. Rosen's affidavit, that the exemplar garment did not pass the outdated version of the NFPA 701 test, since his affidavit never expressly stated that the exemplar garment dripped flaming particles that burned *after they reached the floor*.  (*Id*.)

[122]      (Dkt. No. 58, at 6-7 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude].)

191-53 Test" and the "Modified CS 191-53 Test" on the exemplar garment even though he acknowledged that the garment was exempt from those tests.  Furthermore, Mr. Rosen was not satisfied when he was forced to conclude, from these two tests, that the garment was of "normal" or "low" flammability, and that it was not composed of a "torch type" fabric.  As a result, he proceeded to note an undetermined quantity of "molten flaming drops" during one of these tests, even though he acknowledged that the test did not require or involve such an analysis or assessment.  Similar gratuitous "findings" were made after the exemplar garment's satisfactory performance on the "NFPA 701 Test."  Perhaps Mr. Rosen's most obvious disregard of the very tests that he was performing occurred when he subjected the exemplar garment to the "Children's Sleepwear Standards [Test]," without even bothering to acknowledge the rather obvious fact that the exemplar garment in question is not children's *sleepwear* but a child's jogging suit.

As for Plaintiff's alternative argument that it is not appropriate to apply the *Daubert* factors to Mr. Rosen's testimony because that testimony is based on his experience or training and not on any methodology or technique, I find that argument to be wholly disingenuous, given the obvious scientific nature of Mr. Rosen's attempted methodology.  Furthermore, what part of Mr. Rosen's prior "experience or training" involved performing a flammability analysis of polyester and non-polyester consumer apparel (including jogging suits) in the relevant market? Under the circumstances, I simply have no reason to conclude that Mr. Rosen's testimony on the general subject of the flammability of consumer apparel would assist the jury "to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.[123]

_____

[123]     *See also Liriano v. Hobart Corp.*, 949 F. Supp. 171, 178 (S.D.N.Y. 1996) (reciting the legal standard for a "non-*Daubert*" analysis).

Furthermore, to the extent that the testimony might have any probative value at all, I find

that the probative value would be substantially outweighed by the danger of unfair prejudice,

confusion of the issues, and misleading the jury under Rules 403 and 703 of the Federal Rules of

Evidence.  *See, e.g., Wald by Strauss v. Costco Wholesale Corp.*, 03-CV-6308, 2005 U.S. Dist.

LEXIS 2723, at *17-19 (S.D.N.Y. 2005) (granting defendants' motion to preclude expert

testimony and report of Dr. William Vigilante, Ph.D. in psychology/ergonomics, with respect to

failure-to-warn claim in product liability action under Fed. R. Evid. 403).  In *Wald*, as here, the

proffered expert "cited no empirical studies that are sufficiently specific to the facts at hand to be

helpful.  His generalized opinions . . . are little more than common sense.  His application of

those theories to this case seems more impressionistic, subjective and conclusory than scientific."

2005 U.S. Dist. LEXIS 2723, at *18.  As a result, the Southern District of New York concluded

that "[a]t best, [the proffered expert's] opinions would be irrelevant and unhelpful; at worst, they

would confuse and prejudice the jury from forming its own opinions."  *Id*. at *19.  I reach the

same conclusion with regard to Mr. Rosen, especially given the complexity of the issues in this

case and the strong potential of Mr. Rosen (a self-proclaimed expert in numerous fields) to

mislead the jury with regard to those issues.  *See Daubert*, 509 U.S. at 595 (reasoning that

"[e]xpert evidence can be both powerful and quite misleading because of the difficulty in

evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative

force under Rule 403 . . . exercises more control over experts than over lay witnesses") [internal

quotation marks and citation omitted].  I reach this conclusion on the additional ground that Mr.

Rosen's proposed testimony is too far outside of his limited field of expertise.[124]

For all these reasons, I conclude that Mr. Rosen's proposed testimony about the general subject of the flammability of consumer apparel should be excluded on the alternative ground that it is unreliable and/or unfairly prejudicial.  However, again, I find that he should be permitted to testify on the limited subject of the properties of polyester and how such properties are subject to change due to the application of heat or flame.

### 2.   Reliability of Testimony Regarding Use of Flame Retardants on Consumer Apparel

The technique or theory used by Mr. Rosen to arrive at his testimony about the use of flame retardants on the jogging suit in question is so devoid of any scientific method that it is difficult to subject to a *Daubert* analysis.  For example, he provides no explanation of the technique or theory he used (if any) to arrive at his conclusion that the application of "Antiblaze NF10" and "Trivera CS" to the jogging suit in question would have cost "about 10 to 30 cents per garment."[125]  Moreover, setting aside the vagueness of the estimate offered by Mr. Rosen, one cannot help but wonder by whom such cost would have been incurred–the manufacturer, the retailer, or the consumer.  Such details are important in cases alleging a product liability "design

---

[124]   *See U.S. v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) (testimony that "strays from expert's scope of . . . expertise" violates Fed. R. Evid. 403); *see, e.g., Dreyer v. Ryder Auto Carrier Group, Inc.*, 367 F. Supp.2d 413, 448-449 (W.D.N.Y. 2005) (granting motion to exclude expert testimony under Fed. R. Evid. 403 in products liability action because expert's "proposed opinion and testimony concerning any causal relationship between [the plaintiff's] use of [the product at issue] and his injuries constitutes unsupported speculation offered by a proposed expert on a subject outside his field of claimed expertise," thus rendering "any probative value of the testimony . . . outweighed by its potential to unduly prejudice or mislead the jury regarding the relevant issue" under Fed. R. Evid. 403).

[125]   (Dkt. No. 51, Part 4, at 10 [Expert Report of Meyer Rosen].)

defect" claim, which has, among its elements, "the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced," and "the manufacturer's ability to spread the cost of any safety-related design changes . . . ." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257 (N.Y. 1995) [citations omitted].

Nor does Mr. Rosen explain the technique or theory he used (if any) to arrive at his conclusions that the washability of such a chemically-treated jogging suit would be "excellent," that the "durability" of the chemically treated fabric would be "excellent," and that the "hand" or softness of the chemically-treated fabric would be "essentially the same as that of the untreated material."[126]   Again, such details are important in cases alleging a product liability "design defect" claim, which has, among its elements, "the product's utility to the public as a whole, . . . its utility to the individual user, . . . [and] the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, . . . ."  *Denny*, 87 N.Y.2d at 257 [citation omitted].  And such facts do not appear to be arrived at casually within the industry, but only after appropriate testing.[127]   However, Mr. Rosen did not even attempt to wash or feel an exemplar of the jogging suit treated with such flame retardants.

Nor does Mr. Rosen explain the technique or theory he used (if any) to arrive at his conclusion that the application of "Antiblaze NF10" and "Trivera CS" to the jogging suit in

---

[126]      (*Id*. at 9-10.)

[127]      *SSM Indus. v. Fairchild Apparel Group, Inc.*, 03-CV-0223, 2004 WL 1109547, at *2 (E.D. Tenn. Jan. 16, 2004) (referring to the manufacturing process of flame-resistant fabric as "highly specialized," noting that the process involved successfully treating the fabric with chemicals, and testing the fabric for, among other things, "weight, shrinkage, feel, and knit characteristics," and noting that "[i]t takes a minimum of ten days to do a test because the cloth must pass a burn test after being washed and dried fifty times").

question would have made that jogging suit "safe."[128]  How safe, or, more precisely, how much

safer than is the untreated jogging suit?  We have absolutely no idea.  Mr. Rosen did not even

attempt to perform any flammability tests on an exemplar of the jogging suit treated with some

sort of flame-retardant chemical.  As a result, it is difficult or impossible to assess such things as

the testability, rate of error, and general acceptability of those techniques or theories.

Plaintiff suggests that Mr. Rosen's testimony on flame retardant fabrics should be

shielded from a *Daubert* analysis because Mr. Rosen is basing his expert testimony "solely on

experience and training as opposed to methodology or technique."  (Dkt. No.58, at 6-7 [Plf.'s

Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude].)  What part of Mr.

Rosen's "experience and training" involved (1) measuring the cost of manufacturing consumer

apparel that had not been treated with flame retardant versus the cost of manufacturing that

apparel with such flame retardant, (2) comparing the flammability of the two aforementioned

fabrics, (3) comparing the "washability" of the two aforementioned fabrics, and (4) comparing

the feel or softness of such fabrics?  None, based on the current record.[129]  Under the

circumstances, I simply have no reason to conclude that Mr. Rosen's testimony on flame

retardant fabrics would assist the jury "to understand the evidence or to determine a fact in

---

[128]        (Dkt. No. 51, Part 4, at 9-10 [Expert Report of Meyer Rosen].)

[129]        (*See generally* Dkt. No. 58, at 6-7 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for
Summ. Judg. and Mtn. to Exclude]; Dkt. No. 51, Part 4, 9-10 [Expert Report of Meyer Rosen];
Dkt. No. 57, ¶¶ 3, 7-13, 15 [Affid. of Meyer Rosen]; Dkt. No. 44, Part 44 [Curriculum Vitae of
Meyer Rosen, as of 7/25/05]; Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Meyer Rosen]; Dkt. No.
62, Part 3 [Trans. of Depo. of Meyer Rosen]; Dkt. No. 54, ¶ 30 [Affid. of Robert Abdella].)

issue." Fed. R. Evid. 702.[130]

Furthermore, to the extent that the testimony might have any probative value at all, I find that the probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under Rules 403 and 703 of the Federal Rules of Evidence. *See*, *supra*, Part II.B.1.b. of this Decision and Order (citing cases applying these rules under similar or analogous circumstances).

For all these reasons, I conclude that Mr. Rosen's proposed testimony about the use of flame retardants on consumer apparel should be excluded on the alternative ground that it is unreliable and/or unfairly prejudicial.

### 3.       Reliability of Testimony Regarding Warnings on Consumer Apparel

My analysis of the reliability of Mr. Rosen's proposed testimony regarding warnings on consumer apparel is similar to my analysis regarding his proposed testimony regarding the use of flame retardants on consumer apparel, set forth above in Part II.B.2. of this Decision and Order. Briefly stated, the technique or theory used by Mr. Rosen to arrive at his testimony about the use of warnings on consumer apparel is so devoid of any scientific method that I find it unreliable under a *Daubert* analysis. For example, I find no evidence in the record that Mr. Rosen bases his proffered expert opinion on any sort of test or consumer survey of the efficacy of a warning on the jogging suit in question.[131]

Rather, he appears to base his proffered expert opinion on (1) his prior experience

---

[130]     *See also Liriano*, 949 F. Supp. at 178 (reciting the legal standard for a "non-*Daubert*" analysis).

[131]     (*See*, *e.g.*, Dkt. No. 57, ¶ 7 [Affid. of Meyer Rosen].)

analyzing warnings in "numerous" but unidentified "litigation matters," and (2) his unsupported assertion that "the vast majority of people wearing [polyester garments] do not know [that such garments melt when exposed to high heat, becoming liquid]."[132]  I can find no evidence in the record that Mr. Rosen has any actual experience performing tests or surveys regarding the efficacy of *flammability* warnings on *consumer apparel*, or tests or surveys regarding consumer beliefs or perceptions about the melting properties of polyester clothing.[133]  As a result, again, I have no reason to conclude that Mr. Rosen's testimony about warnings on consumer apparel would assist the jury "to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.[134]

Furthermore, to the extent that the testimony might have any probative value at all, I find that the probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under Rules 403 and 703 of the Federal Rules of Evidence. *See*, *supra*, Part II.B.1.b. of this Decision and Order (citing cases applying these rules under similar or analogous circumstances).

For all these reasons, I conclude that Mr. Rosen's proposed testimony about warnings on consumer apparel should be excluded on the alternative ground that it is unreliable and/or unfairly prejudicial.

---

[132]        (*See, e.g., id.* at ¶¶ 7, 8.)

[133]        (*Id.*)

[134]        *See also Liriano*, 949 F. Supp. at 178 (reciting the legal standard for a "non-*Daubert*" analysis).

### 4.      Reliability of Testimony Regarding Fire Investigation

Based on a purported "reconstruction of [the] incident," Mr. Rosen concludes, among

other things, that (1) a "blast of hot air" of "about 400 degrees Fahrenheit" emanated from the

Topliff's wood stove as a result of a "downdraft" of air; (2) that the blast of hot air was

accompanied by "flaming and glowing materials including[] newspaper and kindling embers" of

"about 1800 degrees Fahrenheit"; (3) that "some of these flaming embers or burning newspaper

landed on Tanisha's 100% polyester garment and ignited it in a variety of spots."[135]

Defendant has moved to exclude the testimony of Mr. Rosen regarding fire investigation

on the alternative ground that such testimony is unreliable under Rules 702 and 703.  (Dkt. No.

44, Part 76, at 18-21 [Def.'s Memo. of Law in Support of Mtn. to Exclude].)  More specifically,

Defendant advances a number of arguments in favor of exclusion, including the following: (1)

that Mr. Rosen's "incident reconstruction" is based in large part on conjecture, speculation, and

assumption, and that, to the extent that Mr. Rosen's reconstruction is based at all on the events in

question, that reconstruction fails to take into account, and is contradicted by, the deposition

testimony of the parents of Tanisha; and (2) that Mr. Rosen's conclusions are supported by no

objective tests and/or scientific measurements.  (*Id.*)  Plaintiff has failed to oppose these

arguments in his memorandum of law,[136] counsel's affidavit,[137] or Mr. Rosen's affidavit.[138]  The

---

[135]      (Dkt. No. 51, Part 4, at 7-9 [Expert Report of Meyer Rosen].)

[136]      (*See generally* Dkt. No. 58, at 6-7 [Plf.'s Memo. of Law in Opp. to Def.'s Mtn. for
Summ. Judg. and Mtn. to Exclude].)

[137]      (*See generally* Dkt. No. 54, ¶¶ 9-33 [Affid. of Robert Abdella].)

[138]      (*See generally* Dkt. No. 57 [Affid. of Meyer Rosen].)

closest that Plaintiff comes to opposing Defendant's arguments is when Plaintiff suggests that Mr. Rosen's testimony "as to issues of flammability" is exempt from a *Daubert* analysis since Mr. Rosen's testimony is based on his experience.[139]   In reply to this vague response, Defendant argues that Mr. Rosen does not possess sufficient "experience" in the field in question to exempt him from a *Daubert* analysis.  (Dkt. No. 61, Part 6, at 4-5 [Def.'s Reply on Mtn. to Exclude].)

My analysis of the reliability of Mr. Rosen's proposed testimony regarding fire investigation is similar to my analysis regarding his proposed testimony regarding the use of flame retardants on consumer apparel, and his proposed testimony regarding warnings on consumer apparel, as set forth above in Parts II.B.2. and II.B.3. of this Decision and Order. Briefly stated, the technique or theory used by Mr. Rosen to arrive at his testimony about fire investigation is so devoid of any scientific method that I find it unreliable under a *Daubert* analysis, largely for the reasons stated by Defendant in its memorandum of law and reply memorandum of law.[140]   It would be impossible to describe each of the many problems with Mr. Rosen's proposed testimony on this subject without considerably adding to the length of this already lengthy Decision and Order.  In the interest of brevity, I will focus on only one of those problems–Mr. Rosen's failure, in his expert report, to adequately account for all of the record evidence in this action, despite his assertion that he is "work[ing] backwards from the facts as they have been documented."[141]

---

[139]     (*See generally* Dkt. No. 58, at 6-7 [Plf.'s Memo. of Law in Opp. to Def.'s Mtn. for Summ. Judg. and Mtn. to Exclude].)

[140]     (Dkt. No. 44, Part 76, at 18-21 [Def.'s Memo. of Law in Support of Mtn. to Exclude]; Dkt. No. 61, Part 6, at 4-5 [Def.'s Reply on Mtn. to Exclude].)

[141]     (Dkt. No. 51, Part 4, at 7 [Expert Report of Meyer Rosen].)

For example, Mr. Rosen states that "[w]e know that Tanisha was found standing on a portion of the rug near by where her mother was standing while she lit the stove."[142]  By doing so, he implies that Tanisha was standing on the rug *at the time of* the accident.  However, he fails to adequately account for the fact that, in a deposition, Mrs. Topliff testified that (1) "just before" Mrs. Topliff turned to light the stove, Tanisha was "maybe five steps" away from the stove, sitting at the counter eating cereal, and (2) she found Tanisha standing on the rug only *after* having been blown backward against the wall, and after an *undetermined length of time* had passed.[143]  This omission by Mr. Rosen is material since the passing of a moment between the blast and the discovery of Tanisha on the rug would be consistent with a factual finding that Tanisha was sitting at the counter immediately before the blast, and that she approached her mother *only after* witnessing her mother having been blown backward by the blast.

Similarly disregarded by Mr. Rosen is (1) Mrs. Topliff's deposition testimony that the wood used in the stove that day had come from outside where it had been raining,[144] and (2) Mr. Topliff's deposition testimony that, when he returned home later that day, he found enough kindling wood inside the wood stove with which to start a fire, after adding half a sheet of

---

[142]    (*Id*; *see also* Dkt. No. 51, Part 4, at 9 [Expert Report of Meyer Rosen, stating, "[R]egardless of where Tanisha was sometime before the subject incident, it is a fact that she was found standing on the portion of the rug that was near the stove . . . ."].)

[143]    (*See, e.g.*, Dkt. No. 51, Parts 2-3, at 34, 37-41, 48-55 [Depo. of Margaret Topliff, testifying, *inter alia*, that Tanisha was "[s]itting at the countertop eating" when Mrs. Topliff was lighting the fire, which was "[m]aybe five steps away" from the stove, that she saw Tanisha at the counter eating cereal "[j]ust before I lit the stove," that the stove is "more than a couple of steps away" from the counter, and that she did not know how much time had passed between when she was blown backward and when she saw Tanisha standing near the rocking chair].)

[144]    (Dkt. No. 51, Part 2, at 19, 33 [Depo. of Margaret Topliff].)

newspaper.[145]

Mr. Rosen's casual treatment of the record evidence is perhaps most obvious when he acknowledges that "one of the medical reports" states that Tanisha had been ten feet away from the stove at the time of the accident,[146] but he disregards that evidence based on his personal opinion that the evidence is "hard [for him] to believe."[147]

Mr. Rosen's circular reasoning is further evident through his repeated use of words such as "typically" (which he uses three times) and "[i]t is well known" (which he uses twice).  For example, he states that "[s]uch a blast of hot air would *typically* be accompanied by flaming and glowing materials including[] newspaper and kindling embers.  The temperature of such flaming materials would *typically* be in the range of about 1800 degrees Fahrenheit. . . .  It is *well known* that such materials will float in the air and forcefully move by convention currents."[148]  No tests or studies are cited to back up Mr. Rosen's factual assertion that a "downdraft" through the type of stove in question caused newspaper and embers of this temperature to travel such a distance in such a quantity and at such an angle to melt the jogging suit in question.  Why did Mr. Rosen

---

[145]    (Dkt. No. 51, Part 10, at 28-35 [Depo. of Douglas Topliff].)

[146]    (Dkt. No. 51, Part 4, at 8 [Expert Report of Meyer Rosen].)  Indeed, there are several such reports.  (*See, e.g.,* Dkt. No. 44, Part 65, at 1 [University Hospital "Discharge Summary," stating that "a wood stove . . . flashed and caught [Tanisha's] jogging suit on fire approximately 10 feet away"]; Dkt. No. 44, Part 66 [University Hospital "Operative/Procedure Report," stating, "There was a flash which flashed on her approximately 10' away . . . ."]; *cf.* Dkt. No. 44, Part 68 [University Hospital "Outpatient Visit Note," stating that Tanisha "had something come out of her wood stove and set her clothes on fire, even though she was all the way across the room"].)

[147]    (Dkt. No. 51, Part 4, at 8-9 [Expert Report of Meyer Rosen].)

[148]    (*Id*. at 8.)

choose to assume that it was an air-current filled with blazing hot embers that caused the jogging

suit in question to melt rather than an alternative explanation (such as the presence of an

"accelerant" or combustible material on the jogging suit, despite Tanisha's parents' testimony

that no such accelerants were present in the house at the time of the accident)?  Again, he appears

to have done so simply in order to reach his pre-determined conclusion that the jogging suit was

unreasonably dangerous.

The cumulative effect of these factual omissions and unjustified assumptions is an

"incident reconstruction" that can only be described as fanciful.  The "incident reconstruction"

involved placing a "flaming" two-by-two inch "wad" of newspaper on the exemplar garment as

the garment was resting at a 45-degree angle (even though he characterized such an angle as

"totally unrealistic"), and waiting for it to burn the garment.[149]  When Mr. Rosen was apparently

dissatisfied with the fact that the exemplar garment extinguished itself, he then subjected it to a

"flaming" three-by-three inch "wad" of newspaper.[150]  I can find no evidence in the record of

two-by-two inch or three-by-three inch "wads" of newspaper floating across the room and

landing on Tanisha's jogging suit while that suit was at a 45-degree angle (or any other angle).

For these reasons, I find Mr. Rosen's methodology to be unreliable under a *Daubert*

analysis.  Furthermore, to the extent that Mr. Rosen bases his proffered expert opinion about the

accident's occurrence not on a scientific re-enactment of the accident but simply on his previous

experience as a fire investigator, I find that, though he possesses the minimum amount of

experience or training necessary to render him "qualified" to testify as an expert in fire

---

[149]     (*Id*. at 7.)

[150]     (*Id*.)

investigation, he has not shown sufficient experience in investigating wood-stove accidents to render his testimony on the subject probative such that his testimony would assist the jury "to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.[151]

Alternatively, even if the offered testimony were found to have a modicum of probative value, I find that the probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under Rules 403 and 703 of the Federal Rules of Evidence. *See*, *supra*, Part II.B.1.b. of this Decision and Order (citing cases applying these rules under similar or analogous circumstances).

For all these reasons, I conclude that Mr. Rosen's proposed testimony about fire investigation should be excluded on the ground that it is unreliable and/or unfairly prejudicial.

## III.    MOTION FOR SUMMARY JUDGMENT

### A.    Plaintiff's Claim of Strict Liability

"A manufacturer who places a defective product on the market that causes injury may be liable for the ensuing injuries."  *Liriano v. Hobard Corp.*, 92 N.Y.2d 232, 237 (N.Y. 1998) [citation omitted].  "A product may be defective when it contains a manufacturing flaw, is defectively designed or is not accompanied by adequate warnings for the use of the product." *Liriano*, 92 N.Y.S.2d at 237 [citations omitted].

#### 1.    Manufacturing Defect

"In a [strict liability] claim . . . [based on a] manufacturing defect, the plaintiff must prove that: 1. When the product left the defendant's control, it deviated in a material way from its

---

[151]    *See also Liriano*, 949 F. Supp. at 178 (reciting the legal standard for a "non-*Daubert*" analysis).

design or performance standards; and 2. The defect was a substantial factor in causing the injury."  6-232 *Warren's Negligence in the New York Courts* § 232.04[1] (Matthew Bender 2005) [citations omitted].

Defendant argues that Plaintiff's strict liability claim based on a manufacturing defect should be dismissed because, in part, "plaintiff['s] proffered expert report does not discuss a manufacturing defect nor [has the plaintiff[]] provided any other evidence relating to a manufacturing defect."  (Dkt. No. 45, Part 3, at 10 [Def.'s Mem. of Law].)  Even liberally construing Plaintiff's opposition memorandum of law, I can find no response to this argument, or even any assertion suggesting that the jogging suit in question deviated in a material way from its design or performance standards.  (Dkt. No. 58 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.].)  Rather, Plaintiff's memorandum of law argues only that the defect in the jogging suit in question consisted of either a design defect or a failure to warn.  (*Id.*)

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown."  N.D.N.Y. L.R. 7.1(b)(3).  Among the "papers" required to be filed and served by a non-movant in response to a motion for summary judgment is a memorandum of law.[152]  Where a non-movant

---

[152]    N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia*, a memorandum of law); *cf.* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* . . . must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so *respond*, summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

fails in his memorandum of law to oppose a movant's argument in favor of summary judgment, the non-movant has "consented" to that argument.[153]

Because Plaintiff has "consented" to Defendant's argument, the only remaining issue is whether Defendant has met its burden "to demonstrate entitlement to the relief requested" through that argument. As stated above in Part II.A.2. of this Decision and Order, a review of whether a movant has met its burden "to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion for dismissal.[154] With this lightened burden of persuasion in mind, I find that Defendant's argument is, at the very least, facially meritorious. For example, it does not appear that there were any nonconformities in the jogging suit in question during its delivery from the manufacturer (other than an isolated instance of an immaterial nonconformity regarding color, which defect was subsequently cured).[155] Moreover, there is absolutely no reason to believe, from the current record, that the fabric in question (i.e., 100% polyester) was an unintentional deviation from the design of the garment;

---

[153]    *See Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]), *accord, Ingrao v. County of Albany*, 01-CV-0730, 2006 U.S. Dist. LEXIS 70935, at *19 (N.D.N.Y. Sept. 29, 2006) (McAvoy, J.), *Bundy Am. Corp. v. K-Z Rental Leasing Co.*, 00-CV-0260, 2001 U.S. Dist. LEXIS 2439, at *5 (N.D.N.Y. March 9, 2001) (Hurd, J.).

[154]    *See, supra*, note 43 of this Decision and Order.

[155]    (Dkt. No. 51, Parts 7-8, at 13, 21-23, 26-28, 30-57 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart, testifying that she purchased the jogging suits in question from the manufacturer, and, to the best of her knowledge, none of them were returned to either the manufacturer or retailer because of any non-conformities or defects other than on one occasion due to a "failure" with respect to the suits' colors being "off"].)

indeed, Plaintiff's own expert appears to acknowledge that the 100% polyester fabric was used

intentionally because it possesses certain qualities.[156]

Finally, Plaintiff's counsel, in an "affidavit," appears to argue that the manufacturing

defect can be proven solely from the fact that the jogging suit melted and caused Plaintiff's

injuries, and that "[t]he subject garment may very well have been a blend of polyester/cotton or

other highly flammable fabric."  (Dkt. No. 54, ¶ 18 [Affid. of Robert Abdella].)

As an initial matter, as stated above, in the U.S. District Court for the Northern District of

New York, "affidavits" may not contain legal argument.  N.D.N.Y. L.R. 7.1(a)(2).  An attorney's

"affidavit" is unable to create a question of fact for purposes of a motion for summary judgment

where the attorney has no personal knowledge of any of the events giving rise to the action.[157]

Here, to the extent that Plaintiff's counsel is attempting to present arguments in refutation of the

---

[156]     (Dkt. No. 51, Part 4, at 3-7 [Expert Report of Meyer Rosen, stating that the "phenomenon" of polyester fabrics is such that "[w]hen exposed to heat, [the] melted garment will shrink away from the flame" and that "[i]n some cases, the[] drops [that may result] remove the source of ignition and the fire on the garment will go out," and also stating an exemplar of the jogging suit in question passed each of the four flammability tests administered]; *see also* Dkt. No. 44, Part 79, at 2, 4 [Def.'s Expert Report, stating that the "flammability [of the fabric in question] is very much less than the average apparel fabric in this country" and that the jogging suit in question "was reasonably safe and fit for the purpose for which it was intended"]; Dkt. No. 44, Part 57, at 7 [attaching document entitled, "Guide to Nightwear and Fire: A Guide to Nightwear (Safety) Regulations," published by the United Kingdom Department of Trade and Industry on an unidentified date, stating, "[F]abrics, such as nylon and polyester, which melt away cleanly from the flame (ie without decomposing) may pass the [United Kingdom's children's nightwear flammability] test providing that all threads, trimmings and decorations etc are also of a synthetic substance which behaves in this way."])

[157]     *See Flintkote Co. v. U.S.*, 47 F.R.D. 322, 324-325 (S.D.N.Y. 1969), *aff'd*, 435 F.2d 556 (2d Cir. 1971); *Commercial Union Ins. Co. v. Albert Pipe & Supply Co., Inc.*, 484 F. Supp. 1153, 1157 (S.D.N.Y. 1980); *Noth v. Scheurer*, 285 F. Supp. 81, 83 (E.D.N.Y. 1968); *Grissman v. Union Carbide Corp.*, 279 F. Supp. 413, 415 (S.D.N.Y. 1968); *Henkin v. Rockower Bros., Inc.*, 259 F. Supp. 202, 205-206 (S.D.N.Y. 1966).

arguments advanced by Defendant in favor of dismissal of Plaintiff's strict liability

"manufacturing defect" claim, the place for those arguments is in Plaintiff's opposition

memorandum of law.   N.D.N.Y. L.R. 7.1(a)(1),(2).   The Court does not have the duty to search

through the numerous documents filed by Plaintiff in search of Plaintiff's legal argument.   (*See*

Dkt. No. 50, Dkt. No. 51, Parts 1-12; Dkt. No. 52, Parts 1-13; Dkt. No. 53; Dkt. No. 54; Dkt. No.

55; Dkt. No. 56; Dkt. No. 57; Dkt. No. 58; Dkt. No. 62, Parts 1-3.)[158]

   In any event, Plaintiff's counsel's affidavit is insufficient to create an issue of fact with

respect to Plaintiff's strict liability "manufacturing defect" claim.   First, it is completely circular

or question-begging to argue that there was a manufacturing defect because Tanisha was injured.

What Plaintiff needs is some *evidence* of a manufacturing defect, and he has adduced no such

evidence in opposing Defendant's motion for summary judgment.   Second, it is completely

speculative to assert, as does Plaintiff's counsel, that "[t]he subject garment may very well have

been a blend of polyester/cotton or other highly flammable fabric."   (Dkt. No. 54, ¶ 18 [Affid. of

Robert Abdella].)   What is the evidence offered in support of this assertion?   Is it the fact that

Tanisha was injured by the fabric?   If so, again, that so-called "evidence" is completely circular

or question-begging in nature.   Indeed, the evidence unearthed during discovery in this action

establishes that the jogging suits in question were tested for, among other things, "shrinkage" and

"the requirements of the fabric and all that" by an independent company, Consumer Testing

---

[158]  *See* N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain a memorandum of law); N.D.N.Y. L.R. 7.1(a)(2) ("An affidavit must not contain legal arguments . . . ."); *cf. Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted).

Laboratories.  (Dkt. No. 51, Parts 7-8, at 23-26, 40-57 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart].)  Had there been such a nonconformity in the composition of the fabric of the jogging suits in question, it is reasonable to assume that such a nonconformity would have been discovered during such testing, as a noncomformity in color was discovered. (*Id.*)

        For all of these reasons, I grant Defendant's motion for summary judgment with respect to Plaintiff's strict liability "manufacturing defect" claim.

### 2.    Design Defect

        "[T]he New York standard for determining the existence of a design defect . . . require[s] an assessment of whether 'if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner' . . . ."  *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257 (N.Y. 1995) [citations omitted].  "This standard demands an inquiry into such factors as (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes . . . ."  *Denny*, 87 N.Y.2d at 257 [citation omitted]. Moreover, the plaintiff bears the burden of proof on this issue.  *Fane v. Zimmer*, *Inc.*, 927 F.2d 124, 128 (2d Cir. 1991) ("The plaintiff bears the burden of presenting evidence that the product, as designed, presented a substantial likelihood of harm and feasibly could have been designed

more safely.") [citations omitted].

         **a.**     **Product's Utility to Public as Whole, and Product's Utility to Individual User**

While there appear to be few reported decisions discussing what precisely an inquiry into these two factors entails, it appears that, when examining these factors, courts may take into account things such as the product's "purpose" and "the loss of utility that society incurs from the unavailability of the product."  *See McCarthy v. Olin Corp.*, 119 F.3d 148, 163, n.13 (2d Cir. 1997) [citation omitted]; *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 166 (S.D.N.Y. 2003).

Here, Plaintiff's opposition memorandum of law and Rule 7.1 Response are devoid of any citation to record evidence concerning (1) the product's utility to the public as a whole or (2) the product's utility to the individual user.  (Dkt. No. 58 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.]; Dkt. No. 53 [Plf.'s Rule 7.1 Response].)  I decline to perform an independent review of the record in search of such evidence.[159]  In any event, in deciding the other issues presented by Defendant's motion, I have reviewed most or all of the portions of the record that one would expect would contain such evidence, if it were presented, and I have found no such evidence.  (*See, e.g.*, Dkt. No. 51, Parts 7-8 [Trans. of Depo. of Beverly Dych, Business

---

    [159]     *See Amnesty Am.*, 288 F.3d at 470 ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

Manager of Wal-Mart]; Dkt. No. 51, Parts 2-3 [Trans. of Depo. of Margaret Topliff]; Dkt. No.

51, Part 10 [Trans. of Depo. of Douglas Topliff]; Dkt. No. 51, Part 4 [Expert Report of Meyer

Rosen]; Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Meyer Rosen].)

### b.    Likelihood that Product Will Cause Injury

Plaintiff's opposition memorandum of law and Rule 7.1 Response are devoid of any

citation to record evidence concerning the likelihood that the product would (at the time of

manufacture) cause injury.  (Dkt. No. 58 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ.

Judg.]; Dkt. No. 53 [Plf.'s Rule 7.1 Response].)  Again, I do not have a duty to, and I decline to,

perform an independent review of the record in search of such evidence.[160]  In any event, in

deciding the other issues presented by Defendant's motion, I have reviewed most or all of the

portions of the record that one would expect would contain such evidence, if it was presented,

and I have found no such evidence.  (*See*, *e.g.*, Dkt. No. 51, Parts 7-8 [Trans. of Depo. of Beverly

Dych, Business Manager of Wal-Mart; Dkt. No. 51, Part 4 [Expert Report of Meyer Rosen];

Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Meyer Rosen].)

It is noteworthy that the business manager at Wal-Mart responsible for purchasing 12,000

of the girls' jogging suits in question from the suits' manufacturer was asked if she knew of any

complaints or questions by customers regarding the flammability of the jogging suits in question,

all 12,000 of which were sold to customers, and she responded that she did not know of any such

complaints.  (Dkt. No. 51, Parts 7-8, at 13-28, 32-34 [Trans. of Depo. of Beverly Dych, Business

Manager of Wal-Mart].)  In addition, I find that the article entitled, "Committee on Accident

Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," submitted by Plaintiff,

---

[160]    *See*, *supra*, Part III.A.1. of this Decision and Order.

is inapposite for several reasons, not the least of which is the fact that "[o]f the 124 fabric samples suitable for testing [which were submitted by hospitals reporting burn cases caused by ignition of clothing], 94 [of the samples] were of cotton exclusively. . . .  A few cases involved rayon, acetate, and nylon, the latter principally showing up in undergarments."  (Dkt. No. 52, Part 5 [attaching article entitled, "Committee on Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," published by *Pediatrics: Official Journal of the American Academy of Pediatrics* in December of 2006].)

### c.      Availability of Safer Design

The alleged availability of a safer design is the thrust of Plaintiff's efforts in opposing Defendant's motion for dismissal of Plaintiff's "design defect" claim.  What was this alleged safer design?  Liberally construed, Plaintiff's opposition memorandum of law argues that the jogging suit in question could have been designed more safely in that, had a fire-retardant been used in the manufacturing of the jogging suit, the fire in question would have been extinguished before the "melt-drip" feature of the jogging suit's fabric burned Tanisha.[161]

Plaintiff has adduced no admissible evidence in support of this argument.  Plaintiff's

---

[161]      (*See*, *e.g.*, Dkt. No. 58, at 2 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg., citing case in which the plaintiff's expert established that "the synthetics used in the exhibit tend to melt rather than burn to ash and produce high temperatures" and that "when ignited and not immediately extinguished, severe and deep burns are inflicted upon the body of the wearer"]; Dkt. No. 58, at 2, 4 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg., arguing, "It is the contention of the plaintiff's expert that the industry standards of flammability are devised by the industry itself and that, while there is no requirement that 100% polyester garments be tested for flammability, the fact that the garment in question ignited as it did indicates to him that no fire retardants were added during the manufacturing of the garment. . . . [T]he plaintiff can prove that the subject garment was not reasonably safe and that a flame retardant should have been added to the manufacturing process."]; *see also* Dkt. No. 54, ¶ 18 [Affid. of Robert Abdella, arguing that "there is no other explanation [as to defect] but that there was insufficient fire retardant on the garment when it left the manufacturer"].)

opposition memorandum of law is devoid of any citation to such evidence.  (Dkt. No. 58 [Plf.'s

Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.].)[162]  The only such "evidence" cited by

Plaintiff in support of this argument comes in Plaintiff's Rule 7.1 Response, in which he cites

page 9 of Meyer Rosen's Expert Report in disputing Defendant's factual assertion that "[f]lame

retardant chemicals will not affect melt-drip."  (Dkt. No. 53, ¶ 45 [Plf.'s Rule 7.1 Response].)

Page 9 of Mr. Rosen's Expert Report states, in pertinent part: "These flame-retardant finishes do

not interfere with the melt-drip process, but they do act on the molten polymer, making it self-

extinguishing."  (Dkt. No. 51, Part 4, at 9 [Expert Report of Meyer Rosen].)

There are two problems with this "evidence."  First, it is not admissible since I have

found that Plaintiff's expert, Meyer Rosen, is not qualified to testify with regard to the

application of fire retardants to clothing, and that, even if he were qualified, his proposed

testimony would be unreliable and/or unfairly prejudicial.[163]

Second, even if the evidence were admissible, Plaintiff has not taken the next step

necessary to make the evidence *material*.  The evidence regards how flame-retardants act on the

molten polymer in polyester, making it self-extinguishing in general.  However, Plaintiff has

adduced no evidence regarding the extent and/or rate of the self-extinguishing effect of such

---

[162]     Indeed, in Plaintiff's opposition memorandum of law, Plaintiff has offered merely
conclusory assertions that the feature was a "design defect" because Plaintiff was injured, which,
of course, is not sufficient to defeat a motion for summary judgment.  (*See*, *e.g.*, Dkt. No. 58, at 1
[Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg., arguing, "It is the plaintiff's
position that the circumstantial evidence and direct testimony lead to no other conclusion but that
the garment had to be defective or the accident would not have happened."].)

[163]     *See*, *supra*, Parts II.A.2. and II.B.2. of this Decision and Order.

flame-retardants on the particular jogging suit in question.[164]  In particular, Mr. Rosen did not

compare the flammability of the exemplar sample provided in this action to an exemplar treated

with flame retardant.[165]  Thus, based on the current record, there is no reason to believe that

flame-retarding the jogging suit would have extinguished the fire in question *before* Plaintiff was

burned.[166]  I note that Plaintiff concedes that (1) "flame-retardant finishes do not interfere with

the melt-drip process,"[167] and (2) "Mr. Rosen did not provide any scientific data or objective

measurements as to the quantity of temperature of the melt-drip produced by the exemplar

sample as compared to the quantity or temperature of the melt-drip that would be produced by an

exemplar sample treated with flame retardant."[168]

     Even though Plaintiff does not expressly rely on the article entitled, "Committee on

---

[164]    *See Donovan v. Mishy Sportswear*, 200 F. Supp.2d 1103, 1108 (E.D. Mo. 2001)
("The garment was defective only if the burn rate was unreasonably dangerous.).

[165]    *See Simien v. S.S. Kresge Co.*, 566 F.2d 551, 558 (5th Cir. 1978) (reversing
judgment in favor of plaintiff on strict liability claim based on ignition of jacket, because, in part,
"[w]hen asked whether he considered the fabric to be highly dangerous, [the plaintiff's expert]
stated that it was his opinion that 'this fabric is highly dangerous once it is ignited.'  He did not
explain how this conclusion was related to the issue of whether a jacket made from the fabric
would be unsafe.  No comparative analysis was made of the difficulty of ignition plus the rate
and intensity of combustion of this fabric vis-a-vis wool, cotton, or other synthetic materials
normally used in clothing.").

[166]    *See Dye v. Kean's*, 412 So.2d 116, 120 (La. Ct. App., 1st Cir., 1982) ("Even if [the
plaintiff] had been wearing a uniform made of fire retardant material[,] the heat of ignition of the
[solvent and paint thinner] would have subjected his body to temperatures up to 400 degrees
Fahrenheit. . . .  A fire retardant uniform . . . would not have provided protection to [the plaintiff]
under the facts and circumstances of this case.").

[167]    (Dkt. No. 45, Part 4, ¶ 45 [Def.'s Rule 7.1 Statement]; Dkt. No. 53, ¶ 45 [Plf.'s
Rule 7.1 Response]; Dkt. No. 51, Part 4, at 9 [Expert Report of Meyer Rosen, asserting that
"[t]hese flame-retardant finishes do not interfere with the melt-drip process . . . ."]).

[168]    (Dkt. No. 53, ¶ 42 [Plf.'s Rule 7.1 Response].)

Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires" (published by

*Pediatrics: Official Journal of the American Academy of Pediatrics*) in opposing Defendant's

argument on this issue, I consider whether that article constitutes material evidence in support of

Plaintiff's argument. I find that it does not constitute such evidence, because it does not discuss

the "flame-proofing" of the sort of 100% polyester fabric at issue in this action. (Dkt. No. 52,

Part 5 [attaching article entitled, "Committee on Accident Prevention: Investigation of Fabrics

Involved in Wearing Apparel Fires," published by *Pediatrics: Official Journal of the American*

*Academy of Pediatrics* in December of 2006].)[169]

Finally, a few words are necessary about Plaintiff's citation to *LaGorga v. Kroger Co.*,

275 F. Supp. 373 (W.D. Pa. 1967), in Plaintiff's opposition memorandum of law, done partially

in an effort to persuade the Court that the use of 100% polyester in the jogging suit in question

was an inherent design defect. (Dkt. No. 58, at 2 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for

Summ. Judg.].) That case does not support such a conclusion for two reasons. First, the design

defect of the garment in *LaGorga* was not the "melt-drip" feature of 100% polyester untreated

with flame retardant, as it is alleged to be in this case, but (1) the fact that the garment's

particular combination of untreated cotton and synthetic fiber "ignited easily, burned rapidly and

_____

[169]    I will assume for the sake of argument that the article discusses the same fire
retardants as those cited by Meyer Rosen in his Expert Report. However, if that is not the case,
then that would be another reason for finding the article to be immaterial. (*Compare* Dkt. No.
52, Part 5 [attaching article entitled, "Committee on Accident Prevention: Investigation of
Fabrics Involved in Wearing Apparel Fires," published by *Pediatrics: Official Journal of the
American Academy of Pediatrics* in December of 2006, discussing "two chemicals THPC
(tetrakis [hydroxymethyl] phosphonium chloride) and APO (tris 1-aziridinyl phosphate oxide)"]
*with* Dkt. No. 51, Part 4, at 9-10 [Expert Report of Meyer Rosen, discussing the "commercial
flame retardant . . . Antiblaze NF10 (formerly known as Antiblaze 19) . . . manufactured by
Albright and Wilson of Richmond, VA" and "Trivera CS . . . available [from] Celanese
Chemical Co."].)

intensely with a high degree of heat, and were difficult to extinguish," and (2) the fact that the

garment was difficult to remove due to its "hard-to-work zipper." *LaGorga*, 275 F. Supp. at 378,

380-81 & n.10.[170]   Second, even if *LaGorga* says what Plaintiff thinks it says, unlike the expert in

*LaGorga*, Mr. Rosen would *not* be able to testify at trial that, "when ignited and not immediately

extinguished, severe and deep burns are inflicted upon the body of the wearer" as a result of the

100% polyester at issue in this action.  This is because Mr. Rosen does not possess such medical

expertise, nor has he performed tests that sufficiently resembled the circumstances of this case

and that sufficiently followed accepted testing procedures.[171]

More applicable cases support the granting of Defendant's motion for summary judgment

with respect to Plaintiff's "design defect" claim.  *See Donovan , Inc.*, 200 F. Supp.2d at 1106

(granting defendant's motion for summary judgment dismissing strict liability defective-design

claim regarding burns, and death, resulting from ignition and "melt[ing]" of "100% polyester

backing" because plaintiff adduced no evidence that the burn rate of material was unreasonably

dangerous); *Coleman v. Cintas Sales Corp.*, 100 S.W.3d 384, 385-86 (Ct. App., Tex., 4th Dist.,

---

[170]     Plaintiff's reading of *LaGorga* appears to focus too much on that portion of the
decision in which the court states that, after testing a similar jacket, the plaintiff's expert
established that "the synthetics used in the exhibit tend to melt rather than burn to ash and
produce high temperatures" and that "when ignited and not immediately extinguished, severe and
deep burns are inflicted upon the body of the wearer." *Id*. at 378.  From this passage, Plaintiff
appears to conclude that the design defect of the jacket in *LaGorga* was the melting feature of the
synthetics at issue.  That interpretation is contradicted by the text of the decision as a whole,
including a reading of the passage's preceding paragraph, in which the court explains that the
jury's verdict is supported by mere "lay evidence" regarding the "burning behavior and
characteristics of this particular jacket." *Id*.  The burning behavior and characteristics of the
jacket in *LaGorga* were that, after the jacket was touched by a spark, the jacket began to burn
rapidly, emitting "flames" as if [the boy wearing it] were a jet." *Id*. at 377-78.  Plaintiff has
pointed to no such lay evidence in this case.

[171]     *See*, *supra*, Parts II.B.1. and II.B.4. of this Decision and Order.

2002) (noting that trial court previously granted defendant's motion for summary judgment

dismissing strict liability defective-design claim regarding burns resulting from ignition and

"melt[ing]" of work clothes made of 65% polyester and 35% cotton and was not flame-

retardant).

Indeed, there is even a decision from a federal district court (in fact, from the same circuit

as the court issuing the decision in *LaGorga*) appearing to hold that the melt-drip feature in

question is not a "defect" *as a matter of law*.  *See Dysart v. Eastman Chem. Prods.*, 83-CV-0311,

1985 U.S. Dist. LEXIS 17004, at *6 (E.D. Pa. Aug. 8, 1985) (granting defendant's motion for

directed verdict dismissing strict liability defective-design claim regarding burns resulting from

ignition and melting of "polyester fiberfill batting" that was "difficult to ignite, selfextinguishes

and meets all federal flammability standards," in part because "Eastman's product, by plaintiff's

admission, is not defective").  However, I need not, and do not, base my decision on that

authority, since I find sufficient basis to grant Defendant's motion on the ground that Plaintiff has

failed to adduce admissible material evidence sufficient to create a triable issue of fact.

> **d.** **Possibility of Designing and Manufacturing Product So that It
> Is Safer but Remains Functional and Reasonably Priced, and
> Manufacturer's Ability to Spread Cost of any Safety-Related
> Design Changes**

Plaintiff's opposition memorandum of law and Rule 7.1 Response are devoid of any

citation to record evidence concerning (1) the possibility of designing and manufacturing the

product so that it is safer but remains functional and reasonably priced, and (2) the

manufacturer's ability to spread the cost of any safety-related design changes.  (Dkt. No. 58

[Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.]; Dkt. No. 53 [Plf.'s Rule 7.1

Response].)  Again, I do not have a duty to, and I decline to, perform an independent review of the record in search of such evidence.[172]  In any event, in deciding the other issues presented by Defendant's motion, I have reviewed most or all of the portions of the record that one would expect would contain such evidence, if it was presented, and I have found no such evidence. (*See*, *e.g.*, Dkt. No. 51, Parts 7-8 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart]; Dkt. No. 51, Part 4 [Expert Report of Meyer Rosen]; Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Meyer Rosen].)

The closest Plaintiff comes to adducing such evidence is when, on page 10 of his Expert Report, Meyer Rosen opines on the "cost of flame retardant materials."  (Dkt. No. 51, Part 4, at 10 [Expert Report of Meyer Rosen].)  Specifically, Mr. Rosen asserts as follows, in pertinent part:

> Chemical treatment cost would be about 10 to 30 cents per garment. The cost would decrease significantly when flame retardant treatment would be carried out in high volumes typical of the scale for consumer garments.  It is also a small fraction of the price typically charged for finished garments such as the subject-jogging suit . . . .
>
> The washability of flame-retardant fabric is excellent.  In fact, one can expect to wash the fabric about 100 times without affecting the flame retardancy of the material.  The hand ([or] softness) of the fabric is essentially the same as that of the untreated material.  The increased cost for flame retarding a fabric would be offset by the elimination of burn injuries.  This would result in lower insurance costs[] [and] lower medical costs . . . .

(*Id.*)

There are two problems with this "evidence."  First, it is not admissible since I have found that Plaintiff's expert, Meyer Rosen, is not qualified to testify with regard to such matters,

---

[172]      *See*, *supra*, Part III.A.1. of this Decision and Order.

and that, even if he were so qualified, his proposed testimony would be unreliable and/or unfairly prejudicial.[173]  Second, even if it were admissible, the evidence would be of little materiality, given that Plaintiff has not cited evidence establishing such facts as how much the jogging suit cost to manufacture and transport, how much the jogging suit sold for, and how able was the manufacturer to spread the cost of any safety-related design changes.

> **e.**  **Degree of Awareness of Product's Potential Danger that Can Reasonably Be Attributed to Injured User**

In her affidavit, Margaret Topliff implies that, before the accident, she was not aware of the potential of garments made of 100% polyester "to melt or otherwise burn in the event of contact with a source of heat."  (Dkt. No. 56, ¶ 8.)  However, the degree of awareness of a product's potential danger that can reasonably be attributed to an injured user is only one of the several factors considered under the New York standard for determining the existence of a design defect.  *See Denny*, 87 N.Y.2d at 257.

After weighing each of the above factors, I find that no rational fact-finder could, based on the current record, find the existence of a "design defect" in the jogging suit in question.  As a result, I grant Defendant's motion for summary judgment with respect to Plaintiff's strict liability "design defect" claim.

> **3.**  **Inadequate Warnings**

The legal standard governing Plaintiff's strict liability claim for inadequate warnings is the same legal standard that governs Plaintiff's claim of negligence for failure to warn.  *Fane*, 927 F.2d at 128 ("Our holding that the warnings provided . . . were adequate as a matter of law

---

[173]     *See*, *supra*, Parts II.A.2. and II.B.2. of this Decision and Order.

with respect to the . . . claim in strict products liability also resolves the[] claim of negligent

failure to warn.") [citation omitted], *accord, In re Jones Eastern and Southern Dist. of N.Y.*

*Asbestos Litigation*, 897 F.2d 626, 637-38 (2d Cir. 1990); *Gould v. Rexon Indus. Corp., Ltd.*, 05-

CV-0374, 2006 WL 2301852, at \*4 (N.D.N.Y. Aug. 8, 2006) (McAvoy, J.) ("Plaintiff's failure to

warn claims, although predicated alternatively upon theories of negligence and strict liability, are

essentially equivalent and the Court will treat them as such."), *accord*, *Marshall v. Sheldahl, Inc.*,

150 F. Supp.2d 400, 405 n.5 (N.D.N.Y. 2001) (Kahn, J.) [citation omitted], *Tompkins v. R.J.*

*Reynolds Tobacco Co.*, 92 F. Supp.2d 70, 90 (N.D.N.Y. 2000) (Scullin, J.) [citation omitted].[174]

As a result, I address Plaintiff's failure-to-warn claim below in Part III.B. of this Decision

and Order.

**B.     Plaintiff's Claim of Negligent Failure to Warn**

**1.     Relevant Legal Standard**

As stated in Sections 388 and 401 of the *Restatement (Second) of Torts*, where a retailer

has sold a dangerous product without providing an adequate warning of that danger, and that

product has injured a user, the retailer may be liable to the user under a "failure to warn" theory

of liability if the retailer **knew or had reason to know** that the product **was dangerous, or was**

---

[174]     *See also Enright v. Eli Lilly & Co.*, 568 N.Y.S.2d 550, 555-56 (N.Y. 1991)
("[L]iability here is predicated on a failure to warn of dangers of which the manufacturer knew or
with adequate testing should have known.  Such a claim, though it may be couched in terms of
strict liability, is indistinguishable from a negligence claim . . . .  Concepts of reasonable care and
foreseeability are not divorced from this theory of liability, as they may be under other strict
liability predicates.") [citations omitted]; *Wolfgruber v. Upjohn Co.*, 423 N.Y.S.2d 95, 97 (N.Y.
App. Div., 4th Dept., 1979) ("Regardless of the descriptive terminology used to denominate the
cause of action (viz, 'strict liability' or 'negligence'), where the theory of liability is failure to
warn, negligence and strict liability are equivalent . . . .") [citations omitted], *aff'd*, 436 N.Y.S.2d
614 (N.Y. 1980).

*likely to be dangerous*, when used.[175]  New York has traditionally followed these two sections of

the *Restatement (Second) of Torts*.[176]  It is worth noting that this legal standard also has been used

by at least one state court outside of New York in a case similar to the current action, that is, a

case asserting a failure-to-warn claim against a retailer arising out of the flammability of an

article of clothing.[177]

---

[175]     *See Restatement (Second) of Torts* § 388 & *Comment* (1965) ("One who *supplies* directly . . . a chattel for another to use is subject to liability . . . for physical harm caused by the use of the chattel . . . if the supplier (a) *knows or has reason to know* that the chattel is or *is likely to be dangerous* for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous. . . .  *Persons included as 'suppliers.'* . . .  These rules . . . apply to *sellers* . . . .") [emphasis added]; *Restatement (Second) of Torts* § 401 (1965) ("A *seller* of a chattel . . . who *knows or has reason to know* that the chattel is, or *is likely to be, dangerous* when used . . . is subject to liability for bodily harm caused thereby . . . if he fails to exercise reasonable care to inform [the user] of the danger . . . .") [emphasis added].

[176]     *See, e.g.*, *Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 247 (N.Y. 1983) (stating that "[u]nder general tort rules, a person may be negligent because he or she fails to warn another of known dangers or, in some cases, of those dangers which he had reason to know," and stating that this general rule applies to "suppliers . . . of chattels," citing Section 388 of the *Restatement [Second] of Torts*); *Young v. Elmira Transit Mix, Inc.*, 383 N.Y.S.2d 729, 731 (N.Y. App. Div., 4th Dept., 1976) ("[Section 388 of the] Restatement [(Second) of Torts] . . . controls and provides that a supplier is subject to liability [for a failure to warn] where the supplier has reason to know that the product he furnishes is likely to be dangerous for the use for which it is supplied . . . ."); *Harris v. Int'l Harvester Co.*, 486 N.Y.S.2d 600, 606 (N.Y. Sup. Ct., Oneida County, 1984) ("As a retail seller of gasoline [Agway] will be held liable in negligence if it knew or had reason to know of latent danger in the use of its gasoline and failed to give warning of it . . . .") [citations omitted]; *Chandler v. Northwest Engineering Co.*, 444 N.Y.S.2d 398, 400-401 & nn. 1-2 (N.Y. Sup. Ct., Bronx County, 1981) (applying Restatement [Second] of Torts §§ 388, 401 to duty-to-warn case involving seller of mechanical "pull shovel"); *see also Smith v. Mitlof,* 198 F. Supp.2d 492, 502-503 (S.D.N.Y. 2002) (applying Restatement [Second] of Torts § 388 to duty-to-warn case involving seller of pontoon boat).

[177]     *See, e.g.*, *Ringstad v. I. Magnin & Co.*, 239 P.2d 848 (Wash. 1952).  In *Ringstad*, the plaintiff asserted failure-to-warn claim against retailer arising out of flammability of "summer cocktail robe."  239 P.2d at 849-50.  Relying on the *Restatement (First) of Torts* § 402 (Supp. 1948), the Washington Supreme Court stated that legal standard governing such a claim involves

In its motion papers, Defendant appears to interpret the appropriate legal standard as being whether a retailer "knew or *should have known*" of the danger.[178]  This interpretation is certainly understandable, given the subtlety of the distinction between the meaning of the term "had reason to know" and the meaning of the term "should have known."  However, I believe Defendant's interpretation to be incorrect.  As stated above, Sections 388 and 401 of the *Restatement (Second) of Torts* both use the term "had reason to know," not the term "should have known."  Furthermore, according to Sections 401 and 12 of the *Restatement (Second) of Torts*, whether someone "had reason to know" of a danger is a type of knowledge or notice distinct from whether someone "should have known" of the danger.  In short, the term "had reason to know" does not impose any duty to ascertain unknown facts, while the term "should have known" does impose such a duty.[179]

_____

whether a retailer ***"knows or has reason to know"*** that the product "***is, or is likely to be, dangerous*.**"  *Id*. at 849 [emphasis added].

[178]    (Dkt. No. 45, Part 3, at 11 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg., citing *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 [1998] for this "should have known" standard, even though *Liriano* stated only that such a standard applies to "manufacturer[s]"].)

[179]    *Restatement (Second) of Torts* § 401, *Comment* (1965) ("The words 'reason to know' do not impose any duty to ascertain unknown facts, and are to be distinguished from the words 'should know' as defined in § 12(2)."); *Restatement (Second) of Torts* § 12 & *Comment* (1965) (distinguishing between the term "reason to know" and the term "should know," explaining that the former term "implies no duty of knowledge on the part of the actor" while the latter term "implies that the actor owes another the duty of ascertaining the fact in question").  Furthermore, this difference between the two terms is illustrated in Section 402 of the *Restatement (Second) of Torts* (1965), which explicitly distinguishes between whether a seller *knows or has reason to know* of a danger posed by the chattel and whether a seller *should have known* of that danger through an inspection of the chattel:

> A seller of a chattel . . . who neither knows nor ***has reason to know***
> that it is, or is likely to be dangerous, is not liable in an action for
> negligence for harm caused by the dangerous character or condition of

I note that Section 10 of the *Restatement (Third) of Torts: Products Liability* (1998), which describes the liability of a seller of commercial products for harm caused by a *post-sale* failure to warn, does not contain this "had reason to know" language; rather, that section contains the term "knows or reasonably should know."[180]  There are three problems with applying the standard under Section 10 of the *Restatement (Third) of Torts* to Plaintiff's failure-to-warn claim.

First, the legal standard stated in Section 10, which  regards *post-sale* duty-to-warn claims, does not govern Plaintiff's failure-to-warn claim.  That is because Plaintiff's Complaint and Interrogatory Responses say nothing about Defendant failing to provide a warning *after* the time of sale; rather, they refer only to  Defendant's alleged failure to provide a proper "warning," "label" or "instructions" on the garment, implying that the failure occurred at or before the time of sale.[181]

---

the chattel because of his ***failure to discover the danger by an inspection or test of the chattel*** before selling it.

*Restatement (Second) of Torts* § 402 (1965) [emphasis added].

[180]    *Restatement (Third) of Torts: Products Liability* § 10 (1998) ("One engaged in the business of selling . . . products is subject to liability for . . . the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable person in the seller's position would provide such a warning. . . .  A reasonable person in the seller's position would provide a warning after the time of sale if . . . the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property . . . .").

[181]    (*See* Dkt. No. 1, ¶ 32 [Plf.'s Compl., alleging that Defendant "was negligent in the *distribution, sale and promotion* of the aforesaid garment in that . . . [D]efendant failed to warn the public, . . . specific[ally] . . . the plaintiffs, of the defect, and [D]efendant failed to take the steps that a reasonably prudent seller would take to see that the aforementioned garment *when delivered* was safe for its intended use"] [emphasis added]; Dkt. No. 44, Part 13, ¶ 16 [Plf.'s Supplemental Response to Defendant's Interrogatories, asserting, "The defendant was negligent in all the ways set forth in the complaint and further in . . . failing to *warn the purchaser* of the product of the dangers inherent in utilization of the product for the purpose intended; . . . failing to properly *label the garment*; [and] failing to *provide instructions* for the use of the garment"]

Second, even if the Court were to strain the bounds of the notice-pleading standard under Rule 8 of the Federal Rules of Civil Procedure, ignore the inevitable motion-to-preclude that would be filed by Defendant under Rule 37, and construe Plaintiff's Complaint and Interrogatory Responses as asserting a post-sale failure-to-warn claim, doing so would not change the outcome of Defendant's motion: applying the standard under Section 10 of the *Restatement (Third) of Torts* would lead to the same result in deciding Defendant's motion as would applying the standard under Sections 388 and 401 of the *Restatement (Second) of Torts*.  This is because Section 10 of the *Restatement (Third) of Torts* contains several requirements for liability that are not found in Sections 388 and 401 of the *Restatement (Second) of Torts*.  In particular, rather than requiring simply that the product in question poses a danger or likelihood of danger, Section 10 requires that (1) the product "poses a substantial risk of harm to persons or property," (2) "those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm," (3) "a warning can be effectively communicated to and acted on by those to whom a warning might be provided," and (4) "the risk of harm is sufficiently great to justify the burden of providing a warning."[182]  I find no record evidence in support of these elements.

For example, the lack of any record evidence of a "substantial risk of harm" posed by the jogging suit in question is clear from my analysis below in Parts III.B.2. and III.B.3. of this Decision and Order.  Also clear from my analysis below in Parts III.B.2. and III.B.3. of this

[emphasis added].)

[182]     Moreover, by injecting reasonableness into the "should have known" standard, the "*reasonably* should have known" standard does not appear to be all that different from the "had *reason* to know" standard.

Decision and Order is the lack of any record evidence that, before the date of the accident

(October 16, 2002), Defendant "reasonably should have known" of any "substantial risk of harm"

posed by the jogging suit in question.  With regard to the possibility of locating, and effectively

communicating a post-sale warning to, Tanisha or Mrs. Topliff, the sole record evidence on the

subject indicates that (1) the jogging suit in question was purchased by Beatrice Topliff,

Tanisha's grandmother, in December of 2001, almost a year before the accident,[183] and (2)

"[u]pon information and belief, the clothing was purchased . . . with a reusable gift card that may

have been used in connection with [Beatrice Topliff's] Discover Credit [C]ard."[184]  Furthermore,

even if the Court were to assume that it had been possible for Defendant to communicate a

warning to Mrs. Topliff and/or Tanisha, there is no record evidence that, before the accident, "the

*risk* of harm [was] sufficiently great to justify the burden of providing a warning."

Third, it is far from certain that Section 10 of the *Restatement (Third) of Torts* correctly

states the law in New York with respect to the level of knowledge or notice that a seller must

have to be liable on a post-sale duty to warn claim.  Granted, Section 10 does correctly cite *Cover*

*v. Cohen*, 61 N.Y.2d 261, 276 (N.Y. 1984), as discussing four of the requirements to establish a

post-sale duty-to-warn claim (discussed below).  However, this is the sole New York case cited

in the *Comments* to Section 10.  Furthermore, I have found only one other relevant New York

case citing Section 10 of the *Restatement (Third) of Torts; Products Liability*.  *See Liriano v.*

---

[183]     (Dkt. No. 8, ¶¶ 7.f., 8 [Plf.'s Response to Defendant's Interrogatories].)

[184]     (*Id*. at ¶ 8.)

*Hobart Corp.*, 92 N.Y.2d 232, 240, n.3 (N.Y. 1998).[185]  Neither *Cover v. Cohen* nor *Liriano v.*

*Hobart Corp.* stands for the proposition that a *retailer* has, absent *receiving notice* of a danger, a

duty to perform some sort of investigation and/or testing on its products, post-sale, in order to

ascertain any dangers.  Indeed, those two cases undermine such a rule.  *Cover v. Cohen* states that

a vendor in a post-sale duty-to-warn case should be found liable only if the risks at issue "come

to his attention" or are "brought to [his] attention," for example, through the "report[ing]" of

accidents.[186]  Indeed, *Cover* twice cites Section 388 of the *Restatement (Second) of Torts* in

support of its recitation of the relevant standard for a post-sale duty-to-warn case.[187]  Similarly,

*Liriano v. Hobart Corp*. states that "[s]uch a duty [to warn by a *manufacturer*] will generally

arise where a defect or danger is *revealed by user operation and brought to the attention* of the

*manufacturer . . . .*"[188]

   For all these reasons, I find that the applicable legal standard governing Plaintiff's failure-

---

[185] There is one other case, which I find to be inapposite.  *See Adams v. Genie Indus.*, 237 N.Y.L.J. 26 (N.Y. Sup. Ct., New York County, 2007) (citing Section 10 of the *Restatement [Third] of Torts* but applying it to a manufacturer and, in any event, not discussing the level of notice required for there to be liability).

[186] *Cover v. Cohen*, 61 N.Y.2d 261, 274-276 (N.Y. 1984) ("A . . . retailer may . . . incur liability for failing to warn concerning dangers in the use of a product which come to his attention after . . . sale, through advancements in the state of the art, with which he is expected to stay abreast, or through being made aware of later accidents involving dangers in the product of which warning should be given to users. . . . Although a product be reasonably safe when . . . sold and involve no then known risks of which warning need be given, risks thereafter revealed by user operation and brought to the attention of the . . . vendor may impose on [the vendor] . . . a duty to warn . . . .  Restatement, Torts 2d, § 388 . . . .  What notice to a . . . vendor . . . will trigger his postdelivery duty to warn appears to be a function of the degree of danger which the problem involves and the number of instances reported . . . .  Restatement, Torts 2d, § 388 . . . .").

[187] *Cover*, 61 N.Y.2d at 274-276.

[188] *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 240 (N.Y. 1998) [emphasis added].

to-warn claim is the standard stated in Sections 388 and 401 of the *Restatement (Second) of Torts*.  Applying that legal standard to this action and Defendant's motion, two issues arise: (1) whether any evidence exists in the record from which a reasonable fact-finder could conclude that the jogging suit in question was "dangerous" or "likely to be dangerous" when used; and (2) whether any evidence exists in the record from which a reasonable fact-finder could conclude that, before the date of the accident (October 16, 2002), Defendant "knew or had reason to know" that the jogging suit in question was dangerous or likely to be dangerous when used.

By letter to counsel dated March 8, 2007, I requested the benefit of oral argument on these two issues.  (Dkt. No. 67.)  This occurred on March 12, 2007.  At oral argument, Plaintiff's counsel argued that the "danger" at issue resulted from (1) the "melt-drip" property of the jogging suit's 100% polyester fabric, and (2) the fact that the jogging suit was loose-fitting and/or fuzzy.  Given Plaintiff's counsel's oral arguments on these issues, and given Tanisha's serious injuries, I am going to set forth exhaustively the analysis that leads me to reject his arguments.

### 2.        Danger from "Melt Drip" Effect of 100% Polyester

### a.        No Record Evidence of Such Danger

Before analyzing whether any record evidence exists that the "melt-drip" property of the 100% polyester fabric in question constituted a "danger," it is necessary to analyze precisely what the term "dangerous" means in the legal standard governing failure-to-warn claims.  Simply stated, the term "dangerous" means an *unreasonable* risk of harm.[189]  In determining whether the

---

[189]        *See, e.g., Daley v. McNeil Consumer Prod. Co.*, 164 F. Supp.2d 367, 373 (S.D.N.Y. 2001) (manufacturer had duty to warn only if product posed "an unreasonable danger" to users); *Kaempfe v. Lehn & Fink Prod. Corp.*, 249 N.Y.S.2d 840, 845-846 (N.Y. App. Div., 1st Dept., 1964) (manufacturer has duty to warn only of an "unreasonable danger" to users).

risk of harm was "unreasonable," courts consider, among other things, "the chance that some harm may result" from the product in question.[190]  In addition, courts may find it necessary to consider how dangerous the product is as compared to the "average" or "ordinary" such product on the market.[191]

---

[190]        *See*, *e.g.*, *Kaempfe*, 249 N.Y.S.2d 840, 845-846 (manufacturer "owes no duty to warn "the unknown few who constitute a mere microscopic fraction of potential users who may suffer some allergic reaction not common to the ordinary or normal person"); *Soto v. E.C. Brown Co.*, 130 N.Y.S.2d 21, 22 (N.Y. App. Div., 2d Dept., 1954)  (manufacturer had duty to warn only if product was "probable source of danger"); *see also Restatement (Second) of Torts* § 388, *Comment n.* ("Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them (see § 291), and the magnitude of the risk is determined not only by *the chance that some harm may result* but also the serious or trivial character of the harm which is likely to result (see § 293 [of the *Restatement (Second) of Torts*]).") [emphasis added]; *Restatement (Second) of Torts* § 291 ("Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done."); *Restatement (Second) of Torts* § 293 ("In determining the magnitude of the risk for the purpose of determining whether the actor is negligent, the following factors are important: (a) the social value which the law attaches to the interests which are imperiled; (b) *the extent of the chance that the actor's conduct will cause an invasion of any interest of the other or of one of a class of which the other is a member*; (c) the extent of the harm likely to be caused to the interests imperiled; (d) *the number of persons whose interests are likely to be invaded if the risk takes effect in harm*.") [emphasis added].

[191]        *See*, *e.g.*, *Pelman v. McDonald's Corp.*, 237 F. Supp.2d 512, 531-536 (S.D.N.Y. 2003) (dismissing plaintiff's failure-to-warn claim, after considering allegations that McDonalds' products are more dangerous that the average hamburger, fries and shake); *Weigl v. Quicky Specialties Co.*, No. 18321-92, XVIII N.Y. Jury Verdict Reporter 26, 2000 WL 33724898 (N.Y. Sup. Ct., New York County, Dec. 8, 2000) (affirming a jury verdict in favor of a plaintiff with regard to, *inter alia*, the plaintiff's failure-to-warn claim arising out of the ignition, "melt[ing] and fus[ing] to the wearer" of a lab coat made of 65% polyester and 35% cotton, where plaintiff adduced expert testimony that the plaintiff would not have suffered serious injury if the coat had been made out of either 100% cotton, which is easily extinguished, or 100% polyester, which tends to fall apart and self-extinguish); *see also Restatement (Second) of Torts* § 402A, *Comment i.* ("Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture.  That is not what is meant by 'unreasonably dangerous' . . . .  The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary

### i.    Types of Evidence that Typically Might Suffice to Create Issue of Fact Under Similar Circumstances

I have carefully searched Lexis and Westlaw for duty-to-warn cases arising out of the melting, dripping or clinging of polyester clothing, and I have found only three cases that discuss the evidence involved in sufficient detail to be of guidance to the Court.

In *Weigl v. Quincy Specialties Co.*, the New York State Appellate Division, First Department, affirmed a jury verdict in favor of a plaintiff with regard to, *inter alia*, the plaintiff's failure-to-warn claim arising out of the ignition, "melt[ing] and fus[ing] to the wearer" of a lab coat made of 65% polyester and 35% cotton.  766 N.Y.S2d 428, 429 (N.Y. App. Div., 1st Dept., 2003).  What was the evidence upon which the jury based its finding that the lab coat was "dangerous"?  Such evidence included the following: (1) evidence that the fabric mill that sold the defendant the material to make the coat repeatedly warned the defendant that the material was flammable and should never be exposed to flame or intense heat; (2) the expert testimony of the plaintiff's treating plastic surgeon (Dr. Gregory La Trenta) who offered expert testimony that the lab coat was the "main cause" of the plaintiff's burns; and (3) the testimony of the plaintiff's expert on flammable fabrics (Dr. Charles Beroes), stating that the plaintiff would not have suffered serious injury if the coat had been made out of either 100% cotton (which is easily extinguished) or 100% polyester (which tends to fall apart and self-extinguish), and stating that the fabric in question caused unusually deep and disfiguring burns, due to the fact that the fabric

---

consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.  Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fuel oil, is unreasonably dangerous. . . .  Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.").

was "blended," the ignition of the cotton fueling the melting of the polyester.  *See Weigl v. Quicky Specialities Co.*, No. 18321-92, XVIII N.Y. Jury Verdict Reporter 26, 2000 WL 33724898 (N.Y. Sup. Ct., New York County, Dec. 8, 2000).  In the current case, Plaintiff has offered no such evidence.

Similarly, in *Bingham v. J.C. Penney Co.*, the Supreme Court of Minnesota affirmed a jury verdict in favor of a plaintiff with regard to, *inter alia*, the plaintiff's failure-to-warn claim arising out of the ignition, "melt[ing] and cling[ing]" of a work shirt and pants made of 65% polyester and 35% cotton.  268 N.W.2d 892, 895 (Minn. 1978).  What was the evidence upon which the jury based its finding that the work shirt and pants were "dangerous"?  Such evidence included the following: (1) the testimony of the plaintiff's expert that the injuries plaintiff received from an electric arc or "flash-over" were aggravated by the polyester in the work clothes; and (2) evidence that a co-worker, who was also caught in the flash-over and was wearing all-cotton work clothes, was hospitalized for a shorter period of time than was the plaintiff.  *See Bingham*, 268 N.W.2d at 895 & n.3.  Again, in the current case, Plaintiff has offered no such evidence.

In *Wilson v. Bradlees of New Eng., Inc.*, the U.S. District Court for the District of New Hampshire denied the defendant's pre-trial motion for summary judgment with regard to plaintiff's failure-to-warn claim arising out of the ignition and "melt[ing]" of a sweatshirt made of 50% polyester and 50% cotton.  93-CV-0047, 1999 WL 816817, at *3-4 (D. N.H. Feb. 3, 1999), *aff'd*, 250 F.3d 10, 14 (1st Cir. 2001).  What was the evidence creating a potential question of fact on this claim, including the issue that the sweatshirt was "dangerous"?  While the district court decision does not expressly answer this specific question, that decision, along with an

78

appellate decision, indicate that evidence of such a "danger" included the following: (1) evidence of other accidents showing, *inter alia*, that garments made of 50% polyester and 50% cotton, when ignited, can cause "serious injury"; (2) "limited" testimony by the plaintiff's expert, Dr. Philip Colver, regarding fire cause of origin; (3) "limited" testimony by the plaintiff's expert, Gordon Damant, regarding "matters involving chemistry and the flammable properties of polyvinyl chloride and plastisols"; (4) testimony by the plaintiff's expert, Dr. Charles Beroes, regarding "the risks posed by fabrics that melt on the skin," in particular, testimony that "a burn from a fabric that melts on the skin would be more severe than a burn from a fabric that 'ashes'"; and (5) the expert testimony by the plaintiff's treating physician, Dr. Ramsey Choucair. *Wilson*, 1999 WL 816817, at *5-6; *Wilson*, 250 F.3d at 18-19, 21-23 & n.22.[192]  Again, in the current case, Plaintiff has offered no such evidence.

Indeed, as stated above, the business manager at Wal-Mart responsible for purchasing 12,000 of the girls' jogging suits in question from the suits' manufacturer was asked if she knew of any complaints or questions by customers regarding the flammability of the jogging suits in question, all 12,000 of which were sold to customers, and she responded that she did not know of any such complaints.[193]

---

[192]    At the close of the plaintiff's evidence, the district court granted the defendant's motion for judgment as a matter of law pursuant to Rule 50(a) on the plaintiff's duty-to-warn claim, on a ground other than a lack of the existence of a "danger." *Wilson*, 250 F.3d at 14-15. Specifically, the district court granted defendant's motion on the ground that the "plaintiff had failed to prove that a more particularized warning as to the unwonted flammability characteristics of the sweatshirt would have prevented [the child's] spontaneous cact of reaching for the kettle." *Id*.  On appeal, the First Circuit affirmed.  *Id*. at 14-16, 22-23.

[193]    (Dkt. No. 51, Parts 7-8, at 13-28, 32-34 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart].)

### ii.      Plaintiff's Arguments

In oral argument, Plaintiff's counsel cited six pieces of "evidence" in support of his

assertion that the jogging suit in question was, or was likely to be, dangerous because of the

"melt-drip" property of its 100% polyester.

First, Plaintiff's counsel cited a medical record authored by Dr. Greer L. Pomeroy, M.D.

As with the three press releases mentioned earlier, this medical document was not part of the

record at the time of oral argument.  However, because of the severity of Tanisha's injuries, I

granted leave to Plaintiff's counsel to make that document part of the record, which he did (with

the help of defense counsel).  (Dkt. No. 69, Part 2.)  The sole relevance of that three-page

medical record comes in one sentence occurring in the middle of a long paragraph under the

heading "Emergency Department Course."  Specifically, that sentence states, "The patient had, of

note, a polyester type, purple sweatshirt on, and some of this material had melted with the heat of

the fire, which may have added to the burns on the patient."  As a threshold matter, I find that any

expert testimony offered by Dr. Pomeroy on this subject would be inadmissible.[194]  In any event,

I am extremely doubtful that any such testimony would be enough to create an issue of fact since

that testimony does not discuss "the chance that some harm may result" from the jogging suit in

question,[195] nor does it compare the risks posed by the jogging suit in question to the risks posed

---

[194]      Specifically, I am persuaded by Defendant's argument that such testimony should
be barred at trial on the ground that (1) it constitutes expert testimony, and (2) Plaintiff had
repeatedly failed to disclose Dr. Pomeroy as an expert.  (Dkt. No. 44, Parts 14, 17 [Plf.'s Expert
Witness Disclosure, and Supplemental Expert Witness Disclosure, not listing Dr. Pomeroy as
expert].)

[195]      *Restatement (Second) of Torts* § 388, *Comment n.* ("Here, as in every case which
involves the determination of the precautions which must be taken to satisfy the requirements of
reasonable care, the magnitude of the risk involved must be compared with the burden which

by the "average" or "ordinary" such jogging suits on the market.[196]   I note that, in oral argument,

Plaintiff's counsel admitted that he had no reason to believe that Dr. Pomeroy's trial testimony

would go further than the statements she made in this medical record.

Second, Plaintiff's counsel cited an unidentified medical record of Dr. Margherite

Bonaventura, M.D., allegedly stating that (a) Tanisha's actual injuries were consistent with

Plaintiff's allegation that she was close to a flame and that her garment became "hot," and (b)

that "the way in which the burns formed is what caused the injury."  For the sake of argument, I

will assume that Plaintiff designated Dr. Bonaventura as an expert on the issue of liability (and

not simply an expert on the issue damages, as asserted by Defendant in oral argument).  The

record on Defendant's motion for summary judgment contains four medical records authored by

Dr. Bonaventura.  (Dkt. No. 44, Parts 65-68.)  Only one of these records appears at all relevant.

(Dkt. No. 44, Part 66.)  That document (signed on January 13, 2003, several months after the

---

would be imposed by requiring them (see § 291), and the magnitude of the risk is determined . . .
[in part] by *the chance that some harm may result* . . . .") [emphasis added]; *Restatement
(Second) of Torts* § 291 ("Where an act is one which a reasonable man would recognize as
involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is
of such magnitude as to outweigh what the law regards as the utility of the act or of the particular
manner in which it is done."); *see, e.g., Kaempfe*, 249 N.Y.S.2d 840, 845-846 (manufacturer
owes no duty to warn "the unknown few who constitute a mere microscopic fraction of potential
users who may suffer some allergic reaction not common to the ordinary or normal person");
*Soto*, 130 N.Y.S.2d at 22 (manufacturer had duty to warn only if product was "probable source of
danger").

[196]     *See, e.g., Pelman*, 237 F. Supp.2d at 531-536 (dismissing plaintiff's failure-to-
warn claim, after considering unsubstantiated allegations that McDonalds' products are more
dangerous than the average hamburger, fries and shake); *cf. Weigl*, 2000 WL 33724898
(affirming a jury verdict in favor of a plaintiff with regard to, *inter alia*, the plaintiff's failure-to-
warn claim arising out of the ignition, "melt[ing] and fus[ing] to the wearer" of a lab coat made
of 65% polyester and 35% cotton, where plaintiff adduced expert testimony that the plaintiff
would not have suffered serious injury if the coat had been made out of either 100% cotton,
which is easily extinguished, or 100% polyester, which tends to fall apart and self-extinguish).

accident) states, "The patient is a 5 year old female patient who had been at home with her mother while her mother was lighting a wood stove.  There was a flash which flashed on her approximately 10' away, lighting her dress on fire.  By the time the parents were able to put the fire out by putting her on the ground and rolling her, she suffered second and third degree burns to approximately 27% of her body."  With respect to Plaintiff's counsel's argument that this statement is evidence that Tanisha's actual injuries were consistent with Plaintiff's allegation that she was close to a flame, counsel's argument is undermined by the fact that the medical record states that she was "10' away" from the stove.  In addition, even if the medical record indicated that Tanisha was close to the stove, I fail to understand how such a fact would tend to show that the fabric posed a "danger" for purposes of Plaintiff's failure-to-warn claim (if anything, it would tend to show the opposite fact).  With respect to Plaintiff's counsel's argument that this statement is evidence that Tanisha's actual injuries were consistent with Plaintiff's allegation that Tanisha became "hot" during the accident, I do not see anything in this medical record about Tanisha becoming "hot."[197]  Finally, with respect to Plaintiff's counsel argument that this medical record is evidence that "the way in which the burns formed is what caused the injury," I must reject that argument as well: I see no such evidence in this medical record.  I note that Plaintiff's counsel acknowledged in oral argument that he has no reason to believe that the trial testimony of Dr. Bonaventura (with whom he has not spoken) would "go further" than her statements in these

---

[197]     There is a statement in another medical record that a physical examination of Tanisha at the time of admission to the hospital after the accident showed the "singeing of [her] nasal hair."  (Dkt. No. 44, Part 65.)  Among the several problems with the probative value of this piece of evidence is that Plaintiff is not alleging that the melting of the polyester somehow caused the singeing of Tanisha's nasal hair.  Again, if anything the singeing of Tanisha's nasal hair supports a finding that the 100% polyester garment melted only after being subjected to heat that was extreme enough or close enough to melt the hairs inside Tanisha's nose.

medical records.

Third, Plaintiff's counsel cited Mrs. Topliff's deposition testimony that, at the time of the accident, she heard Tanisha say "I'm hot" although she saw no flame on Tanisha's garment, which caused Mrs. Topliff to believe mistakenly that it was safe to roll Tanisha on the wet grass in order to extinguish the fire. (Dkt. No. 51, Parts 2-3.) The main problem with Plaintiff's counsel's reliance on the selected deposition testimony to which he refers is that the testimony is of no probative value on the issue of whether the fabric posed a "danger" for purposes of Plaintiff's failure-to-warn claim. The most that such testimony would prove is that (1) the fabric in question melted without igniting and (2) the particular burning characteristic of the fabric led Mrs. Topliff to believe it was "safe" to extinguish the fire by rolling Plaintiff on the ground. The first fact is simply not probative of whether a "danger" existed under the circumstances, especially when one considers the bulk of record evidence that the melt-drip property of 100% polyester is often a desirable feature in clothing. With regard to the second fact, I will set aside, for the sake of much-needed brevity, the fact that this "evidence" is severely undermined by those portions of Mrs. Topliff's testimony in which she acknowledges noticing heat on her daughter's clothing when she picked her up (which would appear to undermine counsel's argument that Mrs. Topliff was led to believe it was safe to roll Tanisha on the ground).[198] The main problem with this evidence is that it does not address the safety of the jogging suit in question versus the safety of the average or ordinary such jogging suit on the market, under

_____

[198]    (*See* Dkt. No. 51, Part 3, at 61-62, 64, 67 [Trans. of Depo. of Mrs. Topliff, stating, "[Q:] At what point did you know that she was on fire? [A:] When I picked her up and got my [right] hand burnt. . . . [Q:] When you put your arm around her, did you feel heat? [A:] Yes. [Q:] When did you feel heat? [A:] As soon as I put my arm around her [waist].").

similar circumstances.  As stated above, implicit in the concept of "danger" is a comparison of how dangerous the product at issue is versus how dangerous the average or ordinary such product on the market is.

Fourth, Plaintiff's counsel cited the "fact" that the cotton underwear worn by Tanisha at the time of the accident did not burn.  Plaintiff did not specify the nature of any record evidence in support of this "fact."  I can find nothing in the deposition of Mrs. Topliff regarding any such *cotton* underwear.  (Dkt. No. 51, Part 3, at 74 [Trans. of Depo. of Mrs. Topliff, asserting that Tanisha was wearing underwear at the time of the accident but that "I have no idea" if it was made of cotton].)  I can find nothing in Plaintiff's medical records regarding any such cotton underwear.  (Dkt. No. 44, Parts 65-68; Dkt. No. 69, Part 2.)  Even if there were such record evidence, Defendant argues persuasively that such evidence should be precluded at trial since the underwear in question was discarded at some point and thus never produced to, or inspected by, Defendant.  Furthermore, Plaintiff's argument disregards the fact that the underwear in question was being shielded from the alleged burning debris by the polyester.  For all of these reasons, I find that any evidence that Tanisha's underwear did not burn would be insufficient to create an issue of fact with respect to Plaintiff's failure-to-warn claim.

Fifth, Plaintiff's counsel cites four pieces of "literature."[199]  I find that these documents

---

[199]     The first piece of literature was an article entitled, "Committee on Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," published in *Pediatrics: Official Journal of the American Academy of Pediatrics* in December of 2006.  (Dkt. No. 52, Part 5.)  The second piece of literature was a press release entitled, "If You Make, Import, Distribute or Sell Clothing: An Important Fire Safety Message About the Flammability Hazard of Your Products," issued by the National Association of Fire Marshals in December of 2004.  (Dkt. No. 52, Part 8.)  The third piece of literature was a "Safety Alert" issued by the Consumer Product Safety Commission on June 20, 2000.  (Dkt. No. 51, Part 12.)  The fourth piece of literature was a document entitled, "Guide to Nightwear and Fire: A Guide to Nightwear

are insufficient to create an issue of fact.  Two of those documents do not mention the "melting"

or "clinging" property of polyester at issue in this action.[200]  The third document does state that

"synthetic" fabrics "tend to soften, some actually melting to form a syrupy liquid or a sticky tar-

like substance.  This property may cause serious burns"; however, that document also states that

synthetics generally possess beneficial attributes, stating, "Rayon is not any more flammable than

cotton, while all the other synthetics are less flammable, and some will hardly burn at all. . . .

The weave of a fabric is important in its flammability, at least for cottons and rayons.  The

melting characteristic of synthetics diminishes the importance of the weave or the type of

surface."[201]  The fourth document mentions the "melting" property of polyester but implies that

the property can be desirable, stating: "[F]abrics, such as nylon and polyester, which melt away

cleanly from the flame (ie without decomposing) may pass the [United Kingdom's children's

nightwear flammability] test providing that all threads, trimmings and decorations etc are also of

a synthetic substance which behaves in this way."[202]

---

(Safety) Regulations," published by the United Kingdom Department of Trade and Industry on an
undetermined date.  (Dkt. No. 44, Part 57.)

    [200]    (Dkt. No. 52, Part 8 [attaching press release entitled, "If You Make, Import,
Distribute or Sell Clothing: An Important Fire Safety Message About the Flammability Hazard of
Your Products," published by the National Association of Fire Marshals in December of 2004];
Dkt. No. 51, Part 12 [attaching  "Safety Alert" issued by the Consumer Product Safety
Commission on June 20, 2000].)

    [201]    (Dkt. No. 52, Part 5, at 729-730 [attaching article entitled, "Committee on
Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," published by
*Pediatrics: Official Journal of the American Academy of Pediatrics* in December of 2006].)

    [202]    (Dkt. No. 44, Part 57, at 7 [attaching document entitled, "Guide to Nightwear and
Fire: A Guide to Nightwear (Safety) Regulations," published by the United Kingdom Department
of Trade and Industry on an unidentified date].)

Sixth, Plaintiff's counsel cites three press releases issued by the Consumer Product Safety Commission regarding product recalls.[203]  None of those three press releases mention the "melting" or "clinging" property of polyester at issue in this action.  (Dkt. No. 68, Part 2.)  One of the press releases regards the recall of six styles of children's pajamas sold by Gap and Old Navy because the pajamas' 100% polyester fabric was found, in five tests, to not self-extinguish, as it was required to do under the Children's Sleepwear Test.  However, that press release in no way suggests that *other* garments made of 100% polyester also fail to self-extinguish.  In any event, failure of a 100% polyester garment to self-extinguish is somewhat different than the "danger" alleged in this action, namely, the potential that the fabric will, because of its melt-drip feature, cause burns.

Finally, although Plaintiff's counsel did not cite Dr. Rosen's proffered expert testimony that, when heated,100% polyester fabric melts and has the potential to drip and not self-extinguish, I will consider such testimony.  (Dkt. No. 44, Part 42 [Expert Report of Meyer Rosen]; Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Meyer Rosen]; Dkt. No. 57 [Affid, of Meyer Rosen].)  The problem is that such testimony merely describes the physical or chemical properties of polyester in general without opining specifically on the danger of polyester garments relative to the dangers posed by garments made of other fabrics.  As a result, it is not enough to create an issue of fact under the circumstances.

---

[203]      (Dkt. No. 68, Part 2 [attaching a February 1995 press release regarding a recall of certain "Garments Made from a Flammable Fleece Fabric," a December 1999 press release regarding a recall of certain "Children's Pajamas," and an August 2006 press release regarding a recall of certain "Children's Lounge Pants"].)

b.      **In any Event, No Record Evidence of Knowledge or "Reason to Know" of Such Danger**

In oral argument, Plaintiff's counsel conceded that the record contains no evidence that Defendant had actual knowledge of any danger posed by the jogging suit in question.  I agree: I can find no such evidence in the record.  Indeed, not only is there no record evidence of any actual knowledge by Defendant of any danger posed by the melt-drip effect of 100% polyester, but there is no record evidence of any actual knowledge by Defendant of the melt-drip effect itself.[204]

The question, then, becomes whether or not the record contains any evidence that Defendant "had reason to know" of the danger in question.  But what exactly does "had reason to know" mean?  Section 12 of the *Restatement (Second) of Torts* (1965) provides,

> The words 'reason to know' are used throughout the Restatement of this [s]ubject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists. . . .

> **Comment**: . . .  'Reason to know' means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist.

*Restatement (Second) of Torts* § 12, & *Comment* (1965) [emphasis in original].

---

[204]      For example, during the deposition of Defendant's business manager, Beverly Dych, who was responsible for purchasing the jogging suits in question from the manufacturer, Plaintiff adduced testimony merely that Ms. Dych had reason to believe that the garment at issue was exempt from government flammability testing in some way due to the garment's fabric being composed of 100% polyester.  (Dkt. No. 51, Parts 7-8, at 10-11, 44-46, 49-52 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart].)

i.     **Types of Evidence that Typically Might Suffice to Create Issue of Fact Under Similar Circumstances**

I have carefully read the three analogous decisions discussed above in Part III.B.2.a.i. of this Decision and Order.  *See Weigl v. Quincy Specialties Co.*, 766 N.Y.S2d 428 (N.Y. App. Div., 1st Dept., 2003); *Bingham v. J.C. Penney Co.*, 268 N.W.2d 892 (Minn. 1978); *Wilson v. Bradlees of New Eng., Inc.*, 93-CV-0047, 1999 WL 816817 (D. N.H. Feb. 3, 1999), *aff'd*, 250 F.3d 10 (1st Cir. 2001).  Those cases suggest that the types of evidence that usually suffice to create a question of fact in analogous circumstances include (1) evidence that the manufacturer that sold Defendant the apparel warned it of the danger in question, and/or (2) evidence of other accidents showing that garments of a similar fabric composition are likely to cause serious injury. Here, I have found no such evidence in the record.

ii.     **Plaintiff's Arguments**

In oral argument, Plaintiff's counsel cited three pieces of "evidence" in support of his assertion that Defendant "had reason to know" that the jogging suit in question was, or was likely to be, dangerous because of the melt-drip property of its 100% polyester fabric.

First, Plaintiff's counsel cited Defendant's "contract with the distributor."  I assume that counsel means Defendant's "Vendor Agreement" with Apparel Associates, LLC, which attaches a "Sales Confirmation" document issued by Killara Enterprises Ltd.  (Dkt. No. 51, Part 9.) Granted, that document does mention that the garment at issue is made of 100% polyester. However, the document does not mention anything about the garment having the propensity to "melt" when heated, or somehow being dangerous, because it was made of 100% polyester (or for any other reason).  As a result, I find that this "Vendor's Agreement" is of no probative value

on the issue of whether Defendant "had reason to know" of the danger alleged.[205]

Second, Plaintiff's counsel cites the three press releases issued by the Consumer Product Safety Commission regarding product recalls, discussed above in Part III.B.2.a.ii. of this Decision and Order. One of those press releases was issued in August of 2006, nearly four years *after* the accident in question (on October 16, 2002). (Dkt. No. 68, Part 2 [attaching August 2006 press release regarding recall of "Children's Lounge Pants"].) As a result, I find that the August 2006 press release is of no probative value on the issue of whether Defendant had (by October 16, 2002) "reason to know" of the danger alleged. Moreover, none of the three press releases regards garments sold by Defendant. Finally, none of the three press releases mentions the danger alleged in this action (or even the "melting" or "clinging" property of polyester in general). (Dkt. No. 68, Part 2.) One of the press releases does regard the recall of six styles of children's pajamas sold by Gap and Old Navy because the pajamas' 100% polyester fabric was found, in five tests, to not self-extinguish, as it was required to do under the Children's

---

[205]     I note that, by scrutinizing the deposition testimony of one of Defendant's business managers, Beverly Dych, I find that three reports were apparently issued by Consumer Testing Laboratories, concerning the garment at issue. (Dkt. No. 51, Part 8, at 32-52 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart, referencing Exhibit 6 dated unknown, Exhibit 6A dated 7/17/01, and Exhibit 6B dated 8/1/01, which are each "Consumer Testing Lab Reports"].) Plaintiff did not make these reports part of the record. In any event, from the deposition testimony of Ms. Dych, it appears that only one of the three reports is of any relevance to the issue at hand, namely, the report that gave Ms. Dych reason to believe that the garment at issue was exempt from government flammability testing in some way due to the garment's fabric being composed of 100% polyester. (Dkt. No. 51, Parts 7-8, at 10-11, 44-46, 49-52 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart].) Specifically, Ms. Dych described that report as containing the following question: "[D]oes the fiber composition of the fabric include any fibers other than acrylic, modacrylic, nylon, olefin, polyester and/or wool. . . . If you mark yes, you perform test. If you mark no, [it means you are] 'not required to test by law.'" (*Id*. at 50-51.) In oral argument, Plaintiff's counsel conceded that Ms. Dych's deposition testimony did not contain any evidence that Defendant "had reason to know" of the alleged danger in question. I agree.

Sleepwear Test.  As a threshold matter, that press release in no way suggests that *other* garments made of 100% polyester also fail to self-extinguish.  In any event, the failure of a 100% polyester garment to self-extinguish is somewhat different than the "danger" alleged in this action, namely, the potential that the fabric will, because of its melt-drip feature, cause burns.

Third, Plaintiff's counsel cites the four pieces of "literature" discussed above in Part III.B.2.a.ii. of this Decision and Order.  Again, I find that these documents are insufficient to create an issue of fact with regard to whether Defendant had (before the date of the accident) reason to know of the danger alleged.  Two of the documents were published several years *after* the occurrence of the accident in question.[206]  The third document does not mention the "melting" or "clinging" property of polyester at issue in this action.[207]  The fourth document mentions the

---

[206]        (Dkt. No. 52, Part 5 [attaching article entitled, "Committee on Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," published by *Pediatrics: Official Journal of the American Academy of Pediatrics* in December of 2006]; Dkt. No. 52, Part 8 [attaching press release entitled, "If You Make, Import, Distribute or Sell Clothing: An Important Fire Safety Message About the Flammability Hazard of Your Products," published by the National Association of Fire Marshals in December of 2004].)  Moreover, one of these two documents does not mention the "melting" or "clinging" property of polyester at issue in this action.  (Dkt. No. 52, Part 8 [attaching press release entitled, "If You Make, Import, Distribute or Sell Clothing: An Important Fire Safety Message About the Flammability Hazard of Your Products," published by the National Association of Fire Marshals in December of 2004].)  Furthermore, while the other document does state that "synthetic" fabrics "tend to soften, some actually melting to form a syrupy liquid or a sticky tar-like substance.  This property may cause serious burns," that document also states that synthetics generally possess beneficial attributes:  "Rayon is not any more flammable than cotton, while all the other synthetics are less flammable, and some will hardly burn at all. . . .  The weave of a fabric is important in its flammability, at least for cottons and rayons.  The melting characteristic of synthetics diminishes the importance of the weave or the type of surface."  (Dkt. No. 52, Part 5, at 729-730 [attaching article entitled, "Committee on Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," published by *Pediatrics: Official Journal of the American Academy of Pediatrics* in December of 2006].)

[207]        (Dkt. No. 51, Part 12 [attaching "Safety Alert" issued by the Consumer Product Safety Commission on June 20, 2000].)

90

"melting" property of polyester but implies that the property can be desirable, stating: "[F]abrics, such as nylon and polyester, which melt away cleanly from the flame (ie without decomposing) may pass the [United Kingdom's children's nightwear flammability] test providing that all threads, trimmings and decorations etc are also of a synthetic substance which behaves in this way."[208]

Although Plaintiff's counsel did not cite Dr. Rosen's proffered expert testimony that, when heated,100% polyester fabric melts and has the potential to drip and not self-extinguish, I will consider that testimony.  (Dkt. No. 44, Part 42 [Expert Report of Meyer Rosen]; Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Meyer Rosen]; Dkt. No. 57 [Affid. of Meyer Rosen].)  Setting aside the fact that such testimony merely describes the physical or chemical properties of polyester in general without opining specifically on the danger of polyester garments relative to the dangers posed by garments made of other fabrics, the fact remains that this testimony contains absolutely no evidence that Defendant *had reason to know* of the alleged danger before the date of the accident (October 16, 2002).

Finally, I have scrupulously reviewed decisions on Lexis, Westlaw and the U.S. Courts' PACER Service, but have been unable to find any cases in which Wal-Mart was a defendant in a product liability case involving the melting of polyester, which conceivably *might* be sufficient to find a question of fact regarding whether it "had reason to know" of the danger alleged in this case.  Granted, prior to the date of the accident in question (October 16, 2002), the melt-drip effect (or "melt and cling" effect) of polyester had been the subject of some litigation in the

---

[208]     (Dkt. No. 44, Part 57, at 7 [attaching document entitled, "Guide to Nightwear and Fire: A Guide to Nightwear (Safety) Regulations," published by the United Kingdom Department of Trade and Industry on an unidentified date].)

apparel industry–both in federal courts[209] and state courts.[210]

---

[209]     *See Wilson v. Bradlees of New Eng., Inc.*, 250 F.3d 10, 14 (1st Cir. 2001) (affirming trial court's granting of defendant's trial motion for directed verdict with regard to plaintiff's failure-to-warn claim arising from flammability of a 50/50 cotton-polyester blend sweatshirt that ***melted*** upon ignition), *aff'g*, 93-CV-0047, 1999 WL 816817, at *3 (D. N.H. Feb. 3, 1999) (on pre-trial motion for summary judgment, finding the existence of a question of fact on "the issue whether [a clothing manufacturer] had a duty to warn of the 'particular' flammability characteristics of [a] [50/50 cotton-polyester blend] sweatshirt that were not obvious, specifically, the possibility that the sweatshirt . . . could '***melt*** and cause a more severe burn'") [emphasis added]); *Donovan v. Mishy Sportswear, Inc.*, 200 F. Supp.2d 1103, 1105-1106 (E.D. Mo. 2001) (granting summary judgment to manufacturer on defective-design claim in product liability case regarding burns resulting from ignition and "***melt[ing]***" of a two-piece velour sweatsuit with a 100% polyester "backing" and a 100% cotton "pile") [emphasis added]; *Dysart v. Eastman Chem. Prods.*, 83-CV-0311, 1985 U.S. Dist. LEXIS 17004, at *6 (E.D. Pa. Aug. 8, 1985) (granting directed verdict to fabric manufacturer in strict liability case regarding burns resulting from ignition, **"*melt[ing]*"** and "adher[ing] to the skin" of "polyester fiberfill batting") [emphasis added]; *Price v. Tempo, Inc.*, 603 F. Supp. 1359, 1360, 1365 (E.D. Pa. 1985) (partially denying manufacturer's motion for summary judgment in product liability case regarding burns resulting from ignition and "***melt[ing]*** and adher[ing] to skin" of fire fighter's coat whose inner lining was composed of polyester, based on inapplicability of "the fireman's rule," which involves an assumption-of-risk defense) [emphasis added]; *cf. Alabama Power Co. v. OSHA*, 89 F.3d 740, 745-756 (11th Cir. 1996) (in denying power companies' petition for review of OSHA standard regarding apparel, discussing a videotape evidencing that "synthetics [such as polyester] . . . do not adequately protect workers from the burning and possible ***melting*** and ***sticking*** which can be caused by exposure to electrical arcs") [emphasis added]; *Patterson v. Conopco*, 999 F. Supp. 1417, 1418 (D. Kan. 1997) (denying defendant's motion for summary judgment on product liability claims against manufacturer of hair spray where evidence existed that hair spray caused ignition of shirt, which, noted a Chief Fire Investigator, "appeared to be a cotton and polyester blend as there was ***melting*** involved").

[210]     *See Bingham v. J.C. Penney Co.*, 268 N.W.2d 892, 895 (Minn. 1978) (affirming trial court's judgment denying department store's motion for judgment notwithstanding the verdict, on plaintiff's claim of negligent failure-to-warn claim, with respect to flammability of work shirt and pants made of 65% polyester and 35% cotton, which, when ignited, produced "***melt and cling***" effect) [emphasis added]; *Stephens v. Paris Cleaners, Inc.*, 885 A.2d 59, 62 (Pa. Super. Ct. 2005) (affirming order of trial court granting summary judgment to manufacturer and provider of "polyester blend" work uniform on failure-to-warn claim in product liability case in which an "[e]mployee was positioned on a catwalk approximately two feet above [a] graphitizer when flames shot out of the top of the graphitizer, igniting [the] employee's polyester blend uniform, which ***melted*** onto his skin") [emphasis added]; *cf. Smith v. J.C. Penney Co.*, 525 P.2d 1299, 1305-06 (Or. 1974) (affirming jury verdict in favor of plaintiff against manufacturer of "synthetic" fabric in products liability case arising from an accident in which "[t]here was

However, only one of those decisions indicate that such an effect of polyester in consumer apparel could be a "danger" for purposes of a failure-to-warn claim.[211]  For the sake of argument, I will set aside the fact that the fabric in that case was composed not of 100% polyester (as in the current case), but of 65% polyester and 35% cotton (which blend of fabrics appears to be dangerous because the easy ignition of the cotton will fuel the melting of the polyester).  The problem is that I have no reason to believe that, before the date of the accident (October 16, 2002), Defendant had occasion to conduct the numerous Westlaw and Lexis searches necessary to find that decision.

---

evidence that burning material ***dripped*** from the [acrylic fur] coat . . . " but noting that the jury verdict was in favor of manufacturer and seller of coat) [emphasis added]; *Taulbee v. Audience, Inc.*, 696 N.E.2d 625, 631 (Ohio Ct. App. 1997) (reversing grant of summary judgment to employer in employee's *intentional* tort action alleging, *inter alia*, that "[t]he clothing provided [to the employee] had a polyester content that ***melted*** and caused a more serious injury than would have occurred if the plaintiff had been provided suitable clothing") [emphasis added]; *Miller v. Lee Apparel Co., Inc.*, 881 P.2d 576, 580 (Kan. Ct. App. 1994) (noting, in product liability case regarding burn injuries, that "some areas of the polyester and cotton shirt that [plaintiff] was wearing had ***melted***") [emphasis added]; *Ruby v. Ohio Dep' of Natural Resources*, No. 92AP-947, 1992 Ohio App. LEXIS 6118, at *3-4 (Ohio Ct. App. Dec. 3, 1992) (affirming judgment of trial court finding that *employer* was not liable to employee in *intentional* tort action "assert[ing] that the [polyester blend] clothing which was provided to [plaintiff to fight fires] had a polyester content which ***melted*** and caused a more serious injury than would [have] occurred if [plaintiff] had been provided suitable clothing," although noting that trial court had found that employer would have been negligent in sending out plaintiff to fight fires in such clothing) [emphasis added]; *Dye v. Kean's*, 412 So.2d 116, 117, 121 (La. Ct. App. 1982) (noting, in product liability case regarding burn injuries, that "some . . . employees indicat[ed] that the sparks generated by the welding process would ***melt*** through the 65-35 [polyester-cotton blend] uniform and sting the employees") [emphasis added].

[211]     *See Bingham*, 268 N.W.2d at 895 (affirming trial court's judgment denying department store's motion for judgment notwithstanding the verdict, on plaintiff's claim of negligent failure-to-warn claim, with respect to flammability of work shirt and pants made of 65% polyester and 35% cotton, which, when ignited, produced "melt and cling" effect).

### 3.    Danger from Loose-Fit and/or Fuzziness of Jogging Suit

#### a.    Preclusion of Assertion of Such Claim

As a threshold matter, I reject Plaintiff's claim, expressly asserted for the first time at oral

argument, that the loose-fitting or fuzzy nature of the jogging suit in question constituted a

"danger," because that allegation or theory of liability had not been raised in Plaintiff's

Complaint,[212] Interrogatory Responses,[213] expert witness disclosures or reports,[214] or opposition

memorandum of law.[215]  I acknowledge that the specter of this claim *appears* to have been raised

---

[212]      (Dkt. No. 1, ¶ 17 [Plf.'s Compl., alleging that the garment "melt[ed]" Tanisha's skin].)

[213]      Plaintiff's Interrogatory Responses speak merely of "melting."  In particular, Plaintiff stated as follows: after ignition, "the material of said garment thereby melted onto the skin of the infant-plaintiff.  (Dkt. No. 44, Part 8, ¶ 17.c. [Plf.'s Responses to Def.'s Interrogatories].)  "The manufacturer . . . did not provide proper warnings or instructions on the garment label as to its melting and skin burning potential in order to alert Tanisha's mother of its inherent danger. . . .  They could have conducted flammability tests, which would have shown the melting and burning drops and warned consumers about the impact of such behavior on the safety of the garment. . . .  Additionally, they failed to label the garment pursuant to industry standards and failed to provide [a] warning that the garment would melt when exposed to heat and/or fire."  (Dkt. No. 44, Part 13, ¶¶ 11, 14 [Plf.'s Supp. Responses to Def.'s Interrogatories].)  "In view of the foreseeable event that 100% polyester will melt and is capable of causing second and third degree burns when touching the skin, Wal-Mart had a duty to warn on the label of the subject garment that if exposed to high heat or flame . . . it would certainly melt and cause severe burns to the skin, as occurred to the infant plaintiff.  Examination of the infant's scarring, as it existed prior to the skin grafting, clearly shows the unusual burn pattern of 'drip lines' associated with the melting of the polyester garment and exposing portions of her skin to molten polyester at temperatures high enough to cause third degree burns."  (Dkt. No. 44, Part 13, ¶ 15 [Plf.'s Supp. Responses to Def.'s Interrogatories].)

[214]      This claim was not mentioned in Plaintiff's expert witness disclosures or reports, nor could I find it mentioned in Mr. Rosen's deposition transcript.  (*See generally* Dkt. No. 44, Part 14 [Plf.'s Expert Witness Disclosure]; Dkt. No. 44, Part 17 [Plf.'s Supp. Expert Witness Disclosure]; Dkt. No. 44, Part 18 [Plf.'s Expert Rebuttal]; Dkt. No. 51, Parts 4-6 [Plf.'s Expert Witness Report]; Dkt. No. 52, Parts 2-3 [Trans. of Depo. of Plf.'s Expert].)

[215]      (Dkt. No. 58 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.].)

in the opposition "affidavit" of Plaintiff's counsel.[216]  However, in oral argument, Defendant

explained that, because it had not been put on notice of this claim at an earlier point in time, it

had not conducted discovery on the claim, or hired an expert with regard to the claim.  In

response, Plaintiff's counsel asked the Court to permit Plaintiff to proceed on this claim, and to

adjourn trial so that Defendant could conduct discovery and/or hire an expert in an effort to

oppose the claim.  However, I am not inclined to do so for a variety of reasons, including the

prejudice that would result to Defendant, and the fact that this claim is so late in blossoming.

> **b.     In any Event, No Record Evidence of Such Danger**

In oral argument, Plaintiff's counsel cited two pieces of "evidence" in support of his

assertion that the jogging suit in question was, or was likely to be, dangerous because of its

loose-fit and/or fuzziness.

First, Plaintiff's counsel cited the four pieces of "literature" discussed above in Part

III.B.2.a.ii. of this Decision and Order.  Granted, the first piece of literature, an article entitled,

---

[216]     The closest Plaintiff's counsel comes to asserting this claim is when he *appears* to argue that the jogging suit in question should have displayed the following message: "For children's safety, garment should fit snugly.  This garment is not flame resistant.  Loose-fitting garment is more likely to catch fire."  (Dkt. No. 54, ¶¶ 31-32 [Affid. of Robert Abdella].)  This argument is echoed in one paragraph of the affidavit of Plaintiff's expert.  (Dkt. No. 57, ¶ 10 [Affid. of Meyer Rosen].)  It is unclear whether counsel is arguing that the garment in question was dangerous because it was loose-fitting and fuzzy or that the message cited is an example of a type of warning that might be effective in an appropriate circumstances.  In two other paragraphs of counsel's "affidavit," he similarly argues ambiguously, "The subject garment was loose-fitting and of a fuzzy, fleece-like material.  It was sold without any flammability or melting warnings of any kind. . . .  The defense expert's conclusion that Margaret Topliff would have gained no benefit from a flammability warning on the fabric or a warning of the dangers of loose-fitting fuzzy clothing is her own opinion and not based on any facts in the record. . . ."  (Dkt. No. 54, ¶¶ 8, 27 [Affid. of Robert Abdella].)  It is noteworthy that the defense expert referenced by Plaintiff's counsel–Jane T. Welch, Ph.D.–does not make any reference to warnings regarding loose-fit or fuzziness.  (Dkt. No. 44, Part 40 [Expert Report of Jane T. Welch].)

"Committee on Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," published in *Pediatrics: Official Journal of the American Academy of Pediatrics* in December of 2006, states, "Fabrics that are loosely woven with considerable air space between the fibers burn more rapidly than do heavy dense materials with a low proportion of air and a high density per unit surface."  (Dkt. No. 52, Part 5.)  However, the significance of this sentence is severely diminished by the preceding two sentences, which state, "The weave of a fabric is important in its flammability, at least for cottons and rayons.  The melting characteristics of synthetics diminishes the importance of the weave or the type of surface."  (*Id*.)  Here, the jogging suit in question is made of *synthetic* material that melts when exposed to heat or flame. In addition, there is no evidence in the record that the jogging suit's loose fit or fuzzy nature (even if it could constitute a "danger") in any way *caused or contributed* to Tanisha's injuries under the circumstances.  Rather, all that Plaintiff offers, in this regard, is a circular argument that the loose or fuzzy nature of the garment caused or contributed to the accident because the garment was loose-fitting and/or fuzzy and the accident occurred.  As a result, I find that this article is of no probative value.

Similarly, the second piece of literature, a press release entitled, "If You Make, Import, Distribute or Sell Clothing: An Important Fire Safety Message About the Flammability Hazard of Your Products," issued by the National Association of Fire Marshals in December of 2004, states, "Certain garments are known to be high-hazard designs, such as loose-fitting . . . designs." (Dkt. No. 52, Part 8.)  However, the following two sentences of that press release state, "You should consider using *safer choices of fabrics* . . . .  There are . . . textiles *such as . . . polyester*." (*Id*. [emphasis added].)  In addition, the press release recommends, in appropriate circumstances,

the use of an L.L. Bean warning label, which states, "Certain products can burn if exposed to heat or flame. Fabrics with a fuzzy surface or open weave are more easily ignited." (*Id*.) Even assuming that the jogging suit in question was loose fitting, again, there is no evidence in the record that the jogging suit's loose fit or fuzzy nature in any way caused or contributed to Tanisha's injuries. As a result, I find that this press release is of no probative value.

The third piece of literature, a "Safety Alert" issued by the Consumer Product Safety Commission on June 20, 2000, states that certain loose-fitting clothing can be dangerous, but only if it that clothing is (1) made of cotton or cotton blends, and (2) is used as children's sleepwear. (Dkt. No. 51, Part 12.) No record evidence exists that the garment at issue in this action was either of those things.[217] In any event, the record evidence indicates that the garment

--------

[217] The definition of "children's sleepwear" is "any product of wearing apparel up to and including size [14], such as nightgowns, pajamas, or similar or related items, such as robes, intended to be worn primarily for sleeping or activities related to sleeping . . . ." 1615 C.F.R. 1615.1(a); 1615 C.F.R. 1616.2(a); *see, e.g.*, *Vail v. Kmart Corp.*, 807 N.Y.S.2d 399, 401 (N.Y. App. Div., 2d Dept., 2006) (infant's "shorts outfit" was not "sleepwear" under 16 C.F.R. 1615); *McGarvey v. Kmart Corp.*, No. C-1-91-487 (S.D. Ohio Dec. 15, 1993), 59 Products Liability Advisory 3 (Jan. 1994) (child's "sundress" was "daywear," not "sleepwear" under 16 C.F.R. 1615). Here, there is no evidence in the record that the jogging suit in question was marketed or promoted by Wal-Mart, or primarily used by Tanisha (or anyone), as "sleepwear." (*See, e.g.*, Dkt. No. 51, Parts 7-8 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart]; Dkt. No. 51, Parts 2-3 [Trans. of Depo. of Margaret Topliff]; Dkt. No. 51, Part 10 [Trans. of Depo. of Douglas Topliff]; Dkt. No. 44, Part 26 [Trans. of Depo. of Douglas Topliff]; Dkt. No. 44, Part 27 [Trans. of Depo. of Tanisha Topliff]; Dkt. No. 55 [Affid. of Douglas Topliff].) The closest Plaintiff comes to adducing such "evidence" is part of one sentence of an affidavit of Tanisha's mother, stating, "The garment in question, which was in the nature of a jogging suit or pajamas, was purchased by my mother-in-law, Beatrice Topliff . . . ." (Dkt. No. 56, ¶ 5 [Affid. of Margaret Topliff].) However, any suggestion that the subject garment was in fact used by Tanisha primarily as sleepwear is undermined by (1) Mrs. Topliff's testimony that "[p]rior to the accident Tanisha wore the garment . . . only one or two times . . . .", (2) the fact that the time of the accident (when Tanisha was wearing the garment at issue) was 2:00 p.m. on a weekday, and (3) the fact that the garment worn by Tanisha at the time of the accident "looked like a regular jogging suit." (Dkt. No. 56, ¶ 6 [Affid. of Margaret Topliff]; Dkt. No. 44, Part 8, ¶ 17.a. [Plf.'s Responses to Def.'s Interrogatories]; Dkt. No. 51, Part 3, at 76-77 [Trans. of Depo. of Mrs.

at issue *passed* the Children's Sleepwear Test.  (Dkt. No. 51, Part 4 at 6 [Expert Report of Meyer

Rosen, stating that, with regard to the "Children's sleepwear standards," "the sample passed the

test . . . and very slow burning was evident"]; Dkt. No. 77, ¶ 16 [Affid. of Bruce LeBlanc, stating

"Polyester is accepted for children's sleepwear due to its ability to create melt-drip, and, in fact,

most children's sleepwear is made from 100% polyester fabrics without any flame retardant

finish."].)  As a result, I find that this document is of no probative value.

The fourth piece of literature, a document entitled, "Guide to Nightwear and Fire: A

Guide to Nightwear (Safety) Regulations," published by the United Kingdom Department of

Trade and Industry on an undetermined date, regards the *United Kingdom's* regulation of

children's *sleepwear*.  (Dkt. No. 44, Part 57.)  Again, this is not such a garment.  Furthermore,

Plaintiff's counsel has pointed to no part of this document (and I can find no part of this

document) stating that such garments must be snug-fitting and non-fuzzy.  As a result, I find that

this document is of no probative value.

Second, Plaintiff's counsel cited the three press releases mentioned earlier, regarding

product recalls.  None of these three press releases were part of the record at the time of oral

argument.  However, again, because of the severity of Tanisha's injuries, I granted leave to

Plaintiff's counsel to make them part of the record, which he did (with the help of defense

counsel).  (Dkt. No. 68, Part 2.)

The first press release, issued on February 28, 1995, regards the recall of fleece garments

made of "a polyester-cotton blend material with a raised fiber surface."  There are several

problems with Plaintiff's reliance on this press release.  The recall in question did not expressly

---

Topliff].)

regard "loose-fitting" garments.  Nor did the recall involve a garment made of 100% polyester

(the fabric at issue in this action), but of a cotton-polyester blend.  (As gleaned from the

"literature" cited by Plaintiff, referenced above, 100% polyester material is generally safer than

material made of a cotton-polyester blend in that 100% polyester material *generally* self-

extinguishes flames, while cotton-polyester blends *generally* fuel flames by igniting the cotton

which further melts the polyester.)  Nor did the recall expressly regard garments sold under the

brand name of "Simply Basic" (the alleged brand name of the jogging suit in question).  As a

result, I find that this press release is of no probative value.

The second press release, issued on August 9, 2006, regards the recall of "Children's

Lounge Pants."  Again, there are several problems with Plaintiff's reliance on this press release.

The recall did not expressly regard garments that were "fuzzy."  Nor did the recall involve

daywear (the garment at issue in this action) but lounge pants that were treated as "sleepwear."

(In any event, again, the exemplar garment passed the Children's Sleepwear Test.)  Nor did the

recall express regard garments sold by Wal-Mart.  As a result, I find that this press release is of

no probative value.

Finally, the third press release, issued on December 9, 1999, regards the recall of

"Children's Pajamas" sold at Gap and Old Navy Stores.  Again, there are several problems with

Plaintiff's reliance on this press release. The recall did not expressly regard garments that were

"loose-fitting" or "fuzzy."  Nor did the recall involve daywear (the garment at issue in this

action) but "sleepwear." (In any event, again, the exemplar garment passed the Children's

Sleepwear Test.)  Nor did the recall expressly regard garments sold by Wal-Mart.  As a result, I

find that this press release is of no probative value.

> **c.    In any Event, No Record Evidence of Knowledge or "Reason to Know" of Such Danger**

As stated above, in oral argument, Plaintiff's counsel conceded that the record contains no evidence that Defendant had actual knowledge of any danger posed by the jogging suit in question.  I agree: I can find no such evidence in the record.  The question, then, becomes whether or not the record contains any evidence that Defendant "had reason to know" of the danger in question.

In oral argument, Plaintiff's counsel cited three pieces of "evidence" in support of his assertion that Defendant "had reason to know" that the jogging suit in question was, or was likely to be, dangerous because of its loose-fit and/or fuzziness.

First, Plaintiff's counsel cited Defendant's "contract with the distributor."  I assume that counsel means Defendant's "Vendor Agreement" with Apparel Associates, LLC, which attaches a "Sales Confirmation" document issued by Killara Enterprises Ltd.  (Dkt. No. 51, Part 9.) Granted, that document does mention that the garment at issue is a "fleece."  However, the document does not mention that the garment is loose-fitting.  Moreover, it does not mention anything about the garment being dangerous or unusually flammable because it was a fleece (or for any other reason).  As a result, I find that this "Vendor's Agreement" is of no probative value on the issue of whether Defendant "had reason to know" of the danger alleged.

Second, Plaintiff's counsel cites the three press releases issued by the Consumer Product Safety Commission regarding product recalls, discussed above in Part III.B.2.a.ii. of this Decision and Order.  One of those press releases was issued in August of 2006, nearly four years *after* the accident in question (on October 16, 2002).  (Dkt. No. 68, Part 2 [attaching August 2006

press release regarding recall of "Children's Lounge Pants"].)[218]  As a result, I find that the

August 2006 press release is of no probative value on the issue of whether Defendant had (by

October 16, 2002) "reason to know" of the danger alleged.  Another of those press releases,

issued in December of 1999, does not expressly regard loose-fitting or fuzzy garments.  (Dkt. No.

68, Part 2 [attaching December 1999 press release regarding recall of "Children's Pajamas"].)[219]

As a result, I find that the December 1999 press release is of no probative value on the issue of

whether Defendant "had reason to know" of the danger alleged, which results from the garment

being "loose-fitting" or "fuzzy."  The final press release, issued in February of 1995, did not (1)

expressly regard loose-fitting garments, (2) regard a garment made of 100% polyester (the type of

fabric at issue in this action), or (3) regard garments sold under the brand name of "Simply

Basic" (which is the brand name under which the garment at issue was allegedly sold).  As a

result, I find that the February 1995 press release is of no probative value on the issue of whether

Defendant "had reason to know" of the danger alleged.

Third, Plaintiff's counsel cites the four pieces of "literature" discussed above in Part

III.B.2.a.ii. of this Decision and Order.  Again, I find that these documents are insufficient to

create an issue of fact with regard to whether Defendant had (before the date of the accident)

reason to know of the danger alleged, which results from the garment being "loose-fitting" or

"fuzzy."  Two of the documents were published several years *after* the occurrence of the accident

---

[218]     Moreover, the August 2006 press release (1) did not expressly regard garments that were "fuzzy," (2) did not involve daywear but sleepwear, which is not the type of garment at issue in this action, and (3) did not expressly regard garments sold by Defendant.

[219]     Moreover, the December 1999 press release (1) did not involve daywear but sleepwear, which is not the type of garment at issue in this action, and (2) did not regard garments sold by Defendant.

in question.[220]  Another of the documents was published at an undetermined time, regards the

*United Kingdom's* regulation of children's *sleepwear*, and does not even state that such garments

must be snug-fitting or non-fuzzy.[221]  The final document states that certain loose-fitting clothing

can be dangerous, but only if that clothing is (1) made of cotton or cotton blends, and (2) used as

children's sleepwear.[222]  The garment at issue was neither of those things.

　　　　For all of these reasons, I grant Defendant's motion for summary judgment with respect

to Plaintiff's failure-to-warn claim.

### 4.　　　Grounds on Which Defendant's Motion Is *Not* Decided

　　　　Having described the bases on which my ruling is made, it is necessary to describe the

bases on which it is *not* made.  Defendant concedes that "[a] *manufacturer* has a duty to warn

against latent dangers resulting from foreseeable uses of its product of which it knew or should

have known . . . [and] the danger of unintended uses of a product provided these uses are

reasonably foreseeable . . . ."  *Liriano*, 92 N.Y.2d at 237 [emphasis added; citations omitted].

(Dkt. No. 45, Part 3, at 11 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg.].)  However,

Defendant argues that a *retailer's* duty to warn is more limited than a *manufacturer's* duty to

---

[220]　　　(Dkt. No. 52, Part 5 [attaching article entitled, "Committee on Accident Prevention: Investigation of Fabrics Involved in Wearing Apparel Fires," published by *Pediatrics: Official Journal of the American Academy of Pediatrics* in December of 2006]; Dkt. No. 52, Part 8 [attaching press release entitled, "If You Make, Import, Distribute or Sell Clothing: An Important Fire Safety Message About the Flammability Hazard of Your Products," published by the National Association of Fire Marshals in December of 2004].)

[221]　　　(Dkt. No. 44, Part 57 [attaching document entitled, "Guide to Nightwear and Fire: A Guide to Nightwear (Safety) Regulations," published by the United Kingdom Department of Trade and Industry on an unidentified date].)

[222]　　　(Dkt. No. 51, Part 12 [attaching  "Safety Alert" issued by the Consumer Product Safety Commission on June 20, 2000].)

warn, since a retailer has no duty to inspect and/or test a product for latent defects.  (*Id.*)  Thus (to fill in the interstices of Defendant's argument), because it may not be said that a retailer "should have known" of a latent defect in a product, it may not be said that the retailer had a reason to know of, or consequently a duty to warn of, that latent defect.

There are two problems with Defendant's argument.  First, Defendant's argument confuses the term "had reason to know" with the term "should have known."  *See*, *supra*, Part III.B.1. of this Decision and Order.

Second, Defendant's argument confuses its duty of care regarding the discovery of "latent *defects*" (arising in a negligent failure-to-inspect-and/or-test claim, discussed below in Part III.C. of this Decision and Order) with its duty of care regarding the warning of "latent *dangers*" (arising in a failure-to-warn claim).  A "latent defect" and a "latent danger" may usually be the same in products liability cases; however, they need not be so.  For the sake of simplicity, I will spare the parties a rather abstruse comparison of the perspective from which "latency" is defined in a failure-to-inspect claim (i.e., the retailer's perspective) and the perspective from which "latency" is defined in a failure-to-warn claim (i.e., the consumer's perspective).  Suffice it to say that all, or the vast majority, of authorities that I have found discussing a duty-to-warn claim clearly refer not to "defects," but to "dangers," "risks," or "hazards."[223]  Indeed, if a "defect" were the same as a "danger," then every time a plaintiff had a failure-to-warn claim, he automatically would have either a manufacturing-defect claim or design-defect claim, which is not the law in

---

[223]    *See, e.g.*, Prosser and Keeton, *Torts*, § 96, at 685 (5th ed.) ("A manfuacturer or other seller is subject to liability for failing either to warn or adequately to warn about a *risk* or *hazard* inherent in the way a product is designed that is related to the intended uses as well as the reasonably foreseeable uses that may be made of the product it sells.") [emphasis added].

New York (or elsewhere, apparently).[224]

Moreover, based on my careful reading of Plaintiff's Complaint and Interrogatory Responses, and the parties' motion papers, the "defect" alleged in this action and the "danger" alleged in this action do not appear to be the same things.  Specifically, here, the alleged "latent defect" in question appears to be the absence of fire retardant in or on the 100% polyester fabric,[225] while the alleged "latent danger" in question appears to be the tendency of the 100% polyester fabric to melt and drip (or "melt and cling") once exposed to flames or intense heat.[226]

[224]    1A *New York Pattern Jury Instructions (Civil)* § 2:135, *Comment*, at 680 (2005) ("The duty to warn of dangers in the use of the product exists even though the product is perfectly designed and made . . . .") [citations omitted]; *see also* 1A *New York Pattern Jury Instructions (Civil)* § 2:145, *Comment*, at 746 (2005) ("Additional ways in which a retailer . . . may incur negligence liability are: 1. Failure to warn of dangers inherent in the product or likely to result from its use in a particular manner . . . .  For such a case PJI 2:135 should be adapted."); *see also Restatement (Second) of Torts* § 388, *Comment on Clause (a)* (1965) ("There are many chattels which, even though perfect, are unsafe for any use or for the particular use for which they are supplied unless their properties and capabilities are known to those who use them.").

[225]    (*See*, *e.g.*, Dkt. No. 58, at 2 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg., citing case in which the plaintiff's expert established that "the synthetics used in the exhibit tend to melt rather than burn to ash and produce high temperatures" and that "when ignited and not immediately extinguished, severe and deep burns are inflicted upon the body of the wearer"]; Dkt. No. 58, at 2, 4 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg., arguing, "It is the contention of the plaintiff's expert that the industry standards of flammability are devised by the industry itself and that, while there is no requirement that 100% polyester garments be tested for flammability, the fact that the garment in question ignited as it did indicates to him that no fire retardants were added during the manufacturing of the garment. . . . [T]he plaintiff can prove that the subject garment was not reasonably safe and that a flame retardant should have been added to the manufacturing process."]; *see also* Dkt. No. 54, ¶ 18 [Affid. of Robert Abdella, arguing that "there is no other explanation [as to defect] but that there was insufficient fire retardant on the garment when it left the manufacturer"].)

[226]    (*See* Dkt. No. 1, ¶ 17 [Plf.'s Compl., alleging that "the garment ignited and became aflame, . . . melting the skin of the infant plaintiff . . . ."], ¶¶ 21-22 [alleging that Defendant failed to warn Plaintiff of the "dangers in using the aforementioned garment," not the "defect" in the garment].)  In Plaintiff's Interrogatory Responses, he stated, *inter alia*, that (1) after ignition, "the material of said garment thereby melted onto the skin of the infant-plaintiff,"

Defendant itself argues that, had there been fire retardant in or on the fabric in question, then the fire retardant would not have interfered with the melt-drip process;[227] thus, by Defendant's own reasoning, the elimination of the alleged "defect" in question would not have eliminated the melt-drip feature of the fabric (which I have found to be the alleged "danger" in question).

Simply stated, just because Defendant did not have a duty to inspect and/or test the fabric to determine if it contained a flame retardant does not necessarily mean, as a matter of logic, that Defendant did not have a reason to know that the fabric (regardless of whether or not it contained flame retardant) was potentially dangerous in that it might melt, drip and cling upon its exposure to heat and/or flame.

Defendant also argues that Plaintiff's failure-to-warn claims should be dismissed because Defendant did not have a duty to warn of dangers that were open and obvious, and that, in any event, any failure to warn by Defendant was not the proximate cause of Plaintiff's injury.  (Dkt. No. 45, Part 3, at 12-13 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg.].)  I must reject both of these arguments.

With regard to Defendant's "open and obvious" argument, Defendant misconstrues the

---

(2) "[t]he manufacturer . . . did not provide proper warnings or instructions on the garment label as to its melting and skin burning potential in order to alert Tanisha's mother of its inherent danger," and (3) "[i]n view of the foreseeable event that 100% polyester will melt and is capable of causing second and third degree burns when touching the skin, Wal-Mart had a duty to warn on the label of the subject garment that if exposed to high heat or flame . . . it would certainly melt and cause severe burns to the skin, as occurred to the infant plaintiff."  (Dkt. No. 44, Part 8, ¶ 17.c. [Plf.'s Responses to Def.'s Interrogatories]; Dkt. No. 44, Part 13, ¶¶ 11, 15 [Plf.'s Supp. Responses to Def.'s Interrogatories].)

[227]        (Dkt. No. 45, Part 3, at 8 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg., arguing that "Mr. Rosen specifically stated that flame-retardants would not affect (and not prevent) the occurrence of melt-drip . . . . [T]he application of flame retardant would not affect the occurrence of melt-drip"].)

alleged danger in question.  That danger is not the danger that fabrics are "flammable" or that they "will burn."  (Dkt. No. 45, Part 3, at 12-13 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg.].)  If that were the case, then it would be difficult to imagine any circumstance in which a plaintiff could succeed on a failure-to-warn claim arising out of the ignition of fabrics. Rather, the alleged danger in question, as described earlier, has to do with the "melt-drip" effect (or "melt and cling" effect) of 100% polyester when exposed to heat and/or flames.  Based on the current record, if I were to reach the issue, I would be unable to conclude that no question of fact exists about whether the alleged  "danger" was "open and obvious" to consumers.[228]

With respect to the proximate-causation argument, again, if I were to reach the issue, I would find that, although a reasonable jury could certainly conclude that Plaintiff's mother would not have heeded Defendant's warning, such a jury could also find, based on the testimony of Tanisha's mother,[229] that had she been warned of the alleged "danger" she would have exercised more care with regard to permitting her daughter to wear the jogging suit and/or regulating her daughter's proximity to the wood-burning stove while wearing the jogging suit.  *See Santoro*, 2004 WL 2569493, at *5 ("Although a reasonable jury could conclude that Donnelly would not have heeded Fairview's warning, it could also find, based on Donnelly's testimony, that had he been warned of the danger he would not have allowed the children to be near the fireplace heater

_____

   [228]   (*See*, *e.g.*, Dkt. No. 56, ¶ 8 [Affid. of Margaret Topliff, declaring that "such a warning would have alerted me to the dangers of the garment igniting or melting . . . ."]; Dkt. No. 52, Part 9 [News Article, suggesting that, as of 4/12/06, soldiers in Iraq did not know of the melt-drip "side effect" of polyester].)

   [229]   (Dkt. No. 56, ¶ 8 [Affid. of Margaret Topliff, declaring that "such a warning would have alerted me to the dangers of the garment igniting or melting, and I never would have permitted Tanisha to wear the garment anywhere near our woodstove, if at all."].)

106

without adult supervision.").

Finally, I note that, again, if I were to reach Defendant's proximate-causation argument, I would be skeptical of Plaintiff's characterization of the failure-to-warn law in New York as providing a "presum[ption] that a user would have heeded the warnings if they had been given." (Dkt. No. 58, at 5 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.].)  Plaintiff provides no legal support for this point of law.  (*Id*.)  Plaintiff may be correct.[230]  However, based on a brief review of the law, Plaintiff may well be incorrect.  Rather, as indicated by the more recent Second Circuit authority, the law in New York *appears* to be merely that a trier of fact is permitted to "infer that a warning would have been heeded and thereby to conclude that the absence of a warning that was reasonably required to be given was a proximate case of an injury."  *Raney v. Owens-Illinois, Inc*., 897 F.2d 94, 95 (2d Cir. 1990), *accord*, *Fox v. Cheminova, Inc.*, 387 F. Supp.2d 160, 172 (E.D.N.Y. 2005).

## C.      Plaintiff's Claim of Negligent Failure to Inspect and/or Test

Defendant argues that Plaintiff's claim of negligent failure to inspect and/or test should be dismissed for two reasons.  First, Defendant presents a four-part syllogism in favor of dismissal of this claim: (1) as a retailer, Defendant's duty to inspect the jogging suits in question was limited to a duty to inspect them for obvious or "patent" defects, that is, defects that are discoverable through reasonable physical inspection; (2) the alleged "defect" in question was not

---

[230]      *See, e.g.*, *Plummer v. Lederle Labs.*, 819 F.2d 349, 355-56 (2d Cir. 1988) ("Once the warning is given, there is a presumption that it will be read and heeded.") [citation omitted], *accord*, *Neri v. R.J. Reynolds Tobacco Co.*, 98-CV-0371, 2000 U.S. Dist. LEXIS 22223, at *60 (N.D.N.Y. Sept. 28, 2000) (Scullin, J.) [citation omitted]; *see also Power v. Crown Controls Corp.*, 568 N.Y.S.2d 674, 675 (Sup. Ct., New York County, 1990), *rev'd on other grounds*, 596 N.Y.S.2d 38 (N.Y. App. Div., 1st Dept., 1993).

a patent defect but a hidden or "latent" defect, since it was a defect that could be discovered only through testing; (3) thus, Defendant had no *duty* to inspect and/or test the jogging suits for the alleged defect in question; and (4) because Defendant had no duty to inspect and/or test the jogging suits for the alleged defect in question, Defendant cannot be said to have "breached" any such duty.  (Dkt. No. 45, Part 3, at 11-12, 14-15 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg.].)  Second, and alternatively, Defendant argues that Defendant "should not be held to have been required to conduct such testing because the garment was exempt from testing under the Federal Flammable Fabrics Act[,] 16 C.F.R. 1610.37(d)."  (*Id*. at 12.)  Plaintiff does not oppose either of these two arguments.  (*See generally* Dkt. No. 58 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.].)

As discussed above in Part III.A.1. of this Decision and Order, where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any required papers shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown.  Because Plaintiff has "consented" to Defendant's argument, the only remaining issue is whether Defendant has met its burden "to demonstrate entitlement to the relief requested" through that argument.  I find that Defendant has, at the very least, met this lightened burden.

Generally, Defendant correctly recites the relevant law on the subject.  In New York, "A retailer need not ordinarily inspect merchandise for latent defects.  It has, however, a duty to inspect and discover those defects that are discoverable by reasonable physical inspection.  Accordingly, when a defect is discoverable only by special tests or by an expert's examination, a

retailer will generally not be liable for failure to discover."  6-232 *Warren's Negligence in the New York Courts* § 232.02[2][e] (Matthew Bender 2005) [citations omitted].  There are exceptions to this general rule where (1) the retailer represents itself to be the manufacturer of the product in question, or (2) where the product in question was obtained from an unknown manufacturer or one of dubious reputation.  *Id.*  However, Plaintiff has adduced no evidence that either of these two exceptions apply under the circumstances.

With respect to the four-part syllogism offered by Defendant in favor of dismissal of this claim, there is a slight problem with the second premise, namely, that the alleged "defect" in question was not a patent defect but a hidden or "latent" defect, since it was a defect that could be discovered only through testing.  In support of this premise, Defendant states that "[e]ven Mr. Rosen . . . conceded that the alleged defect could not have been discovered through reasonable physical examination, but would require special testing."  (Dkt. No. 45, Part 3, at 15 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg.].)  According to Defendant, this "concession" came on page 9 of Mr. Rosen's Expert Report, wherein he stated that Defendant "could have conducted flammability tests, which would have shown the melting and burning drops."  (*Id*; *see also* Dkt. No. 45, Part 4, ¶ 43 [Def.'s Rule 7.1 Statement, asserting same fact].)  The problem with Defendant's use of this statement by Mr. Rosen as a "concession" that the alleged defect could be discovered only through testing is that, by so doing, Defendant commits an informal fallacy of logic known as "affirming the consequent."[231]  Stated simply, the fact that testing was a *sufficient* condition for discovery of the defect does not mean that it was a *necessary* condition

---

[231]     Patrick J. Hurley, *A Concise Introduction to Logic* 296-97 (3d ed., Wadsworth Publ'g Co., 3d ed., 1988).

for discovery of the defect.

Fortunately for Defendant, this flaw in reasoning is too minor to render Defendant's argument invalid.[232]  There is authority for the proposition that it is *Plaintiff's* duty, as a threshold matter, to adduce some evidence that the alleged defect was patent or discoverable through reasonable physical inspection.  *See Coleman v. Chesbro-Whitman Co.*, 678 N.Y.S.2d 246, 247 (N.Y. Sup. Ct., Nassau County 1998) (granting retailer's motion for indemnification over and against manufacturer, because "there has been no showing that the retailer could have reasonably discovered such alleged defect [in the ladder]") [citation omitted].  There has been no such showing here.  In any event, even if Plaintiff did not bear the initial burden of proof on this issue, I find that Defendant has met its burden by adducing at least *some* evidence that the alleged defect in question was latent, not patent.[233]  Furthermore, Plaintiff has failed to come forward with evidence controverting that fact.

Finally, with respect to Defendant's alternative argument that Defendant had no duty to inspect and/or test the jogging suits for the alleged defect in question because the garment was exempt from testing under the Federal Flammable Fabrics Act, I am somewhat cautious of that

---

[232]    Indeed, the flaw was so subtle that Plaintiff overlooked it.  (Dkt. No. 53, ¶ 43 [Plf.'s Rule 7.1 Response, admitting the truth of Defendant's factual assertion, "Mr. Rosen's report conceded that flammability testing would be required to discover the alleged defect."].)

[233]    (*See, e.g.*, Dkt. No. 51, Part 4, at 3, 9-10 [Expert Report of Meyer Rosen, indicating that whether or not the jogging suits in question had been treated with a "flame retardant chemical" would not have been visible to the naked eye or detectable by the touch of a hand, and that the chemical could have been able to be added "directly to the dye bath," "without the need for an extra finishing step for the fiber"]; Dkt. No. 51, Parts 7-8, at 23-26, 40-57 [Trans. of Depo. of Beverly Dych, Business Manager of Wal-Mart, indicating that, despite a physical inspection of a sample of the jogging suits in question by Consumer Testing Laboratories, the alleged defect in question was not discovered].)

argument.  Boiled down to its essential elements, Defendant's argument appears to be that, because the jogging suits complied with the Federal Flammable Fabrics Act, there was no "defect" in the jogging suits as a matter of law, and thus no need to inspect and/or test for that defect.  To the extent that this is indeed Defendant's argument, I must reject that argument, since "compliance with the [aforementioned] standard is not conclusive as a measure of [due care] . . . ."  *Simien*, 566 F.2d at 557-68 [citations omitted]; *accord*, 6-232 *Warren's Negligence in the New York Courts* § 232.02[4][a] (Matthew Bender 2005) ("[C]onformance with standard practices in [the] industry is not . . . conclusive proof of due care.") [citations omitted].[234] However, to the extent that Defendant is merely arguing that the jogging suit's compliance with federal standards is additional evidence that the alleged defect in question was latent and not patent, then I accept that argument.

For all of these reasons, I grant Defendant's motion for summary judgment with respect to Plaintiff's claim of negligent failure to inspect and/or test the jogging suits for the alleged defect.

### D.    Plaintiff's Claim of Breach of Implied Warranty of Merchantability

Defendant argues that Plaintiff's claim of breach of implied warranty of merchantability should be dismissed for three reasons: (1) where, as here, a plaintiff asserts a claim of strict liability based on her use of a product for its ordinary purpose, her assertion of that claim precludes her from asserting a claim of breach of implied warranty of merchantability under N.Y.

---

[234]    *See also Pack by Soja v. E.R.O. Indus., Inc.,* 669 N.Y.S.2d 995, 996 (N.Y. App. Div., 4th Dept., 1998); *Davis v. N.Y. City Housing Auth.*, 668 N.Y.S.2d 391, 392-93 (N.Y. App. Div., 2d Dept., 1998); *Feiner v. Calvin Klein, Ltd.*, 549 N.Y.S.2d 692, 693 (N.Y. App. Div., 1st Dept., 1990).

U.C.C. § 2-314, since the two claims have the same elements; (2) Plaintiff has adduced no evidence from which a rational fact-finder could conclude that the jogging suit was not "fit for the ordinary purposes for which such goods are used" under N.Y. U.C.C. § 2-314; and (3) Plaintiff has adduced no evidence from which a rational fact-finder could conclude that the jogging suit was the cause of Plaintiff's injury.  (Dkt. No. 45, Part 3, at 15-17 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg.].)  Plaintiff does not oppose this argument.  (*See generally* Dkt. No. 58 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.].)

As discussed above in Part III.A.1. of this Decision and Order, where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any required papers shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown  Because Plaintiff has "consented" to Defendant's argument, the only remaining issue is whether Defendant has met its burden "to demonstrate entitlement to the relief requested" through that argument.  I find that Defendant has, at the very least, met this lightened burden.

In particular, I am persuaded by the facial merit of Defendant's second argument–i.e., that Plaintiff has adduced no evidence from which a rational fact-finder could conclude that the jogging suit was not "fit for the ordinary purposes for which such goods are used" under N.Y. U.C.C. § 2-314.  Rather, the well-developed record establishes the following uncontroverted facts: (1) the result of the CS 191-53 flammability test performed by Plaintiff's proffered expert, Mr. Rosen, indicated the jogging suit in question had "normal flammability"; (2) the modified CS 191-53 flammability test (a/k/a "the forced ignition test") performed by Mr. Rosen indicated

112

that the jogging suit had "low flammability" and was "difficult to ignite"; and (3) the jogging suit

passed both vertical flammability tests performed by Mr. Rosen, which tests found the jogging

suit to be "self extinguish[ing]."[235]  Given these uncontroverted facts, it is of little surprise to me

that Plaintiff has not argued that the jogging suit in question was not "of medium quality" as

compared to other jogging suits on the market at the relevant time.  *See First Hartford Corp. v.*

*Wyandotte Indus.*, 63 B.R. 479, 490 (Bankr. S.D.N.Y. 1986) (finding that a shipment of lamb's

wool satisfied N.Y. U.C.C. 2-314, which requires merely that the fabric "only be of medium

quality or goodness") [internal quotation marks and citations omitted].[236]

      This lack of focus on what is expected of jogging suits when used in a customary, usual

and reasonably foreseeable manner is the crux of the problem with Plaintiff's breach-of-warranty

claim.[237]  For example, under Plaintiff's theory of warranty liability, the "ordinary purpose" of

the jogging suit in question included the ability to resist a debris-filled blast of air that was so

---

[235]    (Dkt. No. 45, Part 5, ¶¶ 31, 33, 35, 36, 37 [Def.'s Rule 7.1 Statement, citing record]; Dkt. No. 53, ¶¶ 31, 33, 35, 36, 37 [Plf.'s Rule 7.1 Response, not disputing factual assertions contained in aforementioned paragraphs of Def.'s Rule 7.1 Statement].)

[236]    (*See, e.g.*, Dkt. No. 53, ¶ 32 [Plf.'s Rule 7.1 Response, taking no position with regard to Defendant's factual assertion that "[a] garment with 'normal flammability' [such as the garment at issue] is 'generally accepted by the trade as having no unusual burning characteristics.'"].)

[237]    *See* 86 N.Y. Jur.2d, *Product Liability* § 86 (West 2001 & Supp. 2004) ("Although products liability theory sounding in tort and breach of implied warranty theory authorized by the Uniform Commercial Code (U.C.C.) coexist and are often invoked in tandem, the core element of a 'defect' is different in the two causes of action.  While the strict products concept of a product that is 'not reasonably safe' requires a weighing of the product's dangers against its overall advantages, the U.C.C.'s concept of 'defective product' requires an inquiry only into whether the product in question was fit for the ordinary purposes for which such goods are used, with the latter inquiry focusing on the expectations for the performance of the product when used in a customary, usual, and reasonably foreseeable manner.") [citations omitted]; *see also Denny*, 87 N.Y.2d at 258-59.

forceful and hot (ranging from 400 degrees to 1800 degrees Fahrenheit) that it was able to knock over a grown woman.[238]  Plaintiff disputes Defendant's factual assertion that the distance traveled by the blast was 10 feet.[239]  However, Plaintiff does not adduce any evidence actually controverting that factual assertion.[240]  At most, Plaintiff cites evidence that supports a finding that Tanisha was "[r]ight behind" Mrs. Topliff, "on the side of [her]" and "by [her] rocking chair," at some point *after* Mrs. Topliff had been knocked so far *backward* by the blast of air that she was "against the wall."[241]  In any event, whether the distance in question was 10 feet or somewhat less, I have found no authorities suggesting that the "ordinary purpose" (under U.C.C.

---

[238]     (Dkt. No. 1, ¶¶ 6, 12, 17, 26-28 [Plf.'s Compl.]; Dkt. No. 53, ¶¶ 5-7 [Plf.'s Rule 7.1 Response, not disputing factual assertions contained in aforementioned paragraphs of Def.'s Rule 7.1 Statement]; Dkt. No. 44, Part 42 at 8 [Report of Plf.'s Expert, stating that the "surface melting [of the rug in the room] is consistent with a blast of hot air above about 400 degrees Fahrenheit," and that the temperatures of the debris in question would "typically be in the range of 1800 degrees Fahrenheit"]; Dkt. No. 58, at 2 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg., arguing that there was a "flash flame" at the time of the incident].)

[239]     (Dkt. No. 45, Part 5, ¶ 9 [Def.'s Rule 7.1 Statement, citing page 37 of Margaret Topliff's deposition testimony, in which she testified that Tanisha was "[s]itting at the countertop eating" when Mrs. Topliff was lighting the fire, which was "[m]aybe five steps away" from the stove].)  I note that Defendant's assertion of fact is supported by other pages of Margaret Topliff's deposition testimony.  (*See, e.g.*, Dkt. No. 51, Part 2, at 38-41 [Depo. of Margaret Topliff, testifying, *inter alia*, that she saw Tanisha at the counter eating cereal "[j]ust before I lit the stove," and that the stove is "more than a couple of steps away" from the counter].)

[240]     (Dkt. No. 53, ¶ 9 [Plf.'s Rule 7.1 Response, citing pages 50 to 55 of Margaret Topliff's deposition testimony, which does not support Plaintiff's factual assertion that Tanisha was "well within 10 feet of the woodstove" at the time of the accident].)

[241]     (*See, e.g.*, Dkt. No. 51, Part 2, at 48-55 [Depo. of Margaret Topliff, testifying, *inter alia*, that she saw Tanisha at the counter eating cereal "[j]ust before I lit the stove," and that the stove is "more than a couple of steps away" from the counter].)

§ 2-314) of jogging suits is to resist such forceful and hot blasts of air and debris.[242]  Rather, that would appear to be the ordinary purpose of "flame-retardant" or "heat-resistant" garments; and Plaintiff has adduced no evidence that the jogging suit in question was marketed or advertised as flame retardant or heat resistant.  *See Miller v. Lee Apparel Co., Inc.*, 881 P.2d 576, 588 (Kan. App. 1994) (affirming trial court's dismissal of claim of breach of implied warranty of merchantability under U.C.C. § 2-314, in part because "[t]he coveralls were not marketed or advertised as flame resistant or flame retardant, and [Plaintiff] had no reasonable expectation that they would provide such protection").

As a result, I grant Defendant's motion for summary judgment with regard to Plaintiff's claim of breach of implied warranty of merchantability.  Because I find that Defendant's second argument is facially meritorious, I need not, and do not, address the facial meritoriousness of Defendant's first and third arguments.

### E.     Plaintiff's Derivative Claim for Medical Expenses, Loss of Services and Loss of Companionship

Douglas Topliff's derivative claim alleges that "Douglas Topliff, as parent of infant plaintiff Tanish Topliff, has expended great sums of money and time in her [sic] effort to cure the infant plaintiff of the injuries she sustained as a result of this incident and has also been deprived of the infant plaintiff's services and companionship, and will continue to be caused to do so in the future."  (Dkt. No. 1, ¶ 37 [Plf.'s Compl.].)

---

[242]    *Cf. Patterson v. Cent. Mills, Inc.*, 64 F. App'x. 457, 464 (6th Cir. 2003) (affirming judgment for defendant dismissing plaintiff's breach-of-warranty claim arising out of ignition of children's T-shirt, in part because the T-shirt in question, composed of 50% polyester and 50% cotton, "reacted as would any other shirt of similar composition under similar circumstances" and "was safe for its intended purposes").

Defendant argues that Douglas Topliff's derivative action should be dismissed for two reasons: (1) the viability of a parent's derivative action depends on the viability of the underlying causes of action, and, here, Plaintiff has failed to adduce any evidence in support of the underlying causes of action, and (2) for a parent to recover for "loss of services," he must offer some proof as to the value of those services, and, here, Douglas Topliff has not done so.  (Dkt. No. 45, Part 3, at 18 [Def.'s Mem. of Law in Supp. of Mtn. for Summ. Judg.].)  Again, Plaintiff does not oppose this argument.  (*See generally* Dkt. No. 58 [Plf.'s Mem. of Law in Opp. to Def.'s Mtn. for Summ. Judg.].)

As discussed above in Part III.A.1. of this Decision and Order, where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any required papers shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown.  Because Plaintiff has "consented" to Defendant's argument, the only remaining issue is whether Defendant has met its burden "to demonstrate entitlement to the relief requested" through that argument.  I find that Defendant has, at the very least, met this lightened burden.

Specifically, I find that Defendant's first argument (i.e., that Douglas Topliff's derivative action should be dismissed because he has failed to adduce any evidence in support of the underlying causes of action) is, at the very least, facially meritorious.  Moreover, with respect to Defendant's second argument (i.e., that Douglas Topliff's "loss of services" claim should be dismissed because he has failed to offer any proof as to the value of those services) is, at the very least, facially meritorious.  *See Devito v. Opatich*, 627 N.Y.S.2d 441, 442 (N.Y. App. Div. 2d

116

Dept. 1995) (affirming trial court's dismissal of parents' claim for loss of minor daughter's services because "there was no proof of loss of services").  In addition, I find that Plaintiff's "loss of companionship" claim must be dismissed because such a loss is not compensable under New York law.  *See Gilbert v. Stanton Brewery*, 295 N.Y. 270, 274 (N.Y. 1946) ("[T]he trial court erred in charging . . . that the mother was entitled to be compensated for loss of companionship of the infant daughter . . . ."); *Devito*, 627 N.Y.S.2d at 442 ("[T]he loss of [the parents'] minor daughter's society . . . is not compensable.") [citations omitted]; *White v. City of New York*, 322 N.Y.S.2d 920, 920 (N.Y. App. Div. 2d Dept. 1971) ("It was error to permit an award to the father for loss of his child's companionship. . . .  The loss of a child's society is not compensable.").

As a result, I grant Defendant's motion for summary judgment with regard to Douglas Topliff's derivative claim for medical expenses,  "loss of services," and "loss of companionship."

## IV.    MOTION TO BIFURCATE TRIAL

Defendant moves, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, for an order bifurcating the issue of its liability from the issue of Tanisha's damages.  (Dkt. No. 46.)  In light of the fact that I have determined that grounds exist upon which to grant Defendant's motion for summary judgment with respect to all of Plaintiff's claims, Defendant's motion to bifurcate is denied as moot.  However, if I were to reach the merits of Defendant's motion, I would grant it.

In support of its motion Defendant argues that (1) the evidence with respect to liability is separate and distinct from the evidence concerning damages, (2) Tanisha's substantial injuries will prejudice the jury's ability to objectively address liability, and (3) judicial economy and convenience will be advanced.  (Dkt. No. 46, Part 3 [Def.'s Mem. of Law].)  Plaintiff opposes

the motion, primarily on the ground that "the issues of liability and damages are intertwined." (Dkt. No. 58 at 8 [Plf.'s Mem. of Law]; *see also* Dkt. No. 54, ¶¶ 34-35 [Affid. of Robert Abdella].)  Tellingly, Plaintiff does not contest Defendant's compelling argument of prejudice if there were a single trial of all issues.  (*Id*.)

 With respect to the purported intertwined issues of liability and damages, Plaintiff initially argues that, in order to rebut one of Defendant's expert witnesses, Bruce Le Blanc, "doctors and nurses who treated the infant will testify as to her singed nasal hairs, which shows her proximity to the source of heat."  (Dkt. No. 58 at 8 [Plf.'s Mem. of Law].  First, given the Court's rulings above, it is not at all clear that Defendant would call Mr. Le Blanc as a witness.  Second, Plaintiff does not explain specifically how evidence of singed nasal hairs shows Tanisha's *proximity* to the source of heat (as opposed to the strength of that heat), not to mention what that proximity was.

 In addition, Plaintiff argues that Tanisha's "underpants did not melt or otherwise ignite, proving circumstantially that her underpants were made of a material far less flammable than that of the jogging suit she was wearing."  (Dkt. No. 58 at 8-9 [Plf.'s Mem. of Law].)  Assuming *arguendo* the relevancy of this evidence, the condition of Tanisha's underpants surely could be proven in a simple and straightforward manner, separate and apart from the issue of damages.

 Plaintiff also argues that Margaret Topliff was injured, and that evidence of this injury rebuts Mr. LeBlanc's opinion.  This argument is lost on the Court; at a minimum it appears to have nothing to do with bifurcation of the issue of Defendant's liability from the issue of Tanisha's damages.

 Finally, Plaintiff states that "[t]he jury needs to be assured that the garment was not

disposed of by the plaintiffs themselves [sic], but that it had to be scraped off and disposed of by the health care providers."  (Dkt. No. 58 at 9 [Plf.'s Mem. of Law].)  The Court is not aware of any claim of spoliation, but even if there were, the issue could be resolved far short of a full-blown single trial of all issues including damages.

Under the circumstances, and particularly given Defendant's compelling argument of prejudice, which Plaintiff has not contested, I would find bifurcation to be appropriate.  *See generally Witherbee v. Honeywell, Inc.*, 151 F.R.D. 27 (N.D.N.Y. 1993) (Scullin, J.).

**ACCORDINGLY**, it is

**ORDERED** that Defendant's to motion exclude the testimony of Plaintiff's expert Meyer Rosen (Dkt. No. 44) is **<u>GRANTED</u> in part and <u>DENIED</u> in part**, as discussed above in Part II of this Decision and Order; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 45) is **<u>GRANTED</u> in its entirety**, and that Plaintiff's Complaint is **<u>DISMISSED</u>**, for the reasons discussed above in this Decision and Order; and it is further

**ORDERED** that Defendant's motion to bifurcate the trial in this action into two trials, one trial on the issue of liability and the other trial on the issue of damages (Dkt. No. 46), is **<u>DENIED</u> as moot**; and it is further

**ORDERED** that the Clerk shall close this action.

Dated: March 22, 2007
Syracuse, New York

George H. Lowe
United States Magistrate Judge